# EXPERT ANTHONY GAMBOA
# (Economist)



**VOCATIONAL
ECONOMICS
INC.**

NATIONAL HEADQUARTERS 800-227-0198

4440 PGA BOULEVARD, SUITE 600, PALM BEACH GARDENS, FL 33410   561-472-0820

WWW.VOCECON.COM

January 23, 2014

Mr. Andrew C. Hall
Attorney at Law
Hall, Lamb and Hall, P.A.
2665 South Bayshore Dr
Miami, FL 33133

RE: Lakiba Palmer

Dear Mr. Hall:

At your request we performed an analysis on the loss of earning capacity sustained by
Lakiba Palmer as a result of her death due to a terrorist attack while stationed aboard the
USS Cole on October 12, 2000. We additionally considered the loss of her ability to
perform household services.

The loss of earning capacity sustained by Lakiba Palmer is in a range of $1,560,710 to
$2,351,931 stated in terms of present value. The low end of the range represents the loss
using the educational attainment of a high school diploma and a female worklife. The
high end of the range represents the loss using the educational attainment of some college
but no degree and a male worklife.

If personal consumption is considered, the loss is in a range of $1,041,893 to $1,545,034
stated in terms of present value. Personal consumption estimates use data from the
Bureau of Labor Statistics based on household size.

The economic value of household services that would have been performed by Ms.
Palmer from the date of her death through her life expectancy is $839,855 stated in terms
of present value.

The vocational economic assessment contains our conclusions regarding lost earnings as
well as the relevant factors supporting those conclusions.

The vocational economic rationale presents both the philosophy and the methodology
employed in assessing the loss of earning capacity. The method is used to assess earning
capacity in all cases. It is the standard employed by our firm in conducting a vocational
economic assessment.

The projections in this report are based on information received to date and may be updated upon receipt of additional information. Please advise if additional information is desired.

Sincerely,
VOCATIONAL ECONOMICS, INC.

For the Firm

Anthony M. Gamboa, Jr., Ph.D., MBA

Jacquelyn Vega Velez, MRC, MA, CRC

Ronald E. Missun, Ph.D.

/cr



**VOCATIONAL ECONOMICS INC.**

NATIONAL HEADQUARTERS 800-227-0198

4440 PGA BOULEVARD, SUITE 600, PALM BEACH GARDENS, FL 33410  561-472-0820

WWW.VOCECON.COM

# VOCATIONAL ECONOMIC ASSESSMENT
## FOR
## LAKIBA PALMER

| | |
|---|---|
| **Date of Report:** | January 23, 2014 |
| **Date of Birth:** | March 12, 1978 |
| **Age at Death:** | 22 |
| **Educational Attainment:** | High school diploma |
| **Work History:** | US Navy sailor |
| **Date of Death:** | October 12, 2000 |

### Case Comments

Upon your request, an assessment was made of Lakiba Palmer's loss of capacity to perform work and earn money as a result of her death on October 12, 2000. In conducting the assessment, information forwarded by your office was reviewed.

The information reviewed reveals Ms. Palmer to have been an individual with a high school diploma. Her husband, Avinesh Kumar, indicates that she intended to leave the Navy around 2001 and use her GI bill to pursue a degree from a two year technical school. Over her worklife, she functioned as a US Navy sailor.

In assessing loss of lifetime earnings, a variety of issues need to be considered. Assessment of lifetime earning capacity includes consideration of annual earning capacity and worklife expectancy. Once these are determined, present value is calculated. In considering the effects of Ms. Palmer's death on annual earning capacity and worklife expectancy, we used data from the US Census Bureau's American Community Survey (ACS).

### Annual Earning Capacity

Ms. Palmer's lifetime power to earn money is presented in a range based on two scenarios. In the first scenario, her earning capacity is represented by the average age-earnings that accrue to workers with a high school diploma.

In the second scenario, her earning capacity is represented by the average age-earnings that accrue to workers with some college education but no degree. For this scenario, Ms. Palmer is given two years to complete some college education, and then at age 26 her earnings are calculated with an initial cash flow like that of an average 24-year-old worker.

The earning capacities considered for Ms. Palmer are as follows:

### Table 1 Initial Cash Flow

|  | Initial Cash Flow |
| --- | --- |
| High School Diploma | $29,144 |
| Some College, No Degree | $30,449 |

All figures are stated in terms of 2014 dollars. In addition, fringe benefits are calculated at the national average rate of 27.2%, as reported in the U.S. Bureau of Labor Statistics publication "Employer Costs for Employee Compensation – September 2012."

### Worklife Expectancy

Ms. Palmer's worklife expectancies are presented in a range of four scenarios based upon her projected level of education and pattern of employment.

In the first scenario, Ms. Palmer's worklife expectancy is like that of an average female with a high school diploma and no disability.

However, it is unknown whether Ms. Palmer's worklife would have been more like that of an average female or an average male. In the second scenario, her worklife expectancy is like that of an average male with a high school diploma and no disability.

In the third scenario, her worklife expectancy is like that of an average female with some college education but no degree and no disability.

In the final scenario, her worklife expectancy is like that of an average male with some college education but no degree and no disability.

The worklife expectancies that follow are for females and males beginning at age 24 for the educational attainment of a high school diploma and age 26 for attainment of some college education:

### Table 2 Worklife Expectancy

| Source | Education Level | Disability Status | Female | Male |
| --- | --- | --- | --- | --- |
| ACS | High school diploma | No disability | 21.0 yrs. | 25.9 yrs. |
|  | Some college, no degree |  | 22.9 yrs. | 27.3 yrs. |

## Lifetime Loss

The attached Worklife Probability tables calculate Ms. Palmer's loss of lifetime expected earnings. The present value figures are unadjusted for either inflation or real wage growth and are stated in terms of present value. It is assumed that future increases in real wage growth will be offset by the real rate of interest or discount over the remaining life expectancy.

The table below summarizes Ms. Palmer's loss of earnings:

### Table 3a Loss of Earning Capacity

| Educational Attainment | Female Worklife | Male Worklife |
|---|---|---|
| High School Diploma | $1,560,710 | $1,946,357 |
| Some College, No Degree | $1,972,158 | $2,351,931 |

### Table 3b Loss of Earning Capacity, Personal Consumption Considered

| Educational Attainment | Female Worklife | Male Worklife |
|---|---|---|
| High School Diploma | $1,041,893 | $1,283,068 |
| Some College, No Degree | $1,312,287 | $1,545,034 |

## Household Services

In addition to the loss of lifetime earning capacity defined above, Ms. Palmer sustained a loss of capacity to perform a full range of household services.

An analysis of the replacement cost for household services is based on an estimate of the hours the individual would have spent performing various services absent death and an appropriate wage for estimating the replacement cost. The estimate of hours is based on data from the American Time Use Survey (ATUS) collected in 2003 through 2011. The ATUS, sponsored by the U.S. Bureau of Labor Statistics and conducted by the U.S. Census Bureau, is the first time diary study conducted by a federal statistical agency and the largest time survey ever taken in the United States. The average hours for household services are based on gender and age.

The analysis assesses the replacement cost needed, stated in terms of 2014 dollars, based on an estimate for the hourly wage of persons performing similar tasks.

The attached table summarizes the average number of weekly hours females spend performing household services and an estimated hourly wage for performing these tasks, which is $12. Based on this information, the estimated cost of household services is $839,855 from the date of death through Ms. Palmer's life expectancy.

The projections presented in this report are based on information received to date. Our analysis may be updated or changed upon receipt of new information.

# VOCATIONAL ECONOMIC RATIONALE

In cases of permanent disability or death, a lifetime loss of future earning capacity results. A Vocational Economic Assessment (VEA) defines the loss in terms of present value. This Vocational Economic Rationale (VER) presents both the philosophy and the methodology employed in these assessments. It is the standard employed by Vocational Economics, Inc. in conducting a VEA.

## Introduction

The U.S. Supreme Court's decisions in *Daubert* (1993) and *Kumho* (1999) require that expert testimony meet the general tests of "reliability" and "relevancy." The Court, however, has recognized the inexact nature of assessments for lost earnings. In *Jones and Laughlin Steel v. Pfeifer* (1983), the Court stated that:

> By its very nature the calculation of an award for lost earnings must be a rough approximation. Because the lost stream can never be predicted with complete confidence, any lump sum represents only a "rough and ready" effort to put the plaintiff in the position he would have been in had he not been injured.

Thirty years after the *Jones and Laughlin Steel v. Pfeifer* case, one might argue that improved Census Bureau data enable the expert to provide an empirically-based "rough and ready" effort to make the plaintiff economically whole. However, the expert opinion is still an estimate. It is not an absolute statement of what will occur for a plaintiff. No such opinion could ever be stated; rather, the expert defines what probability data tell us about persons most like the plaintiff, using both the best data available and clinical judgment. It is up to the trier of fact to make the ultimate decision as to what is most probable for the plaintiff in terms of future loss of earning capacity.

A VEA is a forecast of future lost earnings. In conducting the assessment, vocational and economic experts consider the unique characteristics of the individual being assessed in combination with relevant career development and economic theory. Experts apply population statistics to individuals to predict a variety of future probable occurrences.

As noted by Marcia Angell in *Science on Trial* (1997, 115):

> Courtroom trials are not about populations, they are about individuals. . . . We have no basis, at least in the current state of knowledge, for making a judgment about a particular woman. We therefore must appeal to epidemiological data – that is, studies of populations.

As stated by Gibson (2001, 21), "Statistical averages have long been accepted as a means for prediction – life expectancy, earnings, and others – and have long been accepted for use in the courts. No statistic, no matter how fine-tuned, can provide an exact predictor of an individual's

future." Nonetheless, utilizing statistical methodologies is a powerful method for arriving at a more empirically-based opinion.

Earnings proxies and worklife expectancies are derived from average rates for various populations. Experts use available statistics about populations and apply them to meet the specifics of the case by considering how earnings or worklife expectancy statistics match the plaintiff's circumstances and characteristics. Data are used by persons who understand the principles on which they are based and the population to which they are applied.

The purpose of this VER is to define the principles underlying assessments of lost earnings as well as the methodology employed in conducting a VEA. A previous edition of this VER has been published in its entirety in the peer-reviewed journal *Estimating Earning Capacity: A Journal of Debate and Discussion* (Gamboa, Tierney, et al. 2009).

## Meeting *Daubert* and *Frye* Criteria

*Daubert* (1993), as expanded by the subsequent *Kumho* (1999) decision, requires that all expert testimony meet the general tests of "relevancy" and "reliability." Quantifying lifetime expected earnings requires exploration of expected annual earnings and worklife expectancy based in scientifically sound estimates. Since use of statistics discussed in this rationale is for measurement of these variables, it is assumed that the relevancy criterion is met (Gibson 2001).

With regard to "reliability," the Court held that scientific evidence must be "grounded in the methods and procedures of science." *Daubert* provides four flexible factors to determine if the evidence qualifies: testing, peer review and publication, error rates and standards controlling the technique's operation, and general acceptance in the relevant community. As updated by *Kumho*, the court stressed that not all factors may apply with every case, especially in the social sciences. The factors serve as flexible guidelines to assure the expert employs the same level of intellectual rigor as he or she would outside the courtroom when working in the relevant discipline.

## Testing

The scientific testing criteria are principally directed at the "hard" sciences and engineering, and have less significance for vocational and economic testimony, which focuses on the future experience of people, which can never be tested or known with absolute certainty. However, data from the American Community Survey (ACS) and Annual Social and Economic Supplement (ASEC) are produced and extensively tested by the U.S. Department of Commerce, Bureau of the Census. Sum and other researchers from the Center for Labor Market Studies at Northeastern University (2010) independently verified the worklife values contained within the *Gamboa Gibson Worklife Tables* (Gamboa & Gibson 2010). The worklife expectancies contained within the tables were congruent with the data examined by the center.

## Peer Review and Publication

Use of the underlying ACS and ASEC data to measure earnings and employment is the subject of multiple published and peer reviewed articles. A bibliography including over 100 publications using the ACS and/or ASEC data can be found at www.vocecon.com/resources/bibliography.aspx.

Both government and non-government researchers rely on the ASEC employment rates and earnings figures for nonforensic purposes. For example, Hoynes (1998) published an article through an academic research center using 1975 to 1997 data to study the effect of business cycles on the employment and earnings of high skilled and less skilled workers. Ilg and Haugen (2000), employees of the U.S. Bureau of Labor Statistics (BLS), use ASEC data to look at the relationship between employment and earnings trends during the 1990s for high-, middle-, and low-paying job categories. Another BLS employee (Meisenheimer II 1992) used ASEC data to study the employment experiences of immigrants.

## Error Rate

The error rate is primarily intended to apply to the "hard" sciences and engineering in conjunction with the testing performed in those disciplines (e.g., reliability of a bolt securing a heavy sheet of metal). One can, however, compute the standard error of a worklife expectancy using the formula for the standard error of acceptance. The large sample sizes of the ACS and ASEC surveys assure low standard error rates. Sample size and its relationship to reliability are discussed further in the "Reliability" section below.

## General Acceptance in the Relevant Community

The *Daubert* test (as well as the *Frye* decision (1923) still used in many states) requires experts to apply generally accepted methodology. Proof that the ACS and ASEC data meet this burden is offered through the multiple peer reviewed and other publications cited throughout this document. The "relevant community" is the community of researchers who rely on both ACS and ASEC data to measure earnings and employment levels for various groups of the population.. By way of example, Farber (2005) regularly uses information from the CPS in assessing the experience of displaced workers, while Fullerton (1999) uses labor force participation data from the CPS to account for differences among races and the sexes. Further, a thorough examination of the *Monthly Labor Review* published by the U.S. Bureau of Labor Statistics reveals several forensic and nonforensic authors citing ASEC and ACS data in their research. "Each month, economists, statisticians, and experts from the Bureau join with private sector professionals and State and local government specialists to provide a wealth of research in a variety of fields."[1]

---

[1] *Monthly Labor Review* online, About Monthly Labor Review Online, http://www.bls.gov/opub/mlr/about.htm

Revised 7/31/2013 © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

## Validity

One issue is the question of the validity of ACS and ASEC data in estimating earnings and employment levels. Validity refers to whether or not the data collected measure what they are designed to measure, i.e., earnings and levels of employment. If we were talking about a test, then the question would be, "Does the instrument test what it is intended to test?" If we are talking about sampling, then the question would be, "Does the sample accurately reflect the population in question?"

There are different types of validity, but the over-arching type is construct validity. In a VEA, the constructs in question are the earnings and employment levels of the various populations. The question is, "Do the samples of data we have at hand (ACS and ASEC) accurately measure the earnings and employment levels of persons, for instance, with various levels of educational attainment?"

In order to assess the accuracy of the data, we look at other types of validity: face validity and content validity. Face validity refers to the extent to which the sample looks like the population in question. Content validity in this context refers to the questions asked of the participants in the sample, namely their earnings and employment history.

The ACS and ASEC have both face validity and content validity in that the samples are taken from populations of individuals who have known levels of educational attainment, and these individuals are questioned about their employment and earnings. There is also convergent validity, in that the two data sets that purport to be assessing/measuring the same construct are in agreement to an acceptable degree.

Both the ACS and ASEC samples are in agreement in very important dimensions. Both sets of data show that earnings and employment levels for individuals with different educational attainment are in the direction that is expected. Those with lower attainment show lower earnings and lower levels of employment than individuals with higher attainment. It can also be concluded that the ACS and ASEC data have concurrent validity, in that the data have the ability to distinguish between two groups that should theoretically be different, e.g. those with a high school diploma vs. those with a college degree.

One should note that validity is always a matter of degree and not a black or white issue. Validating a construct/theoretical relationship is always a matter of degree. For example, even before the ACS data were published, judgments and decisions were made based on ASEC data. The ACS data could be considered a further refinement and validation of the theoretical relationship between earnings, employment, and educational attainment.

## Reliability

Another issue is the question of the reliability of ACS and ASEC data in estimating earnings and employment levels. Reliability refers to the consistency or the repeatability of a measurement operation. For example if we were measuring the intelligence of an individual, we would want to obtain the same IQ score or nearly the same IQ score each time the individual was evaluated using the same test of intelligence. Likewise, if we take repeated samples of a defined

population of people, we would hope to obtain similar scores for each sample. It is important to note that high reliability does not necessarily mean high validity. There can be high reliability, but no validity. For example, we might obtain highly reliable and consistent measures of swimming speed, but these data would not be valid with regard to the mathematic ability of the swimmers. Reliability is necessary, but it is not a sufficient condition for validity. Reliability refers to the precision of measurement of a sample; validity refers to the accuracy of the sample in representing the characteristics of the population.

In assessing reliability, the size of the sample is of critical importance. The larger the sample size is, the more inclusive and representative the sample becomes of the general population. Therefore, opinions and conclusions based on the data can be drawn with a higher degree of confidence that the results would match a census of the general population. Both the ACS and ASEC use very large samples. The sample size of the ASEC is more than 100,000 individuals annually. The ACS sample size is in excess of three million. Therefore, it would be expected (and is true) that the potential error would be extremely small for both sets of data, and the overall data sets would be expected to be highly reliable.

## Issues in Validity and Reliability

It must be stressed that by its very nature statistical data always have limitations. Many times, the limitations of statistical data can be improved by collecting still more data. For example, the methods by which individuals are classified as being disabled or nondisabled and degree or type of disability could be investigated from the standpoint of inter-rater reliability, which measures the consistency of the individuals doing the judging or categorizing of persons with a disability. Likewise, a longitudinal study following a group of individuals over a lifetime of work could provide a goldmine of useful data. However, the factors limiting such data-collection projects are always time and costs. It would take upwards of 40 years to complete the longitudinal study contemplated in this paragraph.

In the meantime, the ACS and ASEC data sets are the largest and best available for measuring earnings and employment levels. A qualified expert must understand the nature of the data and exercise clinical judgment specific to the individual being evaluated. It is the combination of understanding the data and clinical judgment that can best aid the trier of fact.

It is generally accepted that rational decision-making requires the use of both probability statistics and professional judgment (Rubin 2003). While the U.S. Census data that emanate from both the ACS and ASEC provide an excellent data source for defining both earnings and employment levels, applying the data to a specific individual requires a thorough understanding of the data in combination with an understanding of the unique traits and characteristics of the individual. Professional judgment by the forensic expert is necessary to determine from which population to draw the statistics to measure the expected earnings and employment rates of a given plaintiff.

## Earning Capacity

The first decision point in a VEA requires the expert to define earning capacity.

## Defining Earning Capacity

In order to perform a VEA, it is necessary to first understand the concept of earning capacity. Surprisingly little has been written in the forensic vocational or forensic economic literature on the topic of earning capacity. Horner and Slesnick (1999) discuss the concept and the need for a dialogue on the topic. In assessing earning capacity, they discuss the concepts of actual earnings, expected earnings, and earning capacity. These three concepts provide a framework for determining a loss of earning capacity in personal injury litigation. In response to their article, Tierney and Missun (2001) define earning capacity from the perspective of a process model. They indicate, "It differs from traditional models by forsaking the essentialist categories of actual earnings, expected earnings, and earning capacity as commonly defined . . . It focuses on the process applied in assessing lost (future) earnings from which the earning capacity of a particular individual can emerge." Field (2008) provides a historical analysis of future earnings from the perspective of a five-fold venue, one of which is earning capacity.

Earning capacity is a term used by the courts to identify one component of monetary damages associated with a permanent impairment resulting in disability. Earning capacity differs from wage loss. Wage loss is retrospective, while earning capacity is prospective. Wage loss occurs when an employed individual is unable to continue employment in his or her occupation. It is typically a temporary condition.

Estimating earning capacity over a lifespan requires an analysis that is both vocational and economic in nature. The VEA is a three-step process. It requires a definition of each of the following: earning capacity, worklife expectancy, and a present value calculation.

Earning capacity represents an individual's ability or power to earn money. It is the sum total of what one brings to the marketplace intellectually and physically. Education, skills, general learning ability, and the like comprise intellectual capacity. Ability to perform the physical activities associated with various jobs constitutes physical aptitude. These physical and intellectual attributes comprise human capital, and it is this human capital that enables a person to produce cash flows over a worklife.

## Human Capital

The courts generally acknowledge that something other than wage loss must be compensated for if the individual was likely to have future earnings. If the courts ignored potential to earn and focused on wage loss alone, infants, children, or young adults with a nonexistent or limited earning history would be unable to recover monies likely to be lost as a result of death.

Revised 7/31/2013   © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

The language used by the court is synonymous with what economists call human capital. Capital is anything that produces wealth. It can be $100,000 invested in a certificate of deposit earning five percent per year or the same amount of money invested in ten, $10,000 lawn mowers. Each represents a form of capital, with the mowers requiring workers before a return on the investment is realized after expenses associated with labor and equipment are considered.

Human capital is defined by economists as the acquisition of knowledge, skill, and understanding as a result of education, training, and experience that allows an individual to sell his or her services in the marketplace in exchange for wages and fringe benefits.[2] The predictors of human capital are two-fold: intelligence and physical ability. These precursors were first introduced and defined by Gamboa in Thomson West (2006) and serve as the most fundamental building blocks of human capital. Each of the twelve-thousand plus occupational titles contained in the *Dictionary of Occupational Titles* (DOT) are identified as having one of five different levels of general learning ability or intelligence in order for the specific occupation to be performed satisfactorily by a worker (National Academy of Sciences, Committee on Occupational Classification and Analysis 1981). While these definitions are subjective estimates made by employees of the U.S. Department of Labor, they serve as a superb estimate of probable level of intellectual capacity needed for the thousands of occupations identified in the DOT.

There is a strong positive correlation between the variables intelligence, education, skill level, and earnings. Herrnstein and Murray (1994) do an excellent job of examining the relationship among these variables and earnings. Similarly, Gladwell (2008) notes that the higher the IQ score, "the more education you'll get, the more money you're likely to make, and – believe it or not – the longer you'll live." Gamboa and Gibson (2006) note that these same variables increase both earnings and worklife expectancy. The length of employment over the life expectancy adds significantly to lifetime earnings.

Intelligence and physical ability, the precursors to human capital, are used to define earning capacity loss in cases involving infants or children too young to be tested. Absent testing, parental level of educational attainment can be used as an estimate of the infant or child's capacity to complete formal education. There is a positive correlation between intelligence and level of educational attainment. Another approach involves IQ testing by a psychologist familiar with the statistical techniques used to account for regression toward the mean. By IQ testing of each biological parent, a specific IQ score can be used for an infant or child. However, either the education approach or the IQ testing approach is acceptable as an estimate of infant or child level of general learning ability.

Occupations require varying degrees of physical capability. Some occupations require physically strenuous activity while others require little to no physical exertion. The U.S. Department of Labor identifies a myriad of physical demands associated with the occupational titles contained in the DOT. Generally speaking, the occupations range from sedentary to very heavy and include a variety of exertional activities such as climbing, bending, reaching, prolonged standing, etc.

---

[2] http://economics.about.com/cs/economicsglossary/g/human_capital.htm

Revised 7/31/2013 © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

The development of human capital relies upon the two fundamental building blocks, intelligence and physical ability. Reduction or diminution of either of these two components of human capital is synonymous with a decrease in investment capital. A decrease in capital decreases the return on investment (ROI) whether it be human capital or investment capital. If the $100,000 CD is reduced to $20,000, the ROI at five percent is reduced to $1,000.

## Assessing Earning Capacity

Earning capacity is the usual standard for defining lost earnings. Earning capacity is sometimes defined as the "high end" of what a person can earn, in terms of both the annual salary and the number of years worked over a lifetime. The courts, however, usually do not accept damage arguments that would push the concept of earning capacity beyond the bounds of common sense. Our approach in assessing earning capacity is to look at the individual's reasonably expected earnings.

The process of analyzing a case involves answering a series of questions, with each question having several options. Through the process of answering these questions, an individual's earning capacity will emerge. In assessing an individual's annual earning capacity, the choices are to use either actual earnings or a proxy. In most instances, a mature worker's actual earnings are congruent with future lifetime earning capacity. In cases where historical earnings are used to measure future earning capacity, an individual's historical earnings must be restated to present day dollars for proper comparison. Important sources of information are available from the U.S. Bureau of Labor Statistics:

- Consumer Price Index, All Urban Consumers (CPI-U) (2012)
- Major Sector Productivity and Costs Index: Business Sector, Hourly Compensation (2012)
- National Employment, Hours, and Earnings: Average Hourly Earnings of Production Workers (2012)

However, younger workers rarely have earnings that reasonably represent an average lifetime earning capacity. Vocational theorists note that individuals typically go through a series of stages before settling into a career. Young children and adolescents experience a fantasy stage (the young child desires to be a policeman, trapeze artist, etc.). In late adolescence and early adulthood, an individual experiences a period of exploration at which time a variety of career options are explored, assessed, and evaluated (college students changing majors exemplify the exploration process). As the worker matures, he or she tends to become established in a career. One then proceeds through a period of maintenance and, finally, decline (Ginzberg, et al. 1951) (Super 1957).

This vocational process of career development is conceptually related to the economic concept of the Age-Earnings Cycle. There is obviously a high correlation between age and earnings in that earnings tend to increase as the worker ages because experience enhances productivity, and more productive workers earn a premium in the labor market. It should be noted that the ability to be productive is based on the acquisitions of skill, the intellectual and physical aptitudes that one brings to the marketplace, and, of course, the level of educational attainment achieved by the worker.

Revised 7/31/2013   © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

Proxy earnings may be specific to the worker's education level, occupation, or to the labor market, as well as to the worker's gender, disability, and/or age. Proxy earnings can be found in the Occupational Employment Statistics from the U.S. Bureau of Labor Statistics (2012). Data from the ACS (U.S. Census Bureau 2011) and ASEC (1998 forward) surveys can also be used to calculate average earnings of individuals by gender, level of educational attainment, and by disability status. In addition, beginning with the 2005 ACS, national average earnings can be calculated by occupational grouping, and state and local averages can be calculated by gender, education level, and disability status.

Once the expert establishes annual earning capacity, appropriate fringe benefit and worklife expectancy values are applied to project lifetime earnings. Either actual fringe benefits or a statistical average is used. Statistical averages for fringe benefits may be derived from the U.S. Bureau of Labor Statistics' *Employer Costs for Employee Compensation* (2013). Another source for health care coverage emanates from the Kaiser Family Foundation's health insurance survey (2012).

# Worklife Expectancy

The second decision point in a VEA requires the expert to define pre- and post-injury worklife expectancies.

## Defining Worklife Expectancy

Worklife expectancy is a statistical average, derived by summing a series of joint probabilities of life, participation, and employment (LPE) from a given age through age 89.[3] The notion of worklife expectancy is not unique to the forensic setting, as evidenced by the various articles by Millimet et al., referencing ASEC data (Millimet, Nieswiadomy and Slottje 2010) (Millimet, Nieswiadomy and Ryu, et al. 2003). The worklife methodology used in VEAs was introduced as the LPE method by Brookshire and Cobb (1983) and refined by Brookshire, Cobb, and Gamboa (1987) to include persons with a work disability. With this methodology, a person's earning capacity is reduced by the probability of being alive and employed.

The notion of discounting an individual's future earning capacity by the probability of being alive and employed first appeared in an appellate court decision entitled O'Shea v. Riverway Towing (1982) written by Richard A. Posner. In commenting on the plaintiff's before injury expected earnings, he notes:

> If the probability of her being employed as a boat's cook full time in 1990 was only 75 percent, for example, then her estimated wages in that year should have been multiplied by .75 to determine the value of the expectation that she lost as a result of the accident; and so with each of the other future years.

In terms of assessing after injury expected earnings, he describes the following:

---

[3] An explanation for the LPE methodology is provided on the Vocational Economics website (http://www.vocecon.com/resources/ftp/data/lpecalc.pdf).

Revised 7/31/2013  © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

Here is a middle-aged woman, very overweight, badly scarred on one arm and one leg, unsteady on her feet, in constant and serious pain from the accident, with no education beyond high school and no work skills other than cooking, a job that happens to require standing for long periods which she is incapable of doing. It seems unlikely that someone in this condition could find gainful work at the minimum wage. True, the probability is not zero; and a better procedure, therefore, might have been to subtract from Mrs. O'Shea's lost future wages as a boat's cook the wages in some other job, discounted (i.e., multiplied) by the probability-very low-that she would in fact be able to get another job. But the district judge cannot be criticized for having failed to use a procedure not suggested by either party. The question put to him was the dichotomous one, would she or would she not get another job if she made reasonable efforts to do so? This required him to decide whether there was a more than 50 percent probability that she would. We cannot say that the negative answer he gave to that question was clearly erroneous.

The opinion reflects a "better procedure" for estimating future expected earnings – that of utilizing probability statistics to better define future expected earnings in assisting the trier of fact. The O'Shea case involves a woman with a severe work disability. The probability of employment for a 57-year-old female high school graduate with a severe work or physical disability is .052 or .118, respectively, compared to a probability of employment of .632 or .667 for a female of the same age and education with no disability (Gamboa and Gibson 2010).

## Assessing Worklife Expectancy

Because worklife expectancy is a statistical average, exercising professional judgment is essential when defining probable worklife expectancy in years. Worklife expectancy is specific to gender, career pattern, education, age, and disability.

When assessing worklife expectancy, it is important to consider the individual's work history. Typically, males have worklife expectancies that are greater than females. However, a specific female may demonstrate a work pattern that is more like that of an average male of the same age and level of education than that of a female. Similarly, some males may exhibit a pattern of work that is unlike that of an average male with a similar age, education level, and disability status. The specifics of each individual must be considered when assigning worklife expectancy.

# Present Value of Future Lost Earnings

The last decision point in a VEA is the statement of future loss of earnings in terms of present value. Present value in a litigation context specific to loss of earning capacity refers to the amount of money needed today which, when prudently invested, will replace a future stream of lost earnings. The present value sum plus accumulated interest should provide periodic cash payments to replace the expected lost earnings over the plaintiff's worklife expectancy, with no shortfall or overage.

The calculation of present value considers two facts. The first fact is earnings tend to increase over time. For example, the average teacher in 2009 is likely to earn less than the average

Revised 7/31/2013  © Copyright 2013 Vocational Economics, Inc. Vocational Economic Rationale

teacher in 2019. As a result, present value of future lost earnings must consider the fact that earnings are likely to increase over the time period that losses are projected. The annual rate of increase is often referred to as the growth rate.

The second fact concerns a financial consideration. If an amount of money is invested today for future lost earnings, interest can be earned from investing this money before the loss occurs. For instance, money in-hand today to compensate for loss of earnings as a teacher in 2019 should also consider interest that can be earned from investing this money until 2019. The interest rate used to reduce loss of future value earnings to present value is often referred to as the discount rate.

Growth and discount rates can either be stated as "nominal" or "real" rates. Nominal rates include inflation while real rates are net of inflation. For example, suppose in a particular year the general rate of inflation as measured by the Consumer Price Index (CPI) is 3%, and an investment yields a 5% rate of interest. The nominal rate of interest is 5%. However, there would only be a 2% gain in terms of the real purchasing power of the money earned because inflation has also risen at 3%. The real rate of interest in this example would be 2%. Likewise, a person with a 5% increase in earnings in a year when the general rate of inflation was 3% would have a 5% nominal and 2% real growth in earnings. Present value calculations can either be performed with real or nominal rates. Both approaches are acceptable for computing the present value of a future stream of lost earnings.

## Growth Rate for Compensation

Before selecting a growth rate, one must consider precisely what is being grown. There are a number of fairly common misunderstandings in this regard that deserve mention. For example, some attorneys refer to the growth rate as "inflation." The word inflation in the field of economics typically refers to an increase in consumer prices, as measured by the CPI. The rate of increase in the CPI may not be the same as the rate of growth in earnings since consumer prices and a worker's earnings are different variables.

Another common misunderstanding is the belief that the growth rate is the rate of increase in wages. Since a "lost earnings" analysis considers both base wage and fringe benefits, the growth rate should consider both components. Fringe benefits such as health coverage and retirement have an economic value, which is part of what a person earns in exchange for their employment. A person may have an economic incentive to accept a lower paying job because it offers better benefits. In other instances, a person may have an economic incentive to accept a job with no benefits, other than those that are legally mandated, if they are compensated with relatively high wages. For these reasons, total compensation (wages plus benefits) is generally the appropriate variable to examine when discussing what is often referred to as growth in earnings.

Figure 4 on shows historical rates of growth for inflation, wages, and total compensation, all from the U.S. Bureau of Labor Statistics. The data summarized in Figure 4 show that the rate of growth in total compensation has consistently outpaced both inflation and wage growth for short-term as well as long-term time periods. Thus, any analysis of lost earnings conducted during those periods that used a growth rate measured by wages only, would have underestimated the actual growth.

Revised 7/31/2013  © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

Having decided to examine compensation data, instead of inflation or wage data, the next step towards choosing a growth rate is a selection of historical time period(s) that should be considered for the assessment. Averages for different time periods will obviously result in different average nominal and real rates of growth for compensation.

Future projections are made with uncertainty to the future state of the economy. For example, no one could say with great certainty whether or not inflation will be relatively high or low ten years from now, whether or not our economy will be in a recession at that time, etc. For these reasons, a reasonable and fair estimate of the future rate of growth in total compensation should generally be based on long-term data for average growth in total compensation. Long-term averages cover many years, including years of recession and strong economic growth as well as years with high and low levels of inflation. The same time periods examined for compensation growth should be reviewed for interest rates used to discount an award to present value, as discussed in the following section. Therefore, the selection of historical time period(s) to consider for future compensation growth must also be appropriate for choosing a fair and reasonable discount rate.

## Interest or Discount Rate

The next step in computing present value is to reduce the future cash flow values for interest the plaintiff can earn by investing a lump-sum award. That is, we must reduce the future value of projected cash flows for the interest the plaintiff can earn since the damages award is in advance of the anticipated occurrence. Choice of the rate used to measure interest is critical since the higher the assumed interest rate, the larger the reduction and the lower the needed lump-sum award.

Finance theory refers to this process as *discounting* and the rate applied as the *discount rate*. Further, such theory recognizes that discount rates are comprised of expected inflation, a real rate of return, and a risk premium. Whether valuing business income, a potential investment, or future wages, theory requires that the rate used reflect the overall riskiness of the measured cash flow. Valuation of lost future compensation is not measurement of a speculative investment, but the replacement of the bread and butter the plaintiff is putting on the family table. As such, the risk premium component should be valued at zero.

This is similar to the approach proposed by Brody over thirty years ago (Brody 1982). Further, this approach is consistent with that prescribed by the U.S. Supreme Court (Jones and Laughlin Steel Corporation v. Howard E. Pfeifer 1983), in which they dictate use of the "best and safest investments" and a "risk-free stream of earnings."

With the intent of applying a risk-free discount rate, we must determine the best instrument to measure this rate. Risk of debtor default brings increases in interest rates to compensate the creditor for the risk assumed. Thus, the instrument used should bear no such risk. Experts agree that the closest instruments to being free of such risk are the bonds and bills issued by the United States Treasury. However, our search for a risk-free rate does not stop with identification of the issuer of the instrument. The Treasury offers many forms and durations of debt instruments. Consider two extremes presented in Figure 4 debt instruments with 91-day and 10-year maturities. As shown, longer-term commitments regularly command higher interest rates, despite the fact that both bear the same risk of default, considered to be zero. Investors

Revised 7/31/2013  © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

command a premium to compensate for the long-term commitment and the inherent risks associated with it, including the risk of inflation.

## Figure 1 Key Growth and Interest Rates[4]

| Period | Inflation | Wage Growth | Compen. Growth | 91-Day | 10-Year[5] |
|---|---|---|---|---|---|
| 60 years (1952-2012) | 3.7% | 4.2% | 5.2% | 4.8% | N/A |
| 50 years (1962-2012) | 4.1% | 4.3% | 5.3% | 5.3% | N/A |
| 40 years (1972-2012) | 4.4% | 4.1% | 5.1% | 5.4% | 7.0% |
| 30 years (1982-2012) | 2.9% | 3.1% | 3.8% | 4.3% | 6.2% |
| 20 years (1992-2012) | 2.5% | 3.1% | 3.4% | 3.0% | 4.8% |
| 10 years (2002-2012) | 2.5% | 2.8% | 3.1% | 1.6% | 3.7% |
| 5 years (2007-2012) | 2.1% | 2.6% | 2.2% | 0.3% | 2.9% |

The risk of inflation arises because interest rates and note values change with inflation. As shown in Figure 4, interest rates rise and fall with inflation. If an investor buys a 10-year note in a period of low inflation, a rise in inflation will decrease the value of the investment and the real rate of return. As noted by Pelaez (1995), discounting lost earnings by a long-term rate is asking the plaintiff "to accept risk in order to reduce the tortfeasor's liability."

In addition, multi-year Treasury instruments can carry a tax disadvantage for the buyer. Some Treasury instruments pay no interest until maturity. However, an imputed annual interest amount[6] is required to be realized as taxable income, resulting in annual tax payments before receipt of any cash flow from the investment. Standard long-term Treasury notes do pay interest every six months. However, even these may have a hidden tax disadvantage, since adjustment of a bond's face rate to the rate commanded by financial markets is achieved by paying more or less than the face value of the bond or through an "Original Issue Discount." This difference is also amortized over the life of the bond and realized as an adjustment to interest earned. Thus, in cases where the market rate exceeds the face rate, the buyer will pay less than the face value of the bond and pay taxes on the annual amortization even though the actual cash will not be received until the bond's maturity.

---

[4] Rates shown are the geometric averages for the identified periods of time using data from the following sources:
- U.S. Bureau of Labor Statistics - Inflation (Consumer Price Index, All Urban Consumers (CPI-U), U.S. City Average 2012) , Wage Growth (Major Sector Productivity and Costs Index: Business Sector, Hourly Compensation 2012), and Compensation Growth (National Employment, Hours, and Earnings: Average Hourly Earnings of Production Workers 2012)
- Federal Reserve Bank – 91-day Treasury Bill (3-Month Treasury Bill (Secondary Market). Averages of 1947 to 2012 2012) and 10-year Treasury Note (10-Year Treasury Bond, Averages of 1962 to 2012 Daily Prices 2012).

[5] 10-year Treasury Bonds did not exist until 1962.

[6] This imputed interest is known as *accretion*.

Revised 7/31/2013  © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

As a preferred alternative, short-term rates such as the 91-day Treasury Bill[7] provide the same protection against the risk of default. Moreover, they provide the added protection against inflation risk by cycling maturities to meet needed cash flows and avoid the tax disadvantages of long-term bonds. Choice of a 91-day Treasury as a measure of the risk-free discount rate is supported in financial literature and in forensic economic articles such as Pelaez (1989), Lawlis and Male (1994), and Altmann (2002).

Some alternatives occasionally proposed by other experts include the following:

- **Long-term Treasury Notes or Bonds** – As discussed above, these instruments all provide greater risk from inflation and may present tax disadvantages.
- **Treasury Inflation-Protected Securities (TIPS)** – Issued by the United States Treasury, TIPS bonds have an appeal of offering an instrument with no risk of default that is also protected against inflation. However, the market for these relatively new instruments is still imperfect as noted in many articles including Shen and Corning (2001) and Kopcke and Kimball (1999). This has even resulted in negative inflation-adjusted yields (Gongloff 2008).
- **Municipal Bonds** – High-grade debt instruments may provide less risk than the corporate bond market. However, as demonstrated in past financial crises and likely in the current economic environment, they are far from the level of protection offered by U.S. Treasury instruments.
- **Stock Market** – Although some may proffer discount rates derived from general stock market returns, in no event can these be considered to meet the requirements of risk-free rates, regardless of the stature of the companies included. This is certainly demonstrated by the market performance in the economic crisis that began in 2008.

Thus, in our opinion, at the time of this writing, the nature of claims and known court guidelines mandate use of a risk-free discount rate when valuing lost earnings. The best measure of this rate is offered by a 91-day Treasury bill.

## Present Value Calculation

There are two important variables to be considered in arriving at the present value of a future loss of earning capacity. The first is the growth factor to be used. The second is the discount factor. If the growth factor is greater than the discount factor, a net negative discount results. If a pure offset, also referred to as a net neutral discount, is used to arrive at present value, the growth factor is equal to the discount factor, resulting in a present value sum less than the value achieved if a net negative discount is used. A third approach to arriving at present value is referred to as a net positive discount. The discount factor is assumed to be greater than the growth factor, resulting in a present value sum less than the value achieved if a net neutral discount is used.

---

[7] We note that the U.S. Treasury also offers instruments of even shorter duration: 4-week Treasury Bills. These instruments have only been available since 2001, so they do not have a long-term measurable trend. However, in their tenure, they generally have a rate of return comparable to 91-day Treasury Bills.

Revised 7/31/2013 © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

The standard methodology employed in arriving at a present value calculation embraces the following formula:

$$PV = \sum CF\left(\frac{1+G}{1+D}\right)n$$

PV = Present Value

$\sum$ CF = Summation of the cash flows

G = Growth rate for compensation

D = Discount rate of interest rate

$n$ = years of compounding and discounting

All present value calculations utilize the same methodology. Different present value sums are derived as a function of the growth and discount factor used. When a pure offset is used, the growth and discount factors are set as equal to one another. The effect neutralizes the future cash flows resulting in a net neutral discount. Therefore, the summation of each of the future cash flows stated in terms of today's dollars becomes the present value.

Economic literature provides substantial support for a total offset to value lost earnings. Altmann (2002) reviews historical cycles and notes that any disturbance between equilibrium of growth and discount rates tends to be temporary due to "powerful economic forces" that cause the net discount rate to regress to 0%. Lawlis and Male (1994) found a random walk relationship between growth and interest and held that a total offset is the least potentially biased net discount rate.

Brody (1982) observed that with risk held to 0%, the only factors to consider are productivity gains (growth) and the real interest rate. He held that a total offset had been the most accurate net discount rate in the preceding twenty years.

Carlson (1976) noted that when inflation is fully anticipated by the financial and labor markets, wage increases and bond yields were essentially equal. He held that use of a total offset was not only accurate but eliminated much of the confusion generated in courtrooms debating the appropriate rates, classifying such debate as "just plain silly and unnecessary."

Peleaz (1989) found a total offset to be a "robust alternative to the pursuit of illusory exactness based on time consuming calculations and dubious prognostications." In a subsequent article, Peleaz (1995) affirmed the total offset's superiority when considering real interest and growth rates.

Schwartz and Thornton (1991) affirmed much of the above observations. Schwartz (1997) updated his opinions, noting the fallacy of trying to measure movements of earnings and interest rates on short-term trends. He held "over the longer run, the relation between the basic real interest rate and the productivity growth rate does seem to approach equality." Schwartz (2000) affirmed his findings yet again a few years later, noting that use of a total offset is not only fair, but efficient because of its ability to reduce many complications and costs of litigation.

More recently, Stern (2005) confronted the myths associated with "discounting to present value." He provides examples of why it is not necessary to reduce a future earnings loss below the value of today's dollars.

## Summary

The attached VEA conforms to the principles identified in this VER.  The lifetime loss of earning capacity is derived through a three-step model involving a definition of earning capacity, worklife expectancy, and a present value calculation.  Each step in the assessment pertaining to lifetime earning potential is geared to the unique traits and characteristics of the individual. The present value of the lost earnings is an estimate of the measurable economic damages sustained by the individual.

# Bibliography

Altmann, James L. "Extreme Volatility in Interest Rates and Earnings Growth Rates: The Bane of Forensic Economists." *Journal of Business Disciplines* III, no. 1 (2002): 31-41.

Angell, Marcia. *Science on Trial: The Clash of Medical Evidence and the Law in the Breast Implant Case.* New York, NY: W.W. Norton & Company, 1997.

Brody, Michael T. "Inflation, Productivity, and the Total Offset Method of Calculating Damages for Lost Future Earnings." *The University of Chicago Law Review*, 1982: 1003-1025.

Brookshire, Michael L., and William E. Cobb. "The Life-Participation-Employment Approach to Worklife Expectancy in Personal Injury and Wrongful Death Cases." *For the Defense*, 1983: 20-25.

Brookshire, Michael L., William E. Cobb, and Anthony M. Jr. Gamboa. "Work-Life of the Partially Disabled." *Trial*, 1987.

Carlson, John A. "Economic Analysis v. Courtroom Controversy: The Present Value of Future Earnings." *American Bar Association Journal*, 1976: 628-631.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* 113 S. Ct. 2876 (509 U.S. 579, 1993).

Farber, Henry S. "What do we know about Job Loss in the United States? Evidence from the Displaced Workers Survey 1984-2004." Working Paper #498, Industrial Relations Section, Princeton University, January, 2005.

Federal Reserve Bank. *10-Year Treasury Bond, Averages of 1962 to 2012 Daily Prices.* 2012. http://www.federalreserve.gov/datadownload/Output.aspx?rel=H15&series=0b82b42463f 45dbb8fc097de06640ffc&lastObs=&from=&to=&filetype=csv&label=include&layout=s eriescolumn (accessed May 2013).

—. *3-Month Treasury Bill (Secondary Market). Averages of 1947 to 2012.* 2012. http://www.federalreserve.gov/releases/h15/data.htm (accessed May 2013).

Field, Timothy. "Estimating Earning Capacity: Venues, Factors and Methods." *Estimating Earning Capacity: A Journal of Debate and Discussion* 1, no. 1 (2008).

*Frye v. United States.* 54 App. D.C. 46, 47, 293 F. 1013, 1014 (Court of Appeals D. C. Circuit, 1923).

Fullerton, Jr., Howard N. "Labor force participation: 75 years of change, 1950-98 and 1998-2025." *Monthly Labor Review*, December 1999: 3-12.

Gamboa, Anthony M. Jr. "Assessing Loss of Earning Capacity in MAID Cases." In *Litigating Major Auto Injury and Death Cases*, edited by Michael Freeman and Karen Koehler. Danvers, MA: Thomson West, 2006.

Gamboa, Anthony M. Jr., and David S. Gibson. *Gamboa Gibson Worklife Tables.* Portland: Trial Guides, LLC, 2010.

Gamboa, Anthony M. Jr., and David S. Gibson. *The New Worklife Expectancy Tables: Revised 2006; By Gender, Level of Educational Attainment, and Level of Disability.* Louisville, KY: Vocational Econometrics, Inc., 2006.

Gamboa, Anthony M. Jr., et al. "A Vocational Economic Rationale." *Estimating Earning Capacity: A Journal of Debate and Discussion* 2, no. 2 (2009): 97-123.

Gibson, David S. *Daubert, Disability, and Worklife Expectancy.* Louisville, KY: Vocational Econometrics, 2001.

Ginzberg, Eli, Sol Ginsberg, Sidney Axelrad, and John Herma. *Occupational Choice: An Approach to General Theory.* New York: Columbia University, 1951.

Gladwell, Malcolm. *Outliers: The Story of Success.* New York: Little Brown and Company, 2008.

Gongloff, Mark. "TIPS Yields Are Acting Like Politicians." *The Wall Street Journal*, March 12, 2008: C1.

Hernstein, Richard J., and Charles Murray. *The Bell Curve: Intelligence and Class Structure in American Life.* New York: The Free Press, 1994.

Horner, Stephen M., and Frank Slesnick. "The Valuation of Earning Capacity Definition, Measurement and Evidence." *Journal of Forensic Economics* 12, no. 1 (1999): 13-32.

Hoynes, Hilary. *The Employment, Earnings, and Income of Less Skilled Workers Over the Business Cycle.* Paper prepared for the Conference on Labor Markets and Less Skilled Workers, November 5-6,: sponsored by the Joint Center for Poverty Research, 1998.

Ilg, Randy E, and Steven E. Haugen. "Earnings and employment trends in the 1990s." *Monthly Labor Review*, March 2000: 21-33.

*Jones and Laughlin Steel Corporation v. Howard E. Pfeifer.* 462 U.S. 523 (U.S. Supreme Court, 1983).

Kaiser Family Foundation and Health Research and Educational Trust. *Employer Health Benefits.* 2012. http://www.kff.org (accessed May 2013).

Kopcke, Richard W., and Ralph C. Kimball. "Inflation-Indexed Bonds: The Dog That Didn't Bark." *New England Economic Review*, January/February 1999: 3-24.

Revised 7/31/2013   © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

*Kumho Tire Company, Ltd. v. Patrick Carmichael.* 526 U.S. 137 (1999).

Lawlis, Frank, and Robert Male. "Methodological Issues: Interest Rate and Wage Growth Forecasting." *Journal of Legal Economics* 4, no. 3 (Winter 1994): 55-61.

Meisenheimer II, Joseph R. "How do immigrants fare in the U.S. labor market?" *Monthly Labor Review* 115, no. 12 (December 1992): 3-19.

Millimet, Daniel L., Michael Nieswiadomy, and Daniel Slottje. "Detailed Estimation or Worklife Expectancy for the Measurement of Human Capital: Accounting for Marriage and Children." *Journal of Economic Surveys* 24 (2010): 339-361.

Millimet, Daniel L., Michael Nieswiadomy, Hang Ryu, and Daniel Slottje. "Estimating Worklife Expectancies: An Econometric Approach." *Journal of Econometrics*, no. 113 (2003): 83-113.

National Academy of Sciences, Committee on Occupational Classification and Analysis. *Dictionary of Occupational Titles.* Edited by Inter-university Consortium for Political and Social Research. Washington, D.C.: U.S. Department of Commerce, Bureau of the Census, 1981.

*O'Shea v. Riverway Towing Company.* 677 F. 2d 1194 (1982).

Pelaez, Rolondo F. "Pennsylvania's Offset Rule: Fantasy Masquerading as Economics." *Journal of Legal Economics*, Winter 1995: 1-16.

Pelaez, Rolondo F. "The Total Offset Method." *Journal of Forensic Economics*, April 1989: 45-60.

Rubin, Robert E. *In An Uncertain World.* New York: Random House Trade, 2003.

Schwartz, Eli. "Below-Market Interest Rates and the Total Offset Method Re-Visited." *Journal of Forensic Economics*, Winter 1997: 91-94.

Schwartz, Eli. "Settling Claims for Lost Income: The Total Offset Method." *Dickinson Law Review* 104, no. 4 (Summer 2000): 679-686.

Schwartz, Eli, and Robert Thornton. "The Effect of Taxes and Inflation on the Real Interest Rate." *Journal of Forensic Economics*, Winter 1991: 71-73.

Shen, Pu, and Jonathan Corning. "Can TIPS Help Identify Long-Term Inflation Expectations?" *Economic Review*, 2001: 61-87.

Stern, Bruce H. "Discounting to Present Value: Is It Necessary to Reduce?" 2005.

Sum, Andrew; Khatiwada, Ishwar; McLaughlin, Joseph; and Northeastern University-Center for Labor Market Studies. "Replicating the Gamboa Gibson Worklife Tables." *Center for Labor Market Studies Publications* Paper 30 (2010).

Revised 7/31/2013  © *Copyright 2013 Vocational Economics, Inc.* Vocational Economic Rationale

Super, Donald. *The Psychology of Careers*. New York: Harper and Row, 1957.

Tierney, John P. and Missun, Ronald E. "Defining Earning Capacity: A Process Paradigm." *Journal of Forensic Vocational Assessment*, 2001: 3-12.

U.S. Bureau of Labor Statistics. *Consumer Price Index, All Urban Consumers (CPI-U), U.S. City Average*. 2012. http://data.bls.gov/cgi-bin/srgate (Use Series ID #: CUUR0000SA0) (accessed May 2013).

U.S. Bureau of Labor Statistics. "Employer Costs for Employee Compensation - December 2012." http://www.bls.gov/ncs/ect/home.htm, Washington, D.C., 2013.

—. *Major Sector Productivity and Costs Index: Business Sector, Hourly Compensation*. 2012. http://data.bls.gov/cgi-bin/srgate (use Series ID #: PRS84006103) (accessed May 2013).

—. *National Employment, Hours, and Earnings: Average Hourly Earnings of Production Workers*. 2012. http://data.bls.gov/cgi-bin/srgate (Use Series ID #: CEU0500000008) (accessed May 2013).

—. *Occupational Employment Statistics*. May 2012. http://www.bls.gov/oes/home.htm (accessed May 2013).

U.S. Census Bureau. "ACS Public Use Microdata Sample (PUMS)." *American Fact Finder*. 2011. http://www.census.gov/acs/www/data_documentation/pums_data/ (accessed May 2013).

—. *Public Use Files from the March Current Population Survey (CPS)*. 1998 forward. http://thedataweb.rm.census.gov/TheDataWeb/launchDFA.html (accessed January 2012).

## WORKLIFE EXPECTANCY

## AMERICAN COMMUNITY SURVEY

A worklife expectancy statistically estimates how long a person will work over a lifetime. Predictors of worklife are age, level of educational attainment, gender, and disability status. The likelihood of work is calculated from a specific age through the end of the analysis. Each statistical interval in the worklife pattern represents the joint probability that an individual is alive, in the labor force, and actually employed. The statistical intervals are then summed thereby determining the worklife expectancy in years, the format in which worklife expectancies are typically presented.

Sources:
National Center for Health Statistics, Life Tables home page:
http://www.cdc.gov/nchs/products/pubs/pubd/lftbls/life/1966.htm

US Census Bureau. Public Use Data Files from the American Community Survey. ACS Website: http://www.census.gov/acs/www/index.html

### Worklife Probability
### Hall/Palmer
### HS Diploma, Female Worklife

Attorney: Hall, Andrew          Prepared by: Gamboa, Anthony M.
Client: Likiba Palmer

| | *Pre-Injury* |
|---|---|
| Birth Year | 1978 |
| Injury Date | 10/12/2000 |
| Analysis Date | 1/21/2014 |
| Average Over Worklife | 42,415 |
| Fringe Rate | 27.2% |
| Education Level | High School Graduate |
| Gender Life/PE | F/F |
| Disab. Status | Not Disabled |
| Growth/Discount | Pure Offset |
| Future Worklife | 21.0 |
| Total Earnings | 1,560,710 |

| | | | | | | *Pre-Injury* | |
|---|---|---|---|---|---|---|---|
| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
| 3/2002 | 24.00 | 1.00 | 0.999 | 0.640 | 0.639 | 29,144 | 23,688 |
| 3/2003 | 25.00 | 1.00 | 0.998 | 0.652 | 0.651 | 31,321 | 25,936 |
| 3/2004 | 26.00 | 1.00 | 0.997 | 0.652 | 0.650 | 33,039 | 27,317 |
| 3/2005 | 27.00 | 1.00 | 0.997 | 0.652 | 0.650 | 34,178 | 28,258 |
| 3/2006 | 28.00 | 1.00 | 0.996 | 0.652 | 0.649 | 35,135 | 29,005 |
| 3/2007 | 29.00 | 1.00 | 0.996 | 0.652 | 0.649 | 36,040 | 29,752 |
| 3/2008 | 30.00 | 1.00 | 0.995 | 0.668 | 0.665 | 36,881 | 31,197 |
| 3/2009 | 31.00 | 1.00 | 0.994 | 0.668 | 0.664 | 37,713 | 31,853 |
| 3/2010 | 32.00 | 1.00 | 0.994 | 0.668 | 0.664 | 38,532 | 32,545 |
| 3/2011 | 33.00 | 1.00 | 0.993 | 0.668 | 0.663 | 39,359 | 33,193 |
| 3/2012 | 34.00 | 1.00 | 0.992 | 0.668 | 0.663 | 40,281 | 33,971 |
| 3/2013 | 35.00 | 1.00 | 0.991 | 0.705 | 0.699 | 41,210 | 36,641 |
| | Totals | 12.00 | | | 7.906 | | 363,356 |
| 3/2014 | 36.00 | 1.00 | 0.990 | 0.705 | 0.698 | 41,916 | 37,216 |
| 3/2015 | 37.00 | 1.00 | 0.989 | 0.705 | 0.697 | 42,400 | 37,591 |
| 3/2016 | 38.00 | 1.00 | 0.988 | 0.705 | 0.697 | 42,816 | 37,960 |
| 3/2017 | 39.00 | 1.00 | 0.987 | 0.705 | 0.696 | 43,246 | 38,287 |
| 3/2018 | 40.00 | 1.00 | 0.985 | 0.749 | 0.738 | 43,699 | 41,022 |
| 3/2019 | 41.00 | 1.00 | 0.984 | 0.749 | 0.737 | 44,114 | 41,355 |
| 3/2020 | 42.00 | 1.00 | 0.982 | 0.749 | 0.736 | 44,507 | 41,667 |
| 3/2021 | 43.00 | 1.00 | 0.980 | 0.749 | 0.734 | 44,954 | 41,971 |
| 3/2022 | 44.00 | 1.00 | 0.978 | 0.749 | 0.733 | 45,402 | 42,331 |
| 3/2023 | 45.00 | 1.00 | 0.976 | 0.766 | 0.748 | 45,806 | 43,583 |

Hall/Palmer                              1/21/2014

*LAKIBA PALMER, January 23, 2014*

| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Pre-Injury Base Earning | Adjusted Earnings |
|---|---|---|---|---|---|---|---|
| 3/2024 | 46.00 | 1.00 | 0.974 | 0.766 | 0.746 | 46,179 | 43,820 |
| 3/2025 | 47.00 | 1.00 | 0.971 | 0.766 | 0.744 | 46,444 | 43,953 |
| 3/2026 | 48.00 | 1.00 | 0.968 | 0.766 | 0.741 | 46,543 | 43,869 |
| 3/2027 | 49.00 | 1.00 | 0.965 | 0.766 | 0.739 | 46,540 | 43,748 |
| 3/2028 | 50.00 | 1.00 | 0.962 | 0.740 | 0.712 | 46,521 | 42,132 |
| 3/2029 | 51.00 | 1.00 | 0.959 | 0.740 | 0.710 | 46,510 | 42,004 |
| 3/2030 | 52.00 | 1.00 | 0.955 | 0.740 | 0.707 | 46,434 | 41,758 |
| 3/2031 | 53.00 | 1.00 | 0.951 | 0.740 | 0.704 | 46,178 | 41,352 |
| 3/2032 | 54.00 | 1.00 | 0.947 | 0.740 | 0.701 | 45,817 | 40,853 |
| 3/2033 | 55.00 | 1.00 | 0.943 | 0.666 | 0.628 | 45,562 | 36,396 |
| 3/2034 | 56.00 | 1.00 | 0.938 | 0.666 | 0.625 | 45,454 | 36,136 |
| 3/2035 | 57.00 | 1.00 | 0.933 | 0.666 | 0.621 | 45,382 | 35,848 |
| 3/2036 | 58.00 | 1.00 | 0.927 | 0.666 | 0.617 | 45,224 | 35,493 |
| 3/2037 | 59.00 | 1.00 | 0.921 | 0.666 | 0.613 | 45,006 | 35,093 |
| 3/2038 | 60.00 | 1.00 | 0.914 | 0.491 | 0.449 | 44,894 | 25,640 |
| 3/2039 | 61.00 | 1.00 | 0.907 | 0.491 | 0.445 | 44,927 | 25,431 |
| 3/2040 | 62.00 | 1.00 | 0.899 | 0.491 | 0.441 | 45,129 | 25,315 |
| 3/2041 | 63.00 | 1.00 | 0.890 | 0.491 | 0.437 | 45,396 | 25,234 |
| 3/2042 | 64.00 | 1.00 | 0.881 | 0.491 | 0.433 | 45,474 | 25,046 |
| 3/2043 | 65.00 | 1.00 | 0.871 | 0.249 | 0.217 | 45,060 | 12,438 |
| 3/2044 | 66.00 | 1.00 | 0.860 | 0.249 | 0.214 | 43,919 | 11,955 |
| 3/2045 | 67.00 | 1.00 | 0.848 | 0.249 | 0.211 | 42,258 | 11,342 |
| 3/2046 | 68.00 | 1.00 | 0.836 | 0.249 | 0.208 | 40,392 | 10,687 |
| 3/2047 | 69.00 | 1.00 | 0.823 | 0.249 | 0.205 | 40,392 | 10,533 |
| 3/2048 | 70.00 | 1.00 | 0.809 | 0.141 | 0.114 | 40,392 | 5,857 |
| 3/2049 | 71.00 | 1.00 | 0.793 | 0.141 | 0.112 | 40,392 | 5,754 |
| 3/2050 | 72.00 | 1.00 | 0.776 | 0.141 | 0.109 | 40,392 | 5,600 |
| 3/2051 | 73.00 | 1.00 | 0.758 | 0.141 | 0.107 | 40,392 | 5,498 |
| 3/2052 | 74.00 | 1.00 | 0.738 | 0.141 | 0.104 | 40,392 | 5,343 |
| 3/2053 | 75.00 | 1.00 | 0.716 | 0.077 | 0.055 | 40,392 | 2,826 |
| 3/2054 | 76.00 | 1.00 | 0.692 | 0.077 | 0.053 | 40,392 | 2,723 |
| 3/2055 | 77.00 | 1.00 | 0.667 | 0.077 | 0.051 | 40,392 | 2,620 |
| 3/2056 | 78.00 | 1.00 | 0.640 | 0.077 | 0.049 | 40,392 | 2,518 |
| 3/2057 | 79.00 | 1.00 | 0.611 | 0.077 | 0.047 | 40,392 | 2,415 |
| 3/2058 | 80.00 | 1.00 | 0.580 | 0.040 | 0.023 | 40,392 | 1,182 |
| 3/2059 | 81.00 | 1.00 | 0.548 | 0.040 | 0.022 | 40,392 | 1,130 |
| 3/2060 | 82.00 | 1.00 | 0.513 | 0.040 | 0.021 | 40,392 | 1,079 |
| 3/2061 | 83.00 | 1.00 | 0.478 | 0.040 | 0.019 | 40,392 | 976 |
| 3/2062 | 84.00 | 1.00 | 0.441 | 0.040 | 0.018 | 40,392 | 925 |
| 3/2063 | 85.00 | 1.00 | 0.404 | 0.022 | 0.009 | 40,392 | 462 |
| 3/2064 | 86.00 | 1.00 | 0.366 | 0.022 | 0.008 | 40,392 | 411 |
| 3/2065 | 87.00 | 1.00 | 0.328 | 0.022 | 0.007 | 40,392 | 360 |
| 3/2066 | 88.00 | 1.00 | 0.291 | 0.022 | 0.006 | 40,392 | 308 |
| 3/2067 | 89.00 | 1.00 | 0.254 | 0.022 | 0.006 | 40,392 | 308 |
| Totals | | 54.00 | | | 21.022 | | 1,197,354 |

Hall/Palmer                              1/21/2014

*LAKIBA PALMER, January 23, 2014*                              *Page 28 of 52*

| | | | | Pre-Injury | | | | |
| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
| | Total Loss | | | | | | 1,560,710 |

**Sources:**

Arias, Elizabeth, Brian L. Rostron, and Betzaida Tejada-Vera. National Vital Statistics Report, vol. 58 no.10, United States Life Tables, 2005. National Center for Health Statistics, U.S. Center for Diseas Control and Prevention, Hyattsville, MD, 2010. http://www.cdc.gov/nchs/data/nvsr/nvsr58/nvsr58_10.pdf (accessed January 2012).

U.S. Census Bureau.  American Community Survey (ACS) Public Use Microdata Sample (PUMS).  American FactFinder.  2005-2007 3-year PUMS. http://www.census.gov/acs/www/data_documentation/pums_data/ (accessed January 2012).

## Worklife Probability
## Hall/Palmer
## HS Diploma, Male Worklife

Attorney: Hall, Andrew      Prepared by: Gamboa, Anthony M.
Client: Likiba Palmer

|  | Pre-Injury |
|---|---|
| Birth Year | 1978 |
| Injury Date | 10/12/2000 |
| Analysis Date | 1/21/2014 |
| Average Over Worklife | 42,253 |
| Fringe Rate | 27.2% |
| Education Level | High School Graduate |
| Gender Life/PE | F/M |
| Disab. Status | Not Disabled |
| Growth/Discount | Pure Offset |
| Future Worklife | 25.9 |
| Total Earnings | 1,946,357 |

| | | | | | | Pre-Injury | |
|---|---|---|---|---|---|---|---|
| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
| 3/2002 | 24.00 | 1.00 | 1.000 | 0.762 | 0.762 | 29,144 | 28,248 |
| 3/2003 | 25.00 | 1.00 | 1.000 | 0.853 | 0.853 | 31,321 | 33,984 |
| 3/2004 | 26.00 | 1.00 | 1.000 | 0.853 | 0.853 | 33,039 | 35,848 |
| 3/2005 | 27.00 | 1.00 | 1.000 | 0.853 | 0.853 | 34,178 | 37,084 |
| 3/2006 | 28.00 | 1.00 | 1.000 | 0.853 | 0.853 | 35,135 | 38,123 |
| 3/2007 | 29.00 | 1.00 | 1.000 | 0.853 | 0.853 | 36,040 | 39,105 |
| 3/2008 | 30.00 | 1.00 | 1.000 | 0.874 | 0.874 | 36,881 | 41,002 |
| 3/2009 | 31.00 | 1.00 | 1.000 | 0.874 | 0.874 | 37,713 | 41,926 |
| 3/2010 | 32.00 | 1.00 | 1.000 | 0.874 | 0.874 | 38,532 | 42,837 |
| 3/2011 | 33.00 | 1.00 | 1.000 | 0.874 | 0.874 | 39,359 | 43,757 |
| 3/2012 | 34.00 | 1.00 | 1.000 | 0.874 | 0.874 | 40,281 | 44,782 |
| 3/2013 | 35.00 | 1.00 | 1.000 | 0.882 | 0.882 | 41,210 | 46,233 |
| | Totals | 12.00 | | | 10.279 | | 472,929 |
| 3/2014 | 36.00 | 1.00 | 0.998 | 0.882 | 0.880 | 41,916 | 46,919 |
| 3/2015 | 37.00 | 1.00 | 0.997 | 0.882 | 0.879 | 42,400 | 47,407 |
| 3/2016 | 38.00 | 1.00 | 0.996 | 0.882 | 0.878 | 42,816 | 47,818 |
| 3/2017 | 39.00 | 1.00 | 0.995 | 0.882 | 0.878 | 43,246 | 48,298 |
| 3/2018 | 40.00 | 1.00 | 0.993 | 0.888 | 0.882 | 43,699 | 49,026 |
| 3/2019 | 41.00 | 1.00 | 0.992 | 0.888 | 0.881 | 44,114 | 49,436 |
| 3/2020 | 42.00 | 1.00 | 0.990 | 0.888 | 0.879 | 44,507 | 49,763 |
| 3/2021 | 43.00 | 1.00 | 0.988 | 0.888 | 0.877 | 44,954 | 50,148 |
| 3/2022 | 44.00 | 1.00 | 0.986 | 0.888 | 0.876 | 45,402 | 50,590 |
| 3/2023 | 45.00 | 1.00 | 0.984 | 0.886 | 0.872 | 45,806 | 50,808 |

Hall/Palmer              1/21/2014

| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
|---|---|---|---|---|---|---|---|
| | | | | *Pre-Injury* | | | |
| 3/2024 | 46.00 | 1.00 | 0.981 | 0.886 | 0.869 | 46,179 | 51,045 |
| 3/2025 | 47.00 | 1.00 | 0.979 | 0.886 | 0.867 | 46,444 | 51,220 |
| 3/2026 | 48.00 | 1.00 | 0.976 | 0.886 | 0.865 | 46,543 | 51,210 |
| 3/2027 | 49.00 | 1.00 | 0.973 | 0.886 | 0.862 | 46,540 | 51,030 |
| 3/2028 | 50.00 | 1.00 | 0.970 | 0.866 | 0.840 | 46,521 | 49,707 |
| 3/2029 | 51.00 | 1.00 | 0.966 | 0.866 | 0.837 | 46,510 | 49,518 |
| 3/2030 | 52.00 | 1.00 | 0.963 | 0.866 | 0.834 | 46,434 | 49,260 |
| 3/2031 | 53.00 | 1.00 | 0.959 | 0.866 | 0.830 | 46,178 | 48,753 |
| 3/2032 | 54.00 | 1.00 | 0.955 | 0.866 | 0.827 | 45,817 | 48,197 |
| 3/2033 | 55.00 | 1.00 | 0.950 | 0.800 | 0.760 | 45,562 | 44,046 |
| 3/2034 | 56.00 | 1.00 | 0.945 | 0.800 | 0.756 | 45,454 | 43,710 |
| 3/2035 | 57.00 | 1.00 | 0.940 | 0.800 | 0.752 | 45,382 | 43,410 |
| 3/2036 | 58.00 | 1.00 | 0.934 | 0.800 | 0.747 | 45,224 | 42,971 |
| 3/2037 | 59.00 | 1.00 | 0.928 | 0.800 | 0.742 | 45,006 | 42,478 |
| 3/2038 | 60.00 | 1.00 | 0.921 | 0.607 | 0.559 | 44,894 | 31,922 |
| 3/2039 | 61.00 | 1.00 | 0.914 | 0.607 | 0.555 | 44,927 | 31,717 |
| 3/2040 | 62.00 | 1.00 | 0.906 | 0.607 | 0.550 | 45,129 | 31,572 |
| 3/2041 | 63.00 | 1.00 | 0.897 | 0.607 | 0.544 | 45,396 | 31,413 |
| 3/2042 | 64.00 | 1.00 | 0.888 | 0.607 | 0.539 | 45,474 | 31,177 |
| 3/2043 | 65.00 | 1.00 | 0.877 | 0.341 | 0.299 | 45,060 | 17,138 |
| 3/2044 | 66.00 | 1.00 | 0.867 | 0.341 | 0.296 | 43,919 | 16,536 |
| 3/2045 | 67.00 | 1.00 | 0.855 | 0.341 | 0.292 | 42,258 | 15,696 |
| 3/2046 | 68.00 | 1.00 | 0.843 | 0.341 | 0.287 | 40,392 | 14,746 |
| 3/2047 | 69.00 | 1.00 | 0.829 | 0.341 | 0.283 | 40,392 | 14,540 |
| 3/2048 | 70.00 | 1.00 | 0.815 | 0.214 | 0.174 | 40,392 | 8,940 |
| 3/2049 | 71.00 | 1.00 | 0.799 | 0.214 | 0.171 | 40,392 | 8,786 |
| 3/2050 | 72.00 | 1.00 | 0.782 | 0.214 | 0.167 | 40,392 | 8,580 |
| 3/2051 | 73.00 | 1.00 | 0.764 | 0.214 | 0.163 | 40,392 | 8,375 |
| 3/2052 | 74.00 | 1.00 | 0.744 | 0.214 | 0.159 | 40,392 | 8,169 |
| 3/2053 | 75.00 | 1.00 | 0.722 | 0.133 | 0.096 | 40,392 | 4,932 |
| 3/2054 | 76.00 | 1.00 | 0.698 | 0.133 | 0.093 | 40,392 | 4,778 |
| 3/2055 | 77.00 | 1.00 | 0.672 | 0.133 | 0.089 | 40,392 | 4,573 |
| 3/2056 | 78.00 | 1.00 | 0.645 | 0.133 | 0.086 | 40,392 | 4,419 |
| 3/2057 | 79.00 | 1.00 | 0.616 | 0.133 | 0.082 | 40,392 | 4,213 |
| 3/2058 | 80.00 | 1.00 | 0.585 | 0.076 | 0.044 | 40,392 | 2,261 |
| 3/2059 | 81.00 | 1.00 | 0.552 | 0.076 | 0.042 | 40,392 | 2,158 |
| 3/2060 | 82.00 | 1.00 | 0.518 | 0.076 | 0.039 | 40,392 | 2,004 |
| 3/2061 | 83.00 | 1.00 | 0.482 | 0.076 | 0.037 | 40,392 | 1,901 |
| 3/2062 | 84.00 | 1.00 | 0.445 | 0.076 | 0.034 | 40,392 | 1,747 |
| 3/2063 | 85.00 | 1.00 | 0.407 | 0.051 | 0.021 | 40,392 | 1,079 |
| 3/2064 | 86.00 | 1.00 | 0.369 | 0.051 | 0.019 | 40,392 | 976 |
| 3/2065 | 87.00 | 1.00 | 0.331 | 0.051 | 0.017 | 40,392 | 873 |
| 3/2066 | 88.00 | 1.00 | 0.293 | 0.051 | 0.015 | 40,392 | 771 |
| 3/2067 | 89.00 | 1.00 | 0.256 | 0.051 | 0.013 | 40,392 | 668 |
| **Totals** | | 54.00 | | | 25.935 | | 1,473,428 |

Hall/Palmer

1/21/2014

*LAKIBA PALMER, January 23, 2014*

| | | | Prob. | Pre-Injury | | | Adjusted |
| Mo/Yr | Age | Years | Life | Prob. Empl. | Prob. Work | Base Earning | Earnings |
| | Total Loss | | | | | | 1,946,357 |

Sources:

Arias, Elizabeth, Brian L. Rostron, and Betzaida Tejada-Vera. National Vital Statistics Report, vol. 58 no.10, United States Life Tables, 2005. National Center for Health Statistics, U.S. Center for Diseas Control and Prevention, Hyattsville, MD, 2010. http://www.cdc.gov/nchs/data/nvsr/nvsr58/nvsr58_10.pdf (accessed January 2012).

U.S. Census Bureau.  American Community Survey (ACS) Public Use Microdata Sample (PUMS).  American FactFinder.  2005-2007 3-year PUMS. http://www.census.gov/acs/www/data_documentation/pums_data/ (accessed January 2012).

Hall/Palmer

1/21/2014

## Worklife Probability
## Hall/Palmer
## Some College, Female Worklife

Attorney: Hall, Andrew          Prepared by: Gamboa, Anthony M.
Client: Likiba Palmer

| | Pre-Injury |
|---|---|
| Birth Year | 1978 |
| Injury Date | 10/12/2000 |
| Analysis Date | 1/21/2014 |
| Average Over Worklife | 51,327 |
| Fringe Rate | 27.2% |
| Education Level | Some College, No Degree |
| Gender Life/PE | F/F |
| Disab. Status | Not Disabled |
| Growth/Discount | Pure Offset |
| Future Worklife | 22.9 |
| Total Earnings | 1,972,158 |

| | | | | | | Pre-Injury | |
|---|---|---|---|---|---|---|---|
| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
| 3/2004 | 26.00 | 1.00 | 1.000 | 0.722 | 0.722 | 30,449 | 27,964 |
| 3/2005 | 27.00 | 1.00 | 1.000 | 0.722 | 0.722 | 33,346 | 30,624 |
| 3/2006 | 28.00 | 1.00 | 1.000 | 0.722 | 0.722 | 35,683 | 32,771 |
| 3/2007 | 29.00 | 1.00 | 1.000 | 0.722 | 0.722 | 37,504 | 34,443 |
| 3/2008 | 30.00 | 1.00 | 1.000 | 0.725 | 0.725 | 39,311 | 36,253 |
| 3/2009 | 31.00 | 1.00 | 1.000 | 0.725 | 0.725 | 41,048 | 37,855 |
| 3/2010 | 32.00 | 1.00 | 1.000 | 0.725 | 0.725 | 42,546 | 39,236 |
| 3/2011 | 33.00 | 1.00 | 1.000 | 0.725 | 0.725 | 43,944 | 40,525 |
| 3/2012 | 34.00 | 1.00 | 1.000 | 0.725 | 0.725 | 45,244 | 41,724 |
| 3/2013 | 35.00 | 1.00 | 1.000 | 0.748 | 0.748 | 46,331 | 44,082 |
| | Totals | 10.00 | | | 7.261 | | 365,477 |
| 3/2014 | 36.00 | 1.00 | 0.998 | 0.748 | 0.747 | 47,439 | 45,076 |
| 3/2015 | 37.00 | 1.00 | 0.997 | 0.748 | 0.746 | 48,812 | 46,318 |
| 3/2016 | 38.00 | 1.00 | 0.996 | 0.748 | 0.745 | 50,141 | 47,516 |
| 3/2017 | 39.00 | 1.00 | 0.995 | 0.748 | 0.744 | 51,111 | 48,370 |
| 3/2018 | 40.00 | 1.00 | 0.993 | 0.783 | 0.778 | 51,882 | 51,343 |
| 3/2019 | 41.00 | 1.00 | 0.992 | 0.783 | 0.777 | 52,594 | 51,981 |
| 3/2020 | 42.00 | 1.00 | 0.990 | 0.783 | 0.775 | 53,176 | 52,421 |
| 3/2021 | 43.00 | 1.00 | 0.988 | 0.783 | 0.774 | 53,661 | 52,830 |
| 3/2022 | 44.00 | 1.00 | 0.986 | 0.783 | 0.772 | 54,166 | 53,190 |
| 3/2023 | 45.00 | 1.00 | 0.984 | 0.801 | 0.788 | 54,766 | 54,894 |
| 3/2024 | 46.00 | 1.00 | 0.981 | 0.801 | 0.786 | 55,477 | 55,466 |
| 3/2025 | 47.00 | 1.00 | 0.979 | 0.801 | 0.784 | 56,146 | 55,992 |

Hall/Palmer                    1/21/2014

| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
|---|---|---|---|---|---|---|---|
| | | | | | | *Pre-Injury* | |
| 3/2026 | 48.00 | 1.00 | 0.976 | 0.801 | 0.782 | 56,640 | 56,340 |
| 3/2027 | 49.00 | 1.00 | 0.973 | 0.801 | 0.779 | 57,075 | 56,555 |
| 3/2028 | 50.00 | 1.00 | 0.970 | 0.790 | 0.766 | 57,407 | 55,935 |
| 3/2029 | 51.00 | 1.00 | 0.966 | 0.790 | 0.763 | 57,495 | 55,801 |
| 3/2030 | 52.00 | 1.00 | 0.963 | 0.790 | 0.761 | 57,479 | 55,639 |
| 3/2031 | 53.00 | 1.00 | 0.959 | 0.790 | 0.758 | 57,464 | 55,405 |
| 3/2032 | 54.00 | 1.00 | 0.955 | 0.790 | 0.754 | 57,421 | 55,071 |
| 3/2033 | 55.00 | 1.00 | 0.950 | 0.718 | 0.682 | 57,344 | 49,746 |
| 3/2034 | 56.00 | 1.00 | 0.945 | 0.718 | 0.679 | 57,133 | 49,345 |
| 3/2035 | 57.00 | 1.00 | 0.940 | 0.718 | 0.675 | 56,807 | 48,775 |
| 3/2036 | 58.00 | 1.00 | 0.934 | 0.718 | 0.671 | 56,605 | 48,313 |
| 3/2037 | 59.00 | 1.00 | 0.928 | 0.718 | 0.666 | 56,566 | 47,920 |
| 3/2038 | 60.00 | 1.00 | 0.921 | 0.546 | 0.503 | 56,652 | 36,247 |
| 3/2039 | 61.00 | 1.00 | 0.914 | 0.546 | 0.499 | 56,917 | 36,127 |
| 3/2040 | 62.00 | 1.00 | 0.906 | 0.546 | 0.495 | 57,320 | 36,091 |
| 3/2041 | 63.00 | 1.00 | 0.897 | 0.546 | 0.490 | 57,766 | 36,005 |
| 3/2042 | 64.00 | 1.00 | 0.888 | 0.546 | 0.485 | 58,114 | 35,852 |
| 3/2043 | 65.00 | 1.00 | 0.877 | 0.301 | 0.264 | 58,281 | 19,571 |
| 3/2044 | 66.00 | 1.00 | 0.867 | 0.301 | 0.261 | 58,296 | 19,354 |
| 3/2045 | 67.00 | 1.00 | 0.855 | 0.301 | 0.257 | 57,873 | 18,919 |
| 3/2046 | 68.00 | 1.00 | 0.843 | 0.301 | 0.254 | 56,400 | 18,222 |
| 3/2047 | 69.00 | 1.00 | 0.829 | 0.301 | 0.250 | 54,305 | 17,269 |
| 3/2048 | 70.00 | 1.00 | 0.815 | 0.178 | 0.145 | 52,654 | 9,712 |
| 3/2049 | 71.00 | 1.00 | 0.799 | 0.178 | 0.142 | 52,654 | 9,511 |
| 3/2050 | 72.00 | 1.00 | 0.782 | 0.178 | 0.139 | 52,654 | 9,310 |
| 3/2051 | 73.00 | 1.00 | 0.764 | 0.178 | 0.136 | 52,654 | 9,109 |
| 3/2052 | 74.00 | 1.00 | 0.744 | 0.178 | 0.132 | 52,654 | 8,841 |
| 3/2053 | 75.00 | 1.00 | 0.722 | 0.102 | 0.074 | 52,654 | 4,956 |
| 3/2054 | 76.00 | 1.00 | 0.698 | 0.102 | 0.071 | 52,654 | 4,755 |
| 3/2055 | 77.00 | 1.00 | 0.672 | 0.102 | 0.069 | 52,654 | 4,621 |
| 3/2056 | 78.00 | 1.00 | 0.645 | 0.102 | 0.066 | 52,654 | 4,420 |
| 3/2057 | 79.00 | 1.00 | 0.616 | 0.102 | 0.063 | 52,654 | 4,219 |
| 3/2058 | 80.00 | 1.00 | 0.585 | 0.055 | 0.032 | 52,654 | 2,143 |
| 3/2059 | 81.00 | 1.00 | 0.552 | 0.055 | 0.030 | 52,654 | 2,009 |
| 3/2060 | 82.00 | 1.00 | 0.518 | 0.055 | 0.028 | 52,654 | 1,875 |
| 3/2061 | 83.00 | 1.00 | 0.482 | 0.055 | 0.027 | 52,654 | 1,808 |
| 3/2062 | 84.00 | 1.00 | 0.445 | 0.055 | 0.024 | 52,654 | 1,607 |
| 3/2063 | 85.00 | 1.00 | 0.407 | 0.035 | 0.014 | 52,654 | 938 |
| 3/2064 | 86.00 | 1.00 | 0.369 | 0.035 | 0.013 | 52,654 | 871 |
| 3/2065 | 87.00 | 1.00 | 0.331 | 0.035 | 0.012 | 52,654 | 804 |
| 3/2066 | 88.00 | 1.00 | 0.293 | 0.035 | 0.010 | 52,654 | 670 |
| 3/2067 | 89.00 | 1.00 | 0.256 | 0.035 | 0.009 | 52,654 | 603 |

|  | Totals | 54.00 | | | 22.946 | | 1,606,681 |
|  | Total Loss | | | | | | 1,972,158 |

Hall/Palmer

1/21/2014

*LAKIBA PALMER, January 23, 2014*

| | | | | Pre-Injury | | | |
| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |

Sources:

Arias, Elizabeth, Brian L. Rostron, and Betzaida Tejada-Vera. National Vital Statistics Report, vol. 58 no.10, United States Life Tables, 2005. National Center for Health Statistics, U.S. Center for Diseas Control and Prevention, Hyattsville, MD, 2010. http://www.cdc.gov/nchs/data/nvsr/nvsr58/nvsr58_10.pdf (accessed January 2012).

U.S. Census Bureau.  American Community Survey (ACS) Public Use Microdata Sample (PUMS).  American FactFinder.  2005-2007 3-year PUMS. http://www.census.gov/acs/www/data_documentation/pums_data/ (accessed January 2012).

Hall/Palmer

1/21/2014

*LAKIBA PALMER, January 23, 2014*

## Worklife Probability
### Hall/Palmer
### Some College, Male Worklife

Attorney: Hall, Andrew          Prepared by: Gamboa, Anthony M.
Client: Likiba Palmer

|  | Pre-Injury |
|---|---|
| Birth Year | 1978 |
| Injury Date | 10/12/2000 |
| Analysis Date | 1/21/2014 |
| Average Over Worklife | 51,209 |
| Fringe Rate | 27.2% |
| Education Level | Some College, No Degree |
| Gender Life/PE | F/M |
| Disab. Status | Not Disabled |
| Growth/Discount | Pure Offset |
| Future Worklife | 27.3 |
| Total Earnings | 2,351,931 |

| | | | | | | Pre-Injury | |
|---|---|---|---|---|---|---|---|
| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings |
| 3/2004 | 26.00 | 1.00 | 1.000 | 0.865 | 0.865 | 30,449 | 33,502 |
| 3/2005 | 27.00 | 1.00 | 1.000 | 0.865 | 0.865 | 33,346 | 36,690 |
| 3/2006 | 28.00 | 1.00 | 1.000 | 0.865 | 0.865 | 35,683 | 39,262 |
| 3/2007 | 29.00 | 1.00 | 1.000 | 0.865 | 0.865 | 37,504 | 41,265 |
| 3/2008 | 30.00 | 1.00 | 1.000 | 0.895 | 0.895 | 39,311 | 44,753 |
| 3/2009 | 31.00 | 1.00 | 1.000 | 0.895 | 0.895 | 41,048 | 46,731 |
| 3/2010 | 32.00 | 1.00 | 1.000 | 0.895 | 0.895 | 42,546 | 48,436 |
| 3/2011 | 33.00 | 1.00 | 1.000 | 0.895 | 0.895 | 43,944 | 50,028 |
| 3/2012 | 34.00 | 1.00 | 1.000 | 0.895 | 0.895 | 45,244 | 51,507 |
| 3/2013 | 35.00 | 1.00 | 1.000 | 0.908 | 0.908 | 46,331 | 53,511 |
| | Totals | 10.00 | | | 8.843 | | 445,685 |
| 3/2014 | 36.00 | 1.00 | 0.998 | 0.908 | 0.906 | 47,439 | 54,671 |
| 3/2015 | 37.00 | 1.00 | 0.997 | 0.908 | 0.905 | 48,812 | 56,190 |
| 3/2016 | 38.00 | 1.00 | 0.996 | 0.908 | 0.904 | 50,141 | 57,657 |
| 3/2017 | 39.00 | 1.00 | 0.995 | 0.908 | 0.903 | 51,111 | 58,707 |
| 3/2018 | 40.00 | 1.00 | 0.993 | 0.910 | 0.904 | 51,882 | 59,658 |
| 3/2019 | 41.00 | 1.00 | 0.992 | 0.910 | 0.903 | 52,594 | 60,410 |
| 3/2020 | 42.00 | 1.00 | 0.990 | 0.910 | 0.901 | 53,176 | 60,944 |
| 3/2021 | 43.00 | 1.00 | 0.988 | 0.910 | 0.899 | 53,661 | 61,362 |
| 3/2022 | 44.00 | 1.00 | 0.986 | 0.910 | 0.897 | 54,166 | 61,802 |
| 3/2023 | 45.00 | 1.00 | 0.984 | 0.908 | 0.893 | 54,766 | 62,209 |
| 3/2024 | 46.00 | 1.00 | 0.981 | 0.908 | 0.891 | 55,477 | 62,875 |
| 3/2025 | 47.00 | 1.00 | 0.979 | 0.908 | 0.889 | 56,146 | 63,491 |

Hall/Palmer                          1/21/2014

| Mo/Yr | Age | Years | Prob. Life | Prob. Empl. | Prob. Work | Pre-Injury Base Earning | Adjusted Earnings |
|-------|-----|-------|------------|-------------|------------|-------------------------|-------------------|
| 3/2026 | 48.00 | 1.00 | 0.976 | 0.908 | 0.886 | 56,640 | 63,833 |
| 3/2027 | 49.00 | 1.00 | 0.973 | 0.908 | 0.883 | 57,075 | 64,105 |
| 3/2028 | 50.00 | 1.00 | 0.970 | 0.889 | 0.862 | 57,407 | 62,945 |
| 3/2029 | 51.00 | 1.00 | 0.966 | 0.889 | 0.859 | 57,495 | 62,822 |
| 3/2030 | 52.00 | 1.00 | 0.963 | 0.889 | 0.856 | 57,479 | 62,585 |
| 3/2031 | 53.00 | 1.00 | 0.959 | 0.889 | 0.853 | 57,464 | 62,349 |
| 3/2032 | 54.00 | 1.00 | 0.955 | 0.889 | 0.849 | 57,421 | 62,010 |
| 3/2033 | 55.00 | 1.00 | 0.950 | 0.825 | 0.784 | 57,344 | 57,186 |
| 3/2034 | 56.00 | 1.00 | 0.945 | 0.825 | 0.780 | 57,133 | 56,685 |
| 3/2035 | 57.00 | 1.00 | 0.940 | 0.825 | 0.776 | 56,807 | 56,073 |
| 3/2036 | 58.00 | 1.00 | 0.934 | 0.825 | 0.771 | 56,605 | 55,513 |
| 3/2037 | 59.00 | 1.00 | 0.928 | 0.825 | 0.766 | 56,566 | 55,115 |
| 3/2038 | 60.00 | 1.00 | 0.921 | 0.647 | 0.596 | 56,652 | 42,949 |
| 3/2039 | 61.00 | 1.00 | 0.914 | 0.647 | 0.591 | 56,917 | 42,787 |
| 3/2040 | 62.00 | 1.00 | 0.906 | 0.647 | 0.586 | 57,320 | 42,726 |
| 3/2041 | 63.00 | 1.00 | 0.897 | 0.647 | 0.580 | 57,766 | 42,618 |
| 3/2042 | 64.00 | 1.00 | 0.888 | 0.647 | 0.575 | 58,114 | 42,505 |
| 3/2043 | 65.00 | 1.00 | 0.877 | 0.388 | 0.340 | 58,281 | 25,205 |
| 3/2044 | 66.00 | 1.00 | 0.867 | 0.388 | 0.336 | 58,296 | 24,915 |
| 3/2045 | 67.00 | 1.00 | 0.855 | 0.388 | 0.332 | 57,873 | 24,440 |
| 3/2046 | 68.00 | 1.00 | 0.843 | 0.388 | 0.327 | 56,400 | 23,459 |
| 3/2047 | 69.00 | 1.00 | 0.829 | 0.388 | 0.322 | 54,305 | 22,242 |
| 3/2048 | 70.00 | 1.00 | 0.815 | 0.255 | 0.208 | 52,654 | 13,931 |
| 3/2049 | 71.00 | 1.00 | 0.799 | 0.255 | 0.204 | 52,654 | 13,663 |
| 3/2050 | 72.00 | 1.00 | 0.782 | 0.255 | 0.199 | 52,654 | 13,328 |
| 3/2051 | 73.00 | 1.00 | 0.764 | 0.255 | 0.195 | 52,654 | 13,060 |
| 3/2052 | 74.00 | 1.00 | 0.744 | 0.255 | 0.190 | 52,654 | 12,725 |
| 3/2053 | 75.00 | 1.00 | 0.722 | 0.164 | 0.118 | 52,654 | 7,903 |
| 3/2054 | 76.00 | 1.00 | 0.698 | 0.164 | 0.114 | 52,654 | 7,635 |
| 3/2055 | 77.00 | 1.00 | 0.672 | 0.164 | 0.110 | 52,654 | 7,367 |
| 3/2056 | 78.00 | 1.00 | 0.645 | 0.164 | 0.106 | 52,654 | 7,099 |
| 3/2057 | 79.00 | 1.00 | 0.616 | 0.164 | 0.101 | 52,654 | 6,765 |
| 3/2058 | 80.00 | 1.00 | 0.585 | 0.108 | 0.063 | 52,654 | 4,219 |
| 3/2059 | 81.00 | 1.00 | 0.552 | 0.108 | 0.060 | 52,654 | 4,019 |
| 3/2060 | 82.00 | 1.00 | 0.518 | 0.108 | 0.056 | 52,654 | 3,751 |
| 3/2061 | 83.00 | 1.00 | 0.482 | 0.108 | 0.052 | 52,654 | 3,483 |
| 3/2062 | 84.00 | 1.00 | 0.445 | 0.108 | 0.048 | 52,654 | 3,215 |
| 3/2063 | 85.00 | 1.00 | 0.407 | 0.081 | 0.033 | 52,654 | 2,210 |
| 3/2064 | 86.00 | 1.00 | 0.369 | 0.081 | 0.030 | 52,654 | 2,009 |
| 3/2065 | 87.00 | 1.00 | 0.331 | 0.081 | 0.027 | 52,654 | 1,808 |
| 3/2066 | 88.00 | 1.00 | 0.293 | 0.081 | 0.024 | 52,654 | 1,607 |
| 3/2067 | 89.00 | 1.00 | 0.256 | 0.081 | 0.021 | 52,654 | 1,406 |
| | Totals | 54.00 | | | 27.264 | | 1,906,246 |
| | Total Loss | | | | | | 2,351,931 |

Hall/Palmer

1/21/2014

*LAKIBA PALMER, January 23, 2014*

| Mo/Yr | Age | Years | Prob. Life | Pre-Injury | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Prob. Empl. | Prob. Work | Base Earning | Adjusted Earnings | |

Sources:

Arias, Elizabeth, Brian L. Rostron, and Betzaida Tejada-Vera. National Vital Statistics Report, vol. 58 no.10, United States Life Tables, 2005. National Center for Health Statistics, U.S. Center for Diseas Control and Prevention, Hyattsville, MD, 2010. http://www.cdc.gov/nchs/data/nvsr/nvsr58/nvsr58_10.pdf (accessed January 2012).

U.S. Census Bureau. American Community Survey (ACS) Public Use Microdata Sample (PUMS). American FactFinder. 2005-2007 3-year PUMS. http://www.census.gov/acs/www/data_documentation/pums_data/ (accessed January 2012).

Hall/Palmer                                    1/21/2014

## PERSONAL CONSUMPTION ANALYSIS
### Lakiba Palmer

#### PAST LOSS

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|------|------|------|------|------|
| 3/12/2002 | 24 | 3 | 17.4% | $23,688.00 | $4,121.71 | $19,566.29 |
| 3/12/2003 | 25 | 3 | 17.4% | $25,936.00 | $4,512.86 | $21,423.14 |
| 3/12/2004 | 26 | 3 | 17.4% | $27,317.00 | $4,753.16 | $22,563.84 |
| 3/12/2005 | 27 | 3 | 17.4% | $28,258.00 | $4,916.89 | $23,341.11 |
| 3/12/2006 | 28 | 3 | 17.4% | $29,005.00 | $5,046.87 | $23,958.13 |
| 3/12/2007 | 29 | 3 | 17.4% | $29,752.00 | $5,176.85 | $24,575.15 |
| 3/12/2008 | 30 | 3 | 17.4% | $31,197.00 | $5,428.28 | $25,768.72 |
| 3/12/2009 | 31 | 3 | 17.4% | $31,853.00 | $5,542.42 | $26,310.58 |
| 3/12/2010 | 32 | 3 | 17.4% | $32,545.00 | $5,662.83 | $26,882.17 |
| 3/12/2011 | 33 | 3 | 17.4% | $33,193.00 | $5,775.58 | $27,417.42 |
| 3/12/2012 | 34 | 3 | 17.4% | $33,971.00 | $5,910.95 | $28,060.05 |
| 3/12/2013 | 35 | 3 | 17.4% | $36,641.00 | $6,375.53 | $30,265.47 |

**Total Past Loss Less Consumption** $135,428

#### FUTURE LOSS

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|------|------|------|------|------|
| 3/12/2014 | 36 | 3 | 17.4% | $37,216.00 | $6,475.58 | $30,740.42 |
| 3/12/2015 | 37 | 3 | 17.4% | $37,591.00 | $6,540.83 | $31,050.17 |
| 3/12/2016 | 38 | 3 | 17.4% | $37,960.00 | $6,605.04 | $31,354.96 |
| 3/12/2017 | 39 | 3 | 17.4% | $38,287.00 | $6,661.94 | $31,625.06 |
| 3/12/2018 | 40 | 3 | 17.4% | $41,022.00 | $7,137.83 | $33,884.17 |
| 3/12/2019 | 41 | 3 | 17.4% | $41,355.00 | $7,195.77 | $34,159.23 |
| 3/12/2020 | 42 | 3 | 17.4% | $41,667.00 | $7,250.06 | $34,416.94 |
| 3/12/2021 | 43 | 2 | 24.8% | $41,971.00 | $10,408.81 | $31,562.19 |
| 3/12/2022 | 44 | 2 | 24.8% | $42,331.00 | $10,498.09 | $31,832.91 |
| 3/12/2023 | 45 | 2 | 24.8% | $43,583.00 | $10,808.58 | $32,774.42 |
| 3/12/2024 | 46 | 2 | 24.8% | $43,820.00 | $10,867.36 | $32,952.64 |

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|---|---|---|---|---|---|---|
| 3/12/2025 | 47 | 2 | 24.8% | $43,953.00 | $10,900.34 | $33,052.66 |
| 3/12/2026 | 48 | 2 | 24.8% | $43,869.00 | $10,879.51 | $32,989.49 |
| 3/12/2027 | 49 | 2 | 24.8% | $43,748.00 | $10,849.50 | $32,898.50 |
| 3/12/2028 | 50 | 2 | 24.8% | $42,132.00 | $10,448.74 | $31,683.26 |
| 3/12/2029 | 51 | 2 | 24.8% | $42,004.00 | $10,416.99 | $31,587.01 |
| 3/12/2030 | 52 | 2 | 24.8% | $41,758.00 | $10,355.98 | $31,402.02 |
| 3/12/2031 | 53 | 2 | 24.8% | $41,362.00 | $10,255.30 | $31,096.70 |
| 3/12/2032 | 54 | 2 | 24.8% | $40,853.00 | $10,131.54 | $30,721.46 |
| 3/12/2033 | 55 | 2 | 24.8% | $36,396.00 | $9,026.21 | $27,369.79 |
| 3/12/2034 | 56 | 2 | 24.8% | $36,136.00 | $8,961.73 | $27,174.27 |
| 3/12/2035 | 57 | 2 | 24.8% | $35,848.00 | $8,890.30 | $26,957.70 |
| 3/12/2036 | 58 | 2 | 24.8% | $35,493.00 | $8,802.26 | $26,690.74 |
| 3/12/2037 | 59 | 2 | 24.8% | $35,093.00 | $8,703.06 | $26,389.94 |
| 3/12/2038 | 60 | 2 | 24.8% | $25,640.00 | $6,358.72 | $19,281.28 |
| 3/12/2039 | 61 | 2 | 24.8% | $25,431.00 | $6,306.89 | $19,124.11 |
| 3/12/2040 | 62 | 2 | 24.8% | $25,315.00 | $6,278.12 | $19,036.88 |
| 3/12/2041 | 63 | 2 | 24.8% | $25,234.00 | $6,258.03 | $18,975.97 |
| 3/12/2042 | 64 | 2 | 24.8% | $25,046.00 | $6,211.41 | $18,834.59 |
| 3/12/2043 | 65 | 2 | 24.8% | $12,438.00 | $3,084.62 | $9,353.38 |
| 3/12/2044 | 66 | 2 | 24.8% | $11,955.00 | $2,964.84 | $8,990.16 |
| 3/12/2045 | 67 | 2 | 24.8% | $11,342.00 | $2,812.82 | $8,529.18 |
| 3/12/2046 | 68 | 2 | 24.8% | $10,687.00 | $2,650.38 | $8,036.62 |
| 3/12/2047 | 69 | 2 | 24.8% | $10,533.00 | $2,612.18 | $7,920.82 |
| 3/12/2048 | 70 | 2 | 24.8% | $5,857.00 | $1,452.54 | $4,404.46 |
| 3/12/2049 | 71 | 2 | 24.8% | $5,754.00 | $1,426.99 | $4,327.01 |
| 3/12/2050 | 72 | 2 | 24.8% | $5,600.00 | $1,388.80 | $4,211.20 |
| 3/12/2051 | 73 | 2 | 24.8% | $5,498.00 | $1,363.50 | $4,134.50 |
| 3/12/2052 | 74 | 1 | 80.7% | $5,343.00 | $4,311.80 | $1,031.20 |
| 3/12/2053 | 75 | 1 | 80.7% | $2,826.00 | $2,280.58 | $545.42 |
| 3/12/2054 | 76 | 1 | 80.7% | $2,723.00 | $2,197.46 | $525.54 |
| 3/12/2055 | 77 | 1 | 80.7% | $2,620.00 | $2,114.34 | $505.66 |
| 3/12/2056 | 78 | 1 | 80.7% | $2,518.00 | $2,032.03 | $485.97 |
| 3/12/2057 | 79 | 1 | 80.7% | $2,415.00 | $1,948.91 | $466.10 |
| 3/12/2058 | 80 | 1 | 80.7% | $1,182.00 | $953.87 | $228.13 |

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|----------------------|---------------------|-------------------|---------------------|--------------------------|
| 3/12/2059 | 81 | 1 | 80.7% | $1,130.00 | $911.91 | $218.09 |
| 3/12/2060 | 82 | 1 | 80.7% | $1,079.00 | $870.75 | $208.25 |
| 3/12/2061 | 83 | 1 | 80.7% | $976.00 | $787.63 | $188.37 |
| 3/12/2062 | 84 | 1 | 80.7% | $925.00 | $746.48 | $178.53 |
| 3/12/2063 | 85 | 1 | 80.7% | $462.00 | $372.83 | $89.17 |
| 3/12/2064 | 86 | 1 | 80.7% | $411.00 | $331.68 | $79.32 |
| 3/12/2065 | 87 | 1 | 80.7% | $360.00 | $290.52 | $69.48 |
| 3/12/2066 | 88 | 1 | 80.7% | $308.00 | $248.56 | $59.44 |
| 3/12/2067 | 89 | 1 | 80.7% | $308.00 | $248.56 | $59.44 |

**Total Future Loss Less Consumption**                                                      $906,465

**TOTAL LOSS LESS CONSUMPTION**                                                          $1,041,893

# PERSONAL CONSUMPTION ANALYSIS
## Lakiba Palmer

### PAST LOSS

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|---|---|---|---|---|---|---|
| 3/12/2002 | 24 | 3 | 17.4% | $28,248.00 | $4,915.15 | $23,332.85 |
| 3/12/2003 | 25 | 3 | 17.4% | $33,984.00 | $5,913.22 | $28,070.78 |
| 3/12/2004 | 26 | 3 | 17.4% | $35,848.00 | $6,237.55 | $29,610.45 |
| 3/12/2005 | 27 | 3 | 17.4% | $37,084.00 | $6,452.62 | $30,631.38 |
| 3/12/2006 | 28 | 3 | 17.4% | $38,123.00 | $6,633.40 | $31,489.60 |
| 3/12/2007 | 29 | 3 | 17.4% | $39,105.00 | $6,804.27 | $32,300.73 |
| 3/12/2008 | 30 | 3 | 17.4% | $41,002.00 | $7,134.35 | $33,867.65 |
| 3/12/2009 | 31 | 3 | 17.4% | $41,926.00 | $7,295.12 | $34,630.88 |
| 3/12/2010 | 32 | 3 | 17.4% | $42,837.00 | $7,453.64 | $35,383.36 |
| 3/12/2011 | 33 | 3 | 17.4% | $43,757.00 | $7,613.72 | $36,143.28 |
| 3/12/2012 | 34 | 3 | 17.4% | $44,782.00 | $7,792.07 | $36,989.93 |
| 3/12/2013 | 35 | 3 | 17.4% | $46,233.00 | $8,044.54 | $38,188.46 |

**Total Past Loss Less Consumption**      **$175,436**

### FUTURE LOSS

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|---|---|---|---|---|---|---|
| 3/12/2014 | 36 | 3 | 17.4% | $46,919.00 | $8,163.91 | $38,755.09 |
| 3/12/2015 | 37 | 3 | 17.4% | $47,407.00 | $8,248.82 | $39,158.18 |
| 3/12/2016 | 38 | 3 | 17.4% | $47,818.00 | $8,320.33 | $39,497.67 |
| 3/12/2017 | 39 | 3 | 17.4% | $48,298.00 | $8,403.85 | $39,894.15 |
| 3/12/2018 | 40 | 3 | 17.4% | $49,026.00 | $8,530.52 | $40,495.48 |
| 3/12/2019 | 41 | 3 | 17.4% | $49,436.00 | $8,601.86 | $40,834.14 |
| 3/12/2020 | 42 | 3 | 17.4% | $49,763.00 | $8,658.76 | $41,104.24 |
| 3/12/2021 | 43 | 2 | 24.8% | $50,148.00 | $12,436.70 | $37,711.30 |
| 3/12/2022 | 44 | 2 | 24.8% | $50,590.00 | $12,546.32 | $38,043.68 |
| 3/12/2023 | 45 | 2 | 24.8% | $50,808.00 | $12,600.38 | $38,207.62 |
| 3/12/2024 | 46 | 2 | 24.8% | $51,045.00 | $12,659.16 | $38,385.84 |

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|-----------------------|---------------------|-------------------|----------------------|---------------------------|
| 3/12/2025 | 47 | 2 | 24.8% | $51,220.00 | $12,702.56 | $38,517.44 |
| 3/12/2026 | 48 | 2 | 24.8% | $51,210.00 | $12,700.08 | $38,509.92 |
| 3/12/2027 | 49 | 2 | 24.8% | $51,030.00 | $12,655.44 | $38,374.56 |
| 3/12/2028 | 50 | 2 | 24.8% | $49,707.00 | $12,327.34 | $37,379.66 |
| 3/12/2029 | 51 | 2 | 24.8% | $49,518.00 | $12,280.46 | $37,237.54 |
| 3/12/2030 | 52 | 2 | 24.8% | $49,260.00 | $12,216.48 | $37,043.52 |
| 3/12/2031 | 53 | 2 | 24.8% | $48,753.00 | $12,090.74 | $36,662.26 |
| 3/12/2032 | 54 | 2 | 24.8% | $48,197.00 | $11,952.86 | $36,244.14 |
| 3/12/2033 | 55 | 2 | 24.8% | $44,046.00 | $10,923.41 | $33,122.59 |
| 3/12/2034 | 56 | 2 | 24.8% | $43,710.00 | $10,840.08 | $32,869.92 |
| 3/12/2035 | 57 | 2 | 24.8% | $43,410.00 | $10,765.68 | $32,644.32 |
| 3/12/2036 | 58 | 2 | 24.8% | $42,971.00 | $10,656.81 | $32,314.19 |
| 3/12/2037 | 59 | 2 | 24.8% | $42,478.00 | $10,534.54 | $31,943.46 |
| 3/12/2038 | 60 | 2 | 24.8% | $31,922.00 | $7,916.66 | $24,005.34 |
| 3/12/2039 | 61 | 2 | 24.8% | $31,717.00 | $7,865.82 | $23,851.18 |
| 3/12/2040 | 62 | 2 | 24.8% | $31,572.00 | $7,829.86 | $23,742.14 |
| 3/12/2041 | 63 | 2 | 24.8% | $31,413.00 | $7,790.42 | $23,622.58 |
| 3/12/2042 | 64 | 2 | 24.8% | $31,177.00 | $7,731.90 | $23,445.10 |
| 3/12/2043 | 65 | 2 | 24.8% | $17,138.00 | $4,250.22 | $12,887.78 |
| 3/12/2044 | 66 | 2 | 24.8% | $16,536.00 | $4,100.93 | $12,435.07 |
| 3/12/2045 | 67 | 2 | 24.8% | $15,696.00 | $3,892.61 | $11,803.39 |
| 3/12/2046 | 68 | 2 | 24.8% | $14,746.00 | $3,657.01 | $11,088.99 |
| 3/12/2047 | 69 | 2 | 24.8% | $14,540.00 | $3,605.92 | $10,934.08 |
| 3/12/2048 | 70 | 2 | 24.8% | $8,940.00 | $2,217.12 | $6,722.88 |
| 3/12/2049 | 71 | 2 | 24.8% | $8,786.00 | $2,178.93 | $6,607.07 |
| 3/12/2050 | 72 | 2 | 24.8% | $8,580.00 | $2,127.84 | $6,452.16 |
| 3/12/2051 | 73 | 1 | 24.8% | $8,375.00 | $2,077.00 | $6,298.00 |
| 3/12/2052 | 74 | 1 | 80.7% | $8,169.00 | $6,592.38 | $1,576.62 |
| 3/12/2053 | 75 | 1 | 80.7% | $4,932.00 | $3,980.12 | $951.88 |
| 3/12/2054 | 76 | 1 | 80.7% | $4,778.00 | $3,855.85 | $922.15 |
| 3/12/2055 | 77 | 1 | 80.7% | $4,573.00 | $3,690.41 | $882.59 |
| 3/12/2056 | 78 | 1 | 80.7% | $4,419.00 | $3,566.13 | $852.87 |
| 3/12/2057 | 79 | 1 | 80.7% | $4,213.00 | $3,399.89 | $813.11 |
| 3/12/2058 | 80 | 1 | 80.7% | $2,261.00 | $1,824.63 | $436.37 |

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|----------------------|---------------------|-------------------|---------------------|---------------------------|
| 3/12/2059 | 81 | 1 | 80.7% | $2,158.00 | $1,741.51 | $416.49 |
| 3/12/2060 | 82 | 1 | 80.7% | $2,004.00 | $1,617.23 | $386.77 |
| 3/12/2061 | 83 | 1 | 80.7% | $1,901.00 | $1,534.11 | $366.89 |
| 3/12/2062 | 84 | 1 | 80.7% | $1,747.00 | $1,409.83 | $337.17 |
| 3/12/2063 | 85 | 1 | 80.7% | $1,079.00 | $870.75 | $208.25 |
| 3/12/2064 | 86 | 1 | 80.7% | $976.00 | $787.63 | $188.37 |
| 3/12/2065 | 87 | 1 | 80.7% | $873.00 | $704.51 | $168.49 |
| 3/12/2066 | 88 | 1 | 80.7% | $771.00 | $622.20 | $148.80 |
| 3/12/2067 | 89 | 1 | 80.7% | $668.00 | $539.08 | $128.92 |

**Total Future Loss Less Consumption**                                                                      $1,107,632

**TOTAL LOSS LESS CONSUMPTION**                                                                              $1,283,068

## PERSONAL CONSUMPTION ANALYSIS
### Lakiba Palmer

**PAST LOSS**

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|-----------------------|---------------------|-------------------|----------------------|---------------------------|
| 3/12/2014 | 26 | 3 | 17.4% | $27,964.00 | $4,865.74 | $23,098.26 |
| 3/12/2015 | 27 | 3 | 17.4% | $30,624.00 | $5,328.58 | $25,295.42 |
| 3/12/2016 | 28 | 3 | 17.4% | $32,771.00 | $5,702.15 | $27,068.85 |
| 3/12/2017 | 29 | 3 | 17.4% | $34,443.00 | $5,993.08 | $28,449.92 |
| 3/12/2018 | 30 | 3 | 17.4% | $36,253.00 | $6,308.02 | $29,944.98 |
| 3/12/2019 | 31 | 3 | 17.4% | $37,855.00 | $6,586.77 | $31,268.23 |
| 3/12/2020 | 32 | 3 | 17.4% | $39,236.00 | $6,827.06 | $32,408.94 |
| 3/12/2021 | 33 | 3 | 17.4% | $40,525.00 | $7,051.35 | $33,473.65 |
| 3/12/2022 | 34 | 3 | 17.4% | $41,724.00 | $7,259.98 | $34,464.02 |
| 3/12/2023 | 35 | 3 | 17.4% | $44,082.00 | $7,670.27 | $36,411.73 |

**Total Past Loss Less Consumption**  $103,912

**FUTURE LOSS**

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|-----------------------|---------------------|-------------------|----------------------|---------------------------|
| 3/12/2014 | 36 | 3 | 17.4% | $45,076.00 | $7,843.22 | $37,232.78 |
| 3/12/2015 | 37 | 3 | 17.4% | $46,318.00 | $8,059.33 | $38,258.67 |
| 3/12/2016 | 38 | 3 | 17.4% | $47,516.00 | $8,267.78 | $39,248.22 |
| 3/12/2017 | 39 | 3 | 17.4% | $48,370.00 | $8,416.38 | $39,953.62 |
| 3/12/2018 | 40 | 3 | 17.4% | $51,343.00 | $8,933.68 | $42,409.32 |
| 3/12/2019 | 41 | 3 | 17.4% | $51,981.00 | $9,044.69 | $42,936.31 |
| 3/12/2020 | 42 | 3 | 17.4% | $52,421.00 | $9,121.25 | $43,299.75 |
| 3/12/2021 | 43 | 2 | 24.8% | $52,830.00 | $13,101.84 | $39,728.16 |
| 3/12/2022 | 44 | 2 | 24.8% | $53,190.00 | $13,191.12 | $39,998.88 |
| 3/12/2023 | 45 | 2 | 24.8% | $54,894.00 | $13,613.71 | $41,280.29 |
| 3/12/2024 | 46 | 2 | 24.8% | $55,466.00 | $13,755.57 | $41,710.43 |
| 3/12/2025 | 47 | 2 | 24.8% | $55,992.0 | $13,886.02 | $42,105.98 |
| 3/12/2026 | 48 | 2 | 24.8% | $56,340.00 | $13,972.32 | $42,367.68 |

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|-----------------------|---------------------|-------------------|----------------------|---------------------------|
| 3/12/2027 | 49 | 2 | 24.8% | $56,555.00 | $14,025.64 | $42,529.36 |
| 3/12/2028 | 50 | 2 | 24.8% | $55,935.00 | $13,871.88 | $42,063.12 |
| 3/12/2029 | 51 | 2 | 24.8% | $55,801.00 | $13,838.65 | $41,962.35 |
| 3/12/2030 | 52 | 2 | 24.8% | $55,639.00 | $13,798.47 | $41,840.53 |
| 3/12/2031 | 53 | 2 | 24.8% | $55,405.00 | $13,740.44 | $41,664.56 |
| 3/12/2032 | 54 | 2 | 24.8% | $55,071.00 | $13,657.61 | $41,413.39 |
| 3/12/2033 | 55 | 2 | 24.8% | $49,746.00 | $12,337.01 | $37,408.99 |
| 3/12/2034 | 56 | 2 | 24.8% | $49,345.00 | $12,237.56 | $37,107.44 |
| 3/12/2035 | 57 | 2 | 24.8% | $48,775.00 | $12,096.20 | $36,678.80 |
| 3/12/2036 | 58 | 2 | 24.8% | $48,313.00 | $11,981.62 | $36,331.38 |
| 3/12/2037 | 59 | 2 | 24.8% | $47,920.00 | $11,884.16 | $36,035.84 |
| 3/12/2038 | 60 | 2 | 24.8% | $36,247.00 | $8,989.26 | $27,257.74 |
| 3/12/2039 | 61 | 2 | 24.8% | $36,127.00 | $8,959.50 | $27,167.50 |
| 3/12/2040 | 62 | 2 | 24.8% | $36,091.00 | $8,950.57 | $27,140.43 |
| 3/12/2041 | 63 | 2 | 24.8% | $36,005.00 | $8,929.24 | $27,075.76 |
| 3/12/2042 | 64 | 2 | 24.8% | $35,852.00 | $8,891.30 | $26,960.70 |
| 3/12/2043 | 65 | 2 | 24.8% | $19,571.00 | $4,853.61 | $14,717.39 |
| 3/12/2044 | 66 | 2 | 24.8% | $19,354.00 | $4,799.79 | $14,554.21 |
| 3/12/2045 | 67 | 2 | 24.8% | $18,919.00 | $4,691.91 | $14,227.09 |
| 3/12/2046 | 68 | 2 | 24.8% | $18,222.00 | $4,519.06 | $13,702.94 |
| 3/12/2047 | 69 | 2 | 24.8% | $17,269.00 | $4,282.71 | $12,986.29 |
| 3/12/2048 | 70 | 2 | 24.8% | $9,712.00 | $2,408.58 | $7,303.42 |
| 3/12/2049 | 71 | 2 | 24.8% | $9,511.00 | $2,358.73 | $7,152.27 |
| 3/12/2050 | 72 | 2 | 24.8% | $9,310.00 | $2,308.88 | $7,001.12 |
| 3/12/2051 | 73 | 2 | 24.8% | $9,109.00 | $2,259.03 | $6,849.97 |
| 3/12/2052 | 74 | 1 | 80.7% | $8,841.00 | $7,134.69 | $1,706.31 |
| 3/12/2053 | 75 | 1 | 80.7% | $4,956.00 | $3,999.49 | $956.51 |
| 3/12/2054 | 76 | 1 | 80.7% | $4,755.00 | $3,837.29 | $917.72 |
| 3/12/2055 | 77 | 1 | 80.7% | $4,621.00 | $3,729.15 | $891.85 |
| 3/12/2056 | 78 | 1 | 80.7% | $4,420.00 | $3,566.94 | $853.06 |
| 3/12/2057 | 79 | 1 | 80.7% | $4,219.00 | $3,404.73 | $814.27 |
| 3/12/2058 | 80 | 1 | 80.7% | $2,143.00 | $1,729.40 | $413.60 |
| 3/12/2059 | 81 | 1 | 80.7% | $2,009.00 | $1,621.26 | $387.74 |
| 3/12/2060 | 82 | 1 | 80.7% | $1,875.00 | $1,513.13 | $361.88 |

*LAKIBA PALMER, January 23, 2014*

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|---|---|---|---|---|---|---|
| 3/12/2061 | 83 | 1 | 80.7% | $1,808.00 | $1,459.06 | $348.94 |
| 3/12/2062 | 84 | 1 | 80.7% | $1,607.00 | $1,296.85 | $310.15 |
| 3/12/2063 | 85 | 1 | 80.7% | $938.00 | $756.97 | $181.03 |
| 3/12/2064 | 86 | 1 | 80.7% | $871.00 | $702.90 | $168.10 |
| 3/12/2065 | 87 | 1 | 80.7% | $804.00 | $648.83 | $155.17 |
| 3/12/2066 | 88 | 1 | 80.7% | $670.00 | $540.69 | $129.31 |
| 3/12/2067 | 89 | 1 | 80.7% | $603.00 | $486.62 | $116.38 |

**Total Future Loss Less Consumption**     $1,208,375

**TOTAL LOSS LESS CONSUMPTION**     $1,312,287

# PERSONAL CONSUMPTION ANALYSIS
## Lakiba Palmer

### PAST LOSS

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|------|------|------|------|------|
| 3/12/2014 | 26 | 3 | 17.4% | $33,502.00 | $5,829.35 | $27,672.65 |
| 3/12/2015 | 27 | 3 | 17.4% | $36,690.00 | $6,384.06 | $30,305.94 |
| 3/12/2016 | 28 | 3 | 17.4% | $39,262.00 | $6,831.59 | $32,430.41 |
| 3/12/2017 | 29 | 3 | 17.4% | $41,265.00 | $7,180.11 | $34,084.89 |
| 3/12/2018 | 30 | 3 | 17.4% | $44,753.00 | $7,787.02 | $36,965.98 |
| 3/12/2019 | 31 | 3 | 17.4% | $46,731.00 | $8,131.19 | $38,599.81 |
| 3/12/2020 | 32 | 3 | 17.4% | $48,436.00 | $8,427.86 | $40,008.14 |
| 3/12/2021 | 33 | 3 | 17.4% | $50,028.00 | $8,704.87 | $41,323.13 |
| 3/12/2022 | 34 | 3 | 17.4% | $51,507.00 | $8,962.22 | $42,544.78 |
| 3/12/2023 | 35 | 3 | 17.4% | $53,511.00 | $9,310.91 | $44,200.09 |

**Total Past Loss Less Consumption**  $124,494

### FUTURE LOSS

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|------|------|------|------|------|
| 3/12/2014 | 36 | 3 | 17.4% | $54,671.00 | $9,512.75 | $45,158.25 |
| 3/12/2015 | 37 | 3 | 17.4% | $56,190.00 | $9,777.06 | $46,412.94 |
| 3/12/2016 | 38 | 3 | 17.4% | $57,657.00 | $10,032.32 | $47,624.68 |
| 3/12/2017 | 39 | 3 | 17.4% | $58,707.00 | $10,215.02 | $48,491.98 |
| 3/12/2018 | 40 | 3 | 17.4% | $59,658.00 | $10,380.49 | $49,277.51 |
| 3/12/2019 | 41 | 3 | 17.4% | $60,410.00 | $10,511.34 | $49,898.66 |
| 3/12/2020 | 42 | 3 | 17.4% | $60,944.00 | $10,604.26 | $50,339.74 |
| 3/12/2021 | 43 | 2 | 24.8% | $61,362.00 | $15,217.78 | $46,144.22 |
| 3/12/2022 | 44 | 2 | 24.8% | $61,802.00 | $15,326.90 | $46,475.10 |
| 3/12/2023 | 45 | 2 | 24.8% | $62,209.00 | $15,427.83 | $46,781.17 |
| 3/12/2024 | 46 | 2 | 24.8% | $62,875.00 | $15,593.00 | $47,282.00 |
| 3/12/2025 | 47 | 2 | 24.8% | $63,491.00 | $15,745.77 | $47,745.23 |
| 3/12/2026 | 48 | 2 | 24.8% | $63,833.00 | $15,830.58 | $48,002.42 |

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|----------------------|---------------------|-------------------|----------------------|---------------------------|
| 3/12/2027 | 49 | 2 | 24.8% | $64,105.00 | $15,898.04 | $48,206.96 |
| 3/12/2028 | 50 | 2 | 24.8% | $62,945.00 | $15,610.36 | $47,334.64 |
| 3/12/2029 | 51 | 2 | 24.8% | $62,822.00 | $15,579.86 | $47,242.14 |
| 3/12/2030 | 52 | 2 | 24.8% | $62,585.00 | $15,521.08 | $47,063.92 |
| 3/12/2031 | 53 | 2 | 24.8% | $62,349.00 | $15,462.55 | $46,886.45 |
| 3/12/2032 | 54 | 2 | 24.8% | $62,010.00 | $15,378.48 | $46,631.52 |
| 3/12/2033 | 55 | 2 | 24.8% | $57,186.00 | $14,182.13 | $43,003.87 |
| 3/12/2034 | 56 | 2 | 24.8% | $56,685.00 | $14,057.88 | $42,627.12 |
| 3/12/2035 | 57 | 2 | 24.8% | $56,073.00 | $13,906.10 | $42,166.90 |
| 3/12/2036 | 58 | 2 | 24.8% | $55,513.00 | $13,767.22 | $41,745.78 |
| 3/12/2037 | 59 | 2 | 24.8% | $55,115.00 | $13,668.52 | $41,446.48 |
| 3/12/2038 | 60 | 2 | 24.8% | $42,949.00 | $10,651.35 | $32,297.65 |
| 3/12/2039 | 61 | 2 | 24.8% | $42,787.00 | $10,611.18 | $32,175.82 |
| 3/12/2040 | 62 | 2 | 24.8% | $42,726.00 | $10,596.05 | $32,129.95 |
| 3/12/2041 | 63 | 2 | 24.8% | $42,618.00 | $10,569.26 | $32,048.74 |
| 3/12/2042 | 64 | 2 | 24.8% | $42,505.00 | $10,541.24 | $31,963.76 |
| 3/12/2043 | 65 | 2 | 24.8% | $25,205.00 | $6,250.84 | $18,954.16 |
| 3/12/2044 | 66 | 2 | 24.8% | $24,915.00 | $6,178.92 | $18,736.08 |
| 3/12/2045 | 67 | 2 | 24.8% | $24,440.00 | $6,061.12 | $18,378.88 |
| 3/12/2046 | 68 | 2 | 24.8% | $23,459.00 | $5,817.83 | $17,641.17 |
| 3/12/2047 | 69 | 2 | 24.8% | $22,242.00 | $5,516.02 | $16,725.98 |
| 3/12/2048 | 70 | 2 | 24.8% | $13,931.00 | $3,454.89 | $10,476.11 |
| 3/12/2049 | 71 | 2 | 24.8% | $13,663.00 | $3,388.42 | $10,274.58 |
| 3/12/2050 | 72 | 2 | 24.8% | $13,328.00 | $3,305.34 | $10,022.66 |
| 3/12/2051 | 73 | 2 | 24.8% | $13,060.00 | $3,238.88 | $9,821.12 |
| 3/12/2052 | 74 | 1 | 80.7% | $12,725.00 | $10,269.08 | $2,455.93 |
| 3/12/2053 | 75 | 1 | 80.7% | $7,903.00 | $6,377.72 | $1,525.28 |
| 3/12/2054 | 76 | 1 | 80.7% | $7,635.00 | $6,161.45 | $1,473.56 |
| 3/12/2055 | 77 | 1 | 80.7% | $7,367.00 | $5,945.17 | $1,421.83 |
| 3/12/2056 | 78 | 1 | 80.7% | $7,099.00 | $5,728.89 | $1,370.11 |
| 3/12/2057 | 79 | 1 | 80.7% | $6,765.00 | $5,459.36 | $1,305.65 |
| 3/12/2058 | 80 | 1 | 80.7% | $4,219.00 | $3,404.73 | $814.27 |
| 3/12/2059 | 81 | 1 | 80.7% | $4,019.00 | $3,243.33 | $775.67 |
| 3/12/2060 | 82 | 1 | 80.7% | $3,751.00 | $3,027.06 | $723.94 |

| Year | Age | Size of Consumer Unit | Personal Cons. Rate | Adjusted Earnings | Personal Consumption | Earnings Less Consumption |
|------|-----|-----------------------|---------------------|-------------------|----------------------|---------------------------|
| 3/12/2061 | 83 | 1 | 80.7% | $3,483.00 | $2,810.78 | $672.22 |
| 3/12/2062 | 84 | 1 | 80.7% | $3,215.00 | $2,594.51 | $620.50 |
| 3/12/2063 | 85 | 1 | 80.7% | $2,210.00 | $1,783.47 | $426.53 |
| 3/12/2064 | 86 | 1 | 80.7% | $2,009.00 | $1,621.26 | $387.74 |
| 3/12/2065 | 87 | 1 | 80.7% | $1,808.00 | $1,459.06 | $348.94 |
| 3/12/2066 | 88 | 1 | 80.7% | $1,607.00 | $1,296.85 | $310.15 |
| 3/12/2067 | 89 | 1 | 80.7% | $1,406.00 | $1,134.64 | $271.36 |

**Total Future Loss Less Consumption**     $1,420,540

**TOTAL LOSS LESS CONSUMPTION**     $1,545,034

U.S. Bureau of Labor Statistics.  Consumer Expenditure Surveys:  Cross-tabulated Tables
Tables 35, 36, 38, 39, 40.
http://stats.bls.gov/cex/home.htm

| Household Size | Consumption % |
|---|---|
| 1 | 80.7% |
| 2 | 24.8% |
| 3 | 17.4% |
| 4 | 13.7% |
| 5 | 11.4% |

# Household Services Analysis
for
# Lakiba Palmer
Based on an hourly wage rate of $12

| Date | Age | Time (Years) | Basis | Total Average Weekly Hours | Average Cost of Services |
|------|-----|------|-------|------|------|
| 10/12/2000 | 22.58 | 13.29 | Females age 18 to 24 | 14.51 | $120,331 |
| Past Loss | | 13.29 | | | $120,331 |
| 1/23/2014 | 35.87 | 9.13 | Females age 35 to 44 | 23.33 | $132,914 |
| 3/12/2023 | 45.00 | 10.00 | Females age 45 to 54 | 23.23 | $144,955 |
| 3/12/2033 | 55.00 | 10.00 | Females age 55 to 64 | 24.97 | $155,813 |
| 3/12/2043 | 65.00 | 10.00 | Females age 65 to 74 | 26.68 | $166,483 |
| 3/12/2053 | 75.00 | 7.97 | Females age 75 & over | 24.00 | $119,359 |
| 2/28/2061 | 82.97 | | | | |
| Future Totals | | 47.10 | | | $719,524 |
| Average / Year | | | | | $15,277 |

## Total Loss $839,855

Notes:

[1] Analysis computed based on Lakiba Palmer's life expectancy absent wrongful death of 47.1 years (to age 82.97).
[2] Hours of household services are based on data from the U.S. Department of Labor Statistics' American Time Use Survey, as reported in Expectancy Data, The Dollar Value of a Day: 2011 Dollar Valuation. Shawnee Mission, Kansas, 2012.

Curriculum Vitae

Anthony M. Gamboa, Jr., Ph.D., M.B.A.

**BUSINESS ADDRESS**

Vocational Economics, Inc.
4440 PGA Boulevard
Suite 600
Palm Beach Gardens, FL  33410
Phone:  (561) 472-0820
FAX:    (561) 472-8401

**DATE OF BIRTH:**  January 1945

**EDUCATION:**

8/91 to 8/93   University of Chicago, Chicago, Illinois
School of Business
*Postdoctoral study in Financial and Cost Accounting, Macroeconomics and Microeconomics, Political Economy, Investments, Finance, Statistics and Management.*
*Awarded MBA 8/27/93.*

Spring 1993   University of Nevada at Las Vegas
Department of Finance
*Postdoctoral study in Labor Economics*

Summer 1990   Purdue University, W. Lafayette, Indiana
Department of Economics
*Postdoctoral study in Economic Assessment of Earnings and Health Care Costs*

1/87 to 8/87   University of Louisville, Louisville, Kentucky
Department of Economics and Finance
*Postdoctoral study and research in Economic Assessment of Earnings*

9/81 to 12/81   University of Cincinnati, Cincinnati, Ohio
Department of Rehabilitation Counseling
*Postdoctoral study and research in Vocational Rehabilitation Counseling*

9/68 to 6/71   The Ohio State University, Columbus, Ohio
*Ph.D.:  Guidance and Counseling*
*Major:  Vocational Counseling*
*Minor:  Vocational Education*

9/66 to 8/67   Miami University, Oxford, Ohio
*M.Ed.: Guidance and Counseling*
*Major: Vocational Counseling*

9/62 to 6/66   University of Massachusetts at Boston, Boston, Massachusetts
Formerly State College at Boston
*B.S.: Education*
*Major: History*
*Minor: English*

**WORK EXPERIENCE:**

1/77 – Present   Vocational Economics, Inc.
Chief Executive Officer, Senior Analyst (1/91 to Present)
Vocational Economic Analyst (1/77 to 12/90)
*Supervise and conduct assessments to analyze earning capacity in cases of injury or death. Provide vocational rehabilitation counseling, assessment, consultation, and placement of adult disabled and nondisabled clients.*

6/77 to 9/92   Vocational Expert, U.S. Department of Health and Human Services, Social Security Administration, Bureau of Hearings and Appeals.
*Provided vocational testimony in disability hearings. Testimony based on the claimant's age, education, previous work experience. and review of medical evidence as it relates to the claimant's exertional capabilities.*

Spring 1991   Instructor, Purdue University, Department of Economics, West Lafayette, Indiana
*Co-taught course regarding the economic assessment of earnings and health care costs.*

7/71 to 6/88   Department of Educational and Counseling Psychology, University of Louisville, Louisville, Kentucky. (Leave of Absence, 1/86 to 6/88)
Professor of Counseling (7/79 to 6/88)
Associate Professor   (7/75 to 6/79)
Assistant Professor   (7/71 to 6/75)
*Instructed graduate students preparing for careers as vocational counselors, rehabilitation counselors, and school counselors. Performed research in the areas of career development, vocational economic assessment, and vocational rehabilitation.*

6/69 to 6/71   Director of Guidance, State of Ohio, Ohio Youth Commission, Scioto Village School for Girls, Box 100, Powell, Ohio.

*Supervised counseling staff and direct client service in the area of vocational and educational counseling and placement of disabled clients.*

9/68 to 6/69   School Counselor, State of Ohio, Ohio Youth Commission, Fairfield School of
               Boys, Lancaster, Ohio.
               *Vocational, educational, and personal/social counseling of disabled clients.*

9/67 to 6/68   Teacher/Counselor, Delaware City Schools, Delaware, Ohio.
               *History teacher and school counselor.*


## PUBLICATIONS AND PRESENTATIONS:

1.   Gamboa, Anthony M. Jr. and Vega, Enrique. "Using the Vocational and the Economic
     Expert." Presentation given at 14th Annual Neuroscience of Brain Injury Conference:
     Research Informing Medical Treatment & Legal Practice, Silverado Resort, Napa, CA,
     November 8-9, 2013.

2.   Gamboa, Anthony M. Jr. "Defining Earning Capacity Loss." Webinar hosted by
     TrialGuides, Louisville, KY, November 20, 2012.

3.   Gamboa, Anthony M. Jr. Moderator: "Obtaining and Retaining An Adequate Award:
     Avoiding Legal Malpractice." Kentucky CLE Presentation, Marriott Hotel & Convention
     Center, Louisville, KY, November 16, 2012.

4.   Gamboa, Anthony M. Jr. Panel Discussion: Gamboa Gibson Tables and Reduced
     Worklife. Lead Litigation Conference, Sheraton New Orleans Hotel, New Orleans, LA,
     October 19, 2012.

5.   Gamboa, Anthony M. Jr. "Measuring Earning Capacity Loss." Florida CLE Presentation,
     Hilton Palm Beach Airport, West Palm Beach, FL, September 28, 2012.

6.   Gamboa, Anthony M. Jr. "Presentation Entitled Economic Consequences of TBI." The
     25th Annual Conference on Legal Issues in Brain Injury, North American Brain Injury
     Society, Miami InterContinental, Miami, FL, September 12-15, 2012.

7.   Gamboa, Anthony M. Jr. "Understanding Earning Capacity Loss." Presentation given at
     Louisiana Association for Justice annual convention, New Orleans, LA, March 16, 2012.

8.   Gamboa, Anthony M. Jr. "Vocational Losses Your Own Experts Ignore." Presentation
     given at AAJ and CAALA Conference entitled "Exposing, Diffusing, and Debunking
     Junk Science." January 27, 2012.

9.   Gamboa, Anthony M. Jr. "Worklife Expectancy After Whiplash Trauma" *Journal of
     Rehabilitation Medicine*, August (2011): 20.

10.  Sidlow, Phillip D., Vega, Enrique, Gamboa, Anthony M., Jr. "Discounting Future
     Earnings to Present Value: Debunking the Myths" *Advocate*, March (2011): 94-96.

11. Gamboa, Anthony, Sidlow, Phillip & Vega, Enrique. "Economic Damages: What the Infant or Child Could Have Been" *Advocate*, December (2010): 80-85.

12. Gamboa, Anthony M. Jr. "Loss of Earning Capacity after a Brain Injury." Panel Discussion. American Association for Justice, May 21, 2010. Hotel Allegro, Chicago, Illinois, May 21, 2010.

13. Gamboa, Anthony M. Jr. "The New Worklife Expectancy Tables: Application and Rationale." presentation delivered to Nebraska Association of Rehabilitation Professionals. Omaha, Nebraska, May 5, 2010.

14. Gamboa, Anthony M. Jr. "Quantifying Damages in Mediations or Arbitration." presentation delivered to Mass Torts Made Perfect, sponsored by 360 Advocacy. Wynn Hotel, Las Vegas, Nevada, April 22, 2010.

15. Gamboa, Anthony M. Jr. "The Effect of Disability on Worklife Expectancy." debate with Tom Ireland "American Academy of Economic and Financial Experts." April 8, 2010.

16. Gamboa, Anthony M. Jr. "Further Response to Ireland." The Rehabilitation Professional, vol. 17, no. 4 (2009).

17. Gamboa, Anthony M. Jr. et al. "A Vocational Economic Rationale." *Estimating Earning Capacity: A Journal of Debate and Discussion* 2, no. 2 (2009): 97-123.

18. Gamboa, Anthony M. Jr. "Conventional Wisdom: Irelands Critique of the Gamboa-Gibson Worklife Tables." The Rehabilitation Professional, vol. 17, no. 3 (2009).

19. Gamboa, Anthony M. Jr. "The Effect of MTBI on Professional Workers." A presentation delivered at the 22nd Annual Conference of the North American Brain Injury Society, Austin, TX, October 16, 2009.

20. Gamboa, Anthony M., Jr. and Gibson, David. "Proving Economic Loss: Winning Civil Cases with Expert Testimony." The Institute of Continuing Legal Education, Seminar Handbook. Cosponsored by: Litigation Section of the State Bar of Michigan. June 02, 2009.

21. Gamboa, Anthony M., Jr. "Understanding Worklife Expectancy." A presentation delivered at a Pre-Convention Workshop sponsored by The International Association of Rehabilitation Professionals, Fort Lauderdale, FL, October 29, 2008.

22. Gamboa, Anthony M., Jr. and David S. Gibson. "An Introduction to the New Worklife Expectancy Tables, Revised 2006." *Estimating Earning Capacity: A Journal of Debate and Discussion* 1, no. 2 (2008).

23. Gamboa, Anthony M., Jr.  Presentation given at Masters in Trial: A Trial Demonstration from Opening Statement to Jury Deliberation, conducted by the Ohio Chapter of the American Board of Trial Advocates. "Trial Testimony on Vocational Economic Damages Specific to an Employed Individual Without Wage Loss", Columbus, OH, September 5, 2008.

24. Gamboa, Anthony M., Jr. and David S. Gibson. "The Employment Impact of Brain Injury: Data from the Latest Major Surveys." Presentation delivered to the Seventh World Congress on Brain Injury, Lisbon, Portugal, April 11, 2008. Published in *Brain Injury, International Brain Injury Association*, 22, supplement no. 1 (2008).

25. Gamboa, Anthony M., Jr.  "Los Niveles de Ganancia y Empleo Para Personas con Traumatismo Cerebral Moderado: The Earnings Levels and Employment Levels for Persons Sustaining Mild Traumatic Brain Injury." Presentation given at the International meeting on Neurorehabilitation, Havana, Cuba, March 10-14, 2008.

26. Gamboa, Anthony M., Jr. "Economic Consequences of Whiplash Injury." Presentation given at International Whiplash Trauma Congress, Miami, FL, October 27, 2007.

27. Gamboa, Anthony, M., Jr.  "Defining Earning Capacity Loss for Employed TBI Clients." Presentation given at Florida Justice Association Conference, Orlando, FL, October 18, 2007.

28. Gamboa, Anthony M., Jr.  "Vocational Economic Outcomes of Traumatic Brain Injury." Presentation given at North American Brain Injury Society, San Antonio, TX, September 28, 2007.

29. Gamboa, Anthony M., Jr.  "Establishing Lost Earnings When an Individual has Returned to Work." *Journal: The Florida Justice Association*, no. 522 (2007): 33-35.

30. Gamboa, Anthony M., Jr.  "Vocational Economic Outcomes of Traumatic Brain Injury." Presentation given at Second International Conference of Vocational Outcomes in Traumatic Brain Injury, Vancouver, BC, Canada, May 24-26, 2007.

31. Gamboa, Anthony M., Jr.  "Worklife Expectancy for Canadians With and Without Disability: An Aid to Assess Earning Capacity." Presentation given at Atlantic Providence Canadian Trial Lawyers Association Conference, Halifax, Nova Scotia, Canada, December 2, 2006.

32. Gamboa, Anthony M., Jr.  "Key Issues in Assessing Economic Damages in Cases of Acquired Brain Injury." *Brain Injury Professional* 3, no. 3 (2006): 36-37.

33. Gamboa, Anthony M., Jr., Gwendolyn H. Holland, John P. Tierney, and David S. Gibson. "American Community Survey: Earnings and Employment for Persons with Traumatic Brain Injury." *NeuroRehabilitation* 21, no. 4 (2006): 327-333.

34.  Gamboa, Anthony M., Jr.  "Assessing Loss of Earning Capacity in MAID Cases."  Vol. 2, *Litigating Major Auto Injury and Death Cases*, edited by Karen K. Koehler and Michael D. Freeman, 35-1 – 35-49.  Danvers, MA: Thomson/West, 2006.

35.  Gamboa, Anthony M., Jr., Gwendolyn H. Holland, and John P. Tierney.  "Worklife and Disability: Confronting the Myths."  *The Rehabilitation Professional* 14, no. 3 (2006): 43-53.

36.  Gamboa, Anthony M., Jr., and Linda L. Jones.  "Understanding Worklife Expectancy." *Journal of Forensic Vocational Analysis* 9, no. 1 (Summer 2006): 33-41.

37.  Gamboa, Anthony M., Jr., and Linda L. Jones.  "Loss of Earning Capacity of a Child with Brachial Plexus Injury."  Presentation given at the annual meeting of the International Association of Rehabilitation Professionals, Minneapolis, MN, May 19-21, 2006.

38.  Gamboa, Anthony M., Jr.  "Loss of Earning Capacity in Cases of Disability."  *Directions in Rehabilitation Counseling* 17, no. 2 (2006): 9-22.

39.  Gamboa, Anthony M., Jr., and David S. Gibson.  *The New Worklife Expectancy Tables: Revised 2006; By Gender, Level of Educational Attainment, and Level of Disability.* Louisville, KY: Vocational Econometrics, Inc., 2006.

40.  Gamboa, Anthony M., Jr.  "Soft Tissue Injury: Hard on Earnings."  *Choice Worlds*, Fall 2004.  (Newsletter of Choice Medical Center, Boca Raton, FL)

41.  Gamboa, Anthony M., Jr.  "Pediatric Brain Injury: Defining Economic Loss." Presentation given at the annual meeting of the North American Brain Injury Society Medical/Legal Brain Injury Conference, Napa, CA, October 2004.

42.  Gamboa, Anthony M., Jr.  "The Effect of Brain Injury on Earnings and Worklife Expectancy."  Presentation given at the Indiana Continuing Legal Education Forum, Indianapolis, IN, October 2004.

43.  Gamboa, Anthony M., Jr.  "The Economic Effects of Traumatic Brain Injury: Exploring New Data."  Presentation given at the meeting of the North American Brain Injury Society, Beaver Creek, CO, September 2004.

44.  Gamboa, Anthony M., Jr.  "Vocational Economic Assessment."  Presentation given at the meeting of the Kentucky Academy of Trial Attorneys, Louisville, KY, September 2004.

45.  Gamboa, Anthony M., Jr.  "The Effect of Mild Traumatic Brain Injury on Earnings and Worklife Expectancy."  Presentation given at annual meeting of the American Trial Lawyers Association, Boston, MA, July 2004.

46.    Gamboa, Anthony M., Jr. *"The New Worklife Expectancy Tables*: Point-Counterpoint; Alternate Disability Measures for Earnings and Worklife Expectancy." Panel member and paper presented at the meeting of the American Board of Vocational Experts, Charleston, SC, March 2004.

47.    Gamboa, Anthony M., Jr. "Economic Losses in Adult Traumatic Brain Injury Cases." Presentation given at the meeting of the North American Brain Injury Society, September 2003.

48.    Gamboa, Anthony M., Jr. "Worklife Expectancy for Canadians With and Without Disability: An Aid to Assess Earning Capacity." *The Verdict* 95 (January 2003): 45-52. (Trial Lawyers Association of British Columbia)

49.    Gamboa, Anthony M., Jr. "Vocational and Economic Considerations in Mild Traumatic Brain Injury." In *Handling the Brain Injury Case: A Primer for Lawyers*. Louisville, KY: Kentucky Academy of Trial Attorneys, December 2002.

50.    Gamboa, Anthony M., Jr. "Vocational Rehabilitation Economics." Presentation given at the meeting of the Brain Injury Association of Nevada, *Required Medical and Legal Education in the Traumatic Brain Injury Case*, Las Vegas, NV, October 2002.

51.    Gamboa, Anthony M., Jr. "Disability, Loss of Function, Loss of Limb." Presentation given at the Indiana Continuing Legal Education Forum, *64 Tips for Personal Injury Damages*, Indianapolis, IN, August 2002.

52.    Gamboa, Anthony M., Jr. *"The New Worklife Expectancy Tables: 2002 Edition."* Vocational Econometrics, Inc.: Louisville, KY, July 2002.

53.    Gamboa, Anthony M., Jr. "The Field of Forensic Vocational Economics: Past, Present and Future." Presentation given at the annual meeting of the International Association of Rehabilitation Professionals, San Diego, CA, April 2002.

54.    Gamboa, Anthony M., Jr. "Quantifying Economic Damages." Presentation given at the meeting of the Kentucky Academy of Trial Attorneys, *Litigating the Brain Injury Case*, Bowling Green, KY, June 2001.

55.    Gamboa, Anthony M., Jr. "Measuring and Defining Damages." Presentation given at the Indiana Continuing Legal Education Forum, *ADA Past, Present and Future*, Indianapolis, IN, June 2001.

56.    Gamboa, Anthony M., Jr. "Understanding Worklife Expectancy." Paper presented at the meeting of the American Rehabilitation Economics Association, Reno, NV, May 2001.

57.    Gamboa, Anthony M., Jr. "Worklife Expectancy for Persons with a Work Disability: Meeting the Daubert Challenge." Paper presented at the meeting of the American Board of Vocational Experts, San Diego, CA, March 2001.

58.    Gamboa, Anthony M., Jr. "Under Examination: New Worklife Tables; The Final Word." *Medical Malpractice Law and Strategy,* March 2001:16.

59.    Gamboa, Anthony M., Jr. "Understanding Worklife Expectancy." Presentation given at the meeting of the Massachusetts Academy of Trial Attorneys, Boston, MA, March 2001.

60.    Gamboa, Anthony M., Jr. "Defining Economic Damages: The Importance of Worklife Expectancy." Presentation given at the meeting of the Utah Trial Lawyers Association and the Utah Brain Injury Association, Salt Lake City, UT, February 2001.

61.    Gamboa, Anthony M., Jr. "Understanding Worklife Expectancy: The Key to Measuring Earning Capacity." Presentation given at the seminar for Vocational Econometrics, Inc., Louisville, KY, December 2000.

62.    Gamboa, Anthony M., Jr. "Defining Fair Recovery for Loss of Earning Capacity." Presentation given at the annual meeting of the Colorado Trial Lawyers Association, Steamboat Springs, CO, August 2000.

63.    Gamboa, Anthony M., Jr. "The Economic Issues of Traumatic Brain Injury." Presentation given at the annual meeting of the Brain Injury Association of New York State, New York, NY, June 2000.

64.    Gamboa, Anthony M., Jr. Presentation given at the meeting of the Louisville Association of Paralegals, Louisville, KY, March 2000.

65.    Gamboa, Anthony M., Jr. "Vocational Rehabilitation and Economic Loss." Presentation given at the meeting of the Utah Trial Lawyers Association and Utah Brain Injury Association, Salt Lake City, UT, January 2000.

66.    Gamboa, Anthony M., Jr. "Mild Brain Injury: Vocational and Economic Consequences." Presentation given at the annual meeting of the Brain Injury Association's Conference for Attorneys, Phoenix, AZ, September 1999.

67.    Gamboa, Anthony M., Jr., and Paul Prachyl. "The Vocational Economic Consequences of Brain Injury: An Update." *The Neurolaw Letter* 8, no. 11 (July 1999): 73-79.

68.    Gamboa, Anthony M., Jr., David S. Gibson, Gwendolyn H. Holland, Ronald E. Missun, Paul Prachyl, Darryl Rowe, John P. Tierney, and Mary Watson. *VALE 2000 User's Manual.* Louisville, KY: Vocational Econometrics, Inc., 1999.

69.    Missun, Ronald E., and Anthony M. Gamboa, Jr. "Important Considerations When Computing the Present Value of Lost Earning Capacity." *ATLA tbi* 6, no. 6 (Spring 1999): 16-17.

70.    Gamboa, Anthony M., Jr. "Lost Earning Potential: The Economic Consequences of Occupational Disability." Presentation given at the meeting of the Southeast Region National Rehabilitation Association, Louisville, KY, April 1999.

71. Gamboa, Anthony M., Jr. "Evaluating the Economic Loss: There is No Discount." Presentation given at the meeting of the Consumer Attorneys of California, Lake Tahoe, CA, March 1999.

72. Gamboa, Anthony M., Jr. *The New Worklife Expectancy Tables: 1998 Edition*." Louisville, KY: Vocational Econometrics, Inc., 1998.

73. Gamboa, Anthony M., Jr. "Economic Damages." Presentation given at the meeting of Institute of Continuing Legal Education, Troy, MI, October 1998.

74. Gamboa, Anthony M., Jr. "Mild Brain Injury: Vocational and Economic Consequences; Direct Examination of Experts." Presentation given at the annual meeting of the Brain Injury Association Annual Conference for Attorneys, Palm Beach, FL, September 1998.

75. Gamboa, Anthony M., Jr. Presentation given at the monthly meeting of the Fayette County Bar Association, Lexington, KY, October 1998.

76. Gamboa, Anthony M., Jr. Presentation given at the meeting for Vocational Economics, Inc., *Defining Monetary Damages,* Louisville, KY, August 1998.

77. Gamboa, Anthony M., Jr. "Vocational Economics: The Ability to Earn." Presentation given at the Brain Injury Conference of the Arkansas Trial Lawyers Association, Little Rock, AR, October 1997.

78. Gamboa, Anthony M., Jr. "Mild Brain Injury and Its Vocational and Economic Consequences." Presentation given at the Indiana Continuing Legal Education Forum, Indianapolis, IN, August 1997.

79. Gamboa, Anthony M., Jr., David S. Gibson, and John P. Tierney. "Americans with Disability Act: Short Term Effects." Paper presented at the Authors' Bizarre annual meeting of the American Law and Economics Association, May 10-11, 1996.

80. Gamboa, Anthony M., Jr., and Steve Collard. "Are the Wrongfully Injured Adequately Awarded?" *Michigan Lawyers Weekly* 9, no. 50 (October 23, 1995): 6, 41.

81. Gamboa, Anthony M., Jr. "Vocational Assessment: Determining Loss of Earning Capacity." Presentation given at the annual trial lawyers' conference sponsored by the Brain Injury Association, *The Brain Injury Case: What the Trial Lawyer Needs To Know,* Colorado Springs, CO, September 30, 1995.

82. Gamboa, Anthony M., Jr. "Are the Wrongfully Injured Adequately Awarded?" In *The Issues Papers: Seventh National Forum on Issues in Vocational Assessment, March 10-12, 1995, Louisville, Kentucky,* compiled by Ronald R. Fry, 94-98. Menomonie, WI: The Rehabilitation Resource, Stout Vocational Rehabilitation Institute, School of Education and Human Services, University of Wisconsin - Stout, 1995.

83.  Gamboa, Anthony M., Jr., interview by Elaine McArdle. "Lawyers Undervalue Plaintiffs' Loss of 'Ability to Work.'" *Lawyers Weekly USA*, no. 95-15 (July 17, 1995): 634, 640.

84.  Gamboa, Anthony M., Jr. "Vocational Loss Evaluation of the Survivor of Traumatic Brain Injury." Presentation given at the annual meeting of the Ohio Head Injury Association (sponsored by Clark, Perdue, Roberts & Scott Co., L.P.A.), *Third Annual Brain Injury Seminar: Giving Full Service to Survivors of Traumatic Brain Injury*, Columbus, OH, May 19, 1995.

85.  Gamboa, Anthony M., Jr. "The Vocational Economic Assessment." Presentation given at the meeting of the Michigan Head Injury Alliance and Mothers Against Drunk Driving Michigan State Organization, (sponsored by Simkins & Simkins, Attorneys at Law), *Toward a Better Understanding of Traumatic Brain Injury*, Detroit, MI, March 23, 1995.

86.  Gamboa, Anthony M., Jr. "Are the Wrongfully Injured Adequately Awarded?" Presentation given at the meeting of the Vocational Evaluation and Work Adjustment Association, a Professional Division of the National Rehabilitation Association, *Seventh National Forum on Issues in Vocational Assessment*, Louisville, KY, March 10, 1995.

87.  Gamboa, Anthony M., Jr. *The New Worklife Expectancy Tables: 1995 Edition.* Vocational Econometrics, Inc., Louisville, KY, January 1995.

88.  Gamboa, Anthony M., Jr. "Defining Loss of Earning Capacity in Cases of Partial Disability." Presentation given at the meeting of the Young Lawyers Section of the Chicago Bar Association, Chicago, IL, October 27, 1994.

89.  Gamboa, Anthony M., Jr., David S. Gibson, and Gwendolyn H. Holland. *Analysis of Occupational Characteristics*, 2nd edition. Louisville, KY: Vocational Econometrics, Inc., October 1994.

90.  Gamboa, Anthony M., Jr. "Vocational Assessment: Determining Loss of Earning Capacity." Presentation given at the annual trial lawyers' meeting sponsored by the National Head Injury Foundation, *The Head Injury Case: What the Trial Lawyer Needs To Know*, Palm Beach, FL, October 1, 1994.

91.  Gamboa, Anthony M., Jr., and Joseph Spoonster. "Brain Injury and Loss of Earning Capacity." Presentation given at the meeting of the Cleveland Academy of Trial Attorneys, Cleveland, OH, September 27, 1994.

92.  Gamboa, Anthony M., Jr. "Worklife Expectancy and Disability." Presentation given at the annual meeting of the Western Economic Association (International Conference), Vancouver, British Columbia, Canada, July 1, 1994.

93.  Gamboa, Anthony M., Jr. "Mild Brain Injury and Its Vocational Economic Consequences." Presentation given at the annual meeting of the Ohio Head Injury Alliance Association (sponsored by Clark, Perdue, Roberts & Scott Co., L.P.A.), *Representing the Survivor of 'Mild' Head Injury*, Columbus, OH, June 3, 1994.

94.   Gamboa, Anthony M., Jr. "The Vocational Economic Assessment." Presentation given at the meeting of the Michigan Head Injury Alliance and Mothers Against Drunk Driving, Michigan State Organization (sponsored by Simkins & Simkins, Attorneys at Law), *Toward a Better Understanding of Traumatic Brain Injury*, Detroit, MI, March 24, 1994.

95.   Gamboa, Anthony M., Jr. "The Vocational Economic Consequences of Traumatic Brain Injury: Mild-Moderate-Severe." In *Analysis, Understanding and Presentation of Cases Involving Traumatic Brain Injury*, edited by Charles N. Simkins. Washington, DC: National Head Injury Foundation, February 1994.

96.   Gamboa, Anthony M., Jr. "The Effect of CPLR Articles 50A and 50B on Present Value Calculations." Presentation given at the meeting of the New York State Head Injury Association, *The Effect of CPLR Articles 50A and 50B on Catastrophic Head Injury*, New York, NY, December 9-10, 1993.

97.   Gamboa, Anthony M., Jr. "The Vocational Economic Assessment." Presentation given at the meeting of the Practicing Law Institute, *Proving and Defending Against Damages in Personal Litigation*, New York, NY, June 30, 1993.

98.   Gamboa, Anthony M., Jr., and Angela Suell. "Mild Brain Damage and Its Vocational Economic Consequences." Paper presented at the meeting of the Ohio Head Injury Foundation (sponsored by Clark, Perdue and Roberts Law Firm), *Recognizing, Handling and Litigating the Traumatic Head Injury Case*, Columbus, OH, May 21, 1993.

99.   Gamboa, Anthony M., Jr., and Kathleen Vogler. "The Economic Effect of Personal Injury." *The Indiana Lawyer* 3, no. 25 (April 24, 1993).

100.  Gamboa, Anthony M., Jr. "Demonstrating Damages in Brain Injury Cases." Presentation given at the meeting of the Michigan Head Injury Alliance and Mothers Against Drunk Driving, Michigan State Organization (sponsored by Simkins & Simkins, Attorneys at Law), *Effective Representation of Persons Surviving Head Injury*, Northville, MI, March 25, 1993.

101.  Gamboa, Anthony M., Jr. "Demonstrating Damages in Brain Injury Cases." Presentation given at meeting of the State of Connecticut Mothers Against Drunk Driving (sponsored by Simkins and Simkins, Attorneys at Law), *Effective Representation of Persons Surviving Traumatic Brain Injury*, North Haven, CT, October 9, 1992.

102.  Male, Robert, Frank Lawlis, and Anthony M. Gamboa, Jr. "Establishing Losses Due to Personal Injury: By the Numbers." *Trial News* 27, no, 3 (November 1991). (Washington State Trial Lawyers Association)

103.  Gamboa, Anthony M., Jr. "Defining Economic Damages." Paper presented at the annual meeting of the Inner Circle of Advocates, Santa Fe, NM, August 1991.

104.   Gamboa, Anthony M., Jr., and Marcia Hanak. "Catastrophic Injuries, Catastrophic Costs: The Life Care Plan," *Trial*, March 1991:59-63.

105.   Vogenthaler, Donald, John P. Tierney, and Anthony M. Gamboa, Jr. "Disability and Lost Earnings: Implications of New Data." *Journal of the Missouri Bar*, March 1991:150-153.

106.   Gamboa, Anthony M., Jr. "Demonstrating Damages in Brain Injury Cases." Presentation given at the meeting of the Michigan Head Injury Alliance (sponsored by Simkins and Simkins, Attorneys at Law), *Effective Representation of Persons Surviving Head Injury*, Detroit, MI, March 21, 1991.

107.   Gamboa, Anthony M., Jr. "What the Infant or Child Could Have Been." *The Best of Trial*, 1990:339-343. (American Trial Lawyers Association Press, reprint from the September 1986 issue of *Trial*).

108.   Gamboa, Anthony M., Jr. "Vocational Rehabilitation: More Than Resume Preparation and Want Ad Review." Presentation given at the annual Workers' Compensation meeting of the Louisville Bar Association, Louisville, KY, March 30, 1990.

109.   Gamboa, Anthony M., Jr., Valerie Ellien, and Marcia Hanak. "Projecting Future Economic Loss: Lost Earning Capacity and Medical Expense in Cases of Partial Disability and Catastrophic Injury." Presentation given at the meeting of the New York Trial Lawyers Institute, New York, NY, March 28, 1990.

110.   Gamboa, Anthony M., Jr. "Demonstrating Damages in Brain Injury Cases." Presentation given at the meeting of the Michigan Head Injury Alliance, *Representing the Closed Head Injury Victim*, Northville, MI, March 15, 1990.

111.   Gamboa, Anthony M., Jr. "Use of an Economist in Personal Injury and Wrongful Death Litigation." Presentation given at the meeting of the Arizona Trial Lawyers Association, Phoenix, AZ, February 9, 1990.

112.   Gamboa, Anthony M., Jr., John P. Tierney, and Gwendolyn H. Holland. "Worklife Expectancy and Disability." *Journal of Forensic Economics* 2, no. 2 (April 1989): 29-32.

113.   Gamboa, Anthony M., Jr. "Projecting Future Damages in Head Injury." Presentation given at the meeting of HOPE: Center for Head Injury and the Synergos Neurological Centers, *Medical Perspectives Regarding the Head Injury Case*, Phoenix, AZ, April 28, 1989.

114.   Gamboa, Anthony M., Jr. "Direct and Cross Examination of a Vocational Economist." Presentation given at the Georgetown University Law Center, April 11, 1989. (Guest Lecturer, Advanced Evidence)

115.  Henderson, Suzanne, John P. Tierney, Anthony M. Gamboa, Jr., and Angela Suell. "Assessing Vocational Damages Due to Burn Injury." Paper presented at the meeting of the American Burn Association, New Orleans, LA, March 31, 1989.

116.  Tierney, John P., Anthony M. Gamboa, Jr., and Gwendolyn H. Holland. "Demonstrating Damages in Brain Injury Cases." *Journal of the Missouri Bar* 44, no. 8 (December 1988): 515-517, 520-521.

117.  Gamboa, Anthony M., Jr., Gwendolyn H. Holland, and John P. Tierney. "Assessing Work and Earning Capacity." Vol. 2, *Advances in Clinical Rehabilitation*, edited by Myron G. Eisenberg and Roy Grzesiak, 6-36. New York: Springer Publishing Company, 1988.

118.  Gamboa, Anthony M., Jr. "Assessing Economic Loss." Discussant at the meeting of the Kentucky Academy of Trial Attorneys, Louisville, KY, June 29, 1988.

119.  Tierney, John P., Anthony M. Gamboa, Jr., and Gwendolyn H. Holland. "Addressing the Value of Household Services Through a Functional Vocational Analysis." *Journal of Forensic Economics* 1, no. 2 (May 1988): 93-101.

120.  Gamboa, Anthony M., Jr. "Vocational Economic Damages: Establishing Future Earning Capacity for the Injured Client." *Trial*, March 1988:33-35.

121.  Gamboa, Anthony M., Jr. "Assessing Capacity to Perform Work and Earn Money." Presentation given at the meeting of the National Forensic Center, Atlanta, GA, December 1987.

122.  Gamboa, Anthony M., Jr. "Assessing Capacity to Perform Work and Earn Money." *Journal of Applied Rehabilitation Counseling* 18, no. 3 (Fall 1987): 49-51.

123.  Gamboa, Anthony M., Jr. *Worklife Expectancy of Disabled Versus Nondisabled Persons by Sex and Level of Educational Attainment.* Louisville, KY: Vocational Econometrics Press, 1987.

124.  Gamboa, Anthony M., Jr. *Worklife Profile.* Louisville, KY: Vocational Economics, Inc., Louisville, KY, 1987. (software designed to assess loss of earning capacity as a result of death or total disability)

125.  Gamboa, Anthony M., Jr., and Mary Watson. *Worklife Profile Users Manual.* Louisville, KY: Vocational Economics Press, 1987.

126.  Gamboa, Anthony M., Jr. "Evaluating Loss of Work Potential: Resources and Experts." Presentation given at the annual meeting of the Division of Rehabilitation Psychology, American Psychological Association, New York, NY, August 1987.

127.  Gamboa, Anthony M., Jr., John P. Tierney, and Vickie Gregory. "Assessing Capacity to Perform Work and Earn Money." Discussants at the annual meeting of the American Psychological Association, New York, NY, August 1987.

128.  Gamboa, Anthony M., Jr. "Vocational Assessment of Lost Earnings." Presentation given at the meeting of the Texas Rehabilitation Association, Dallas, TX, July 14, 1987.

129.  Gamboa, Anthony M., Jr. "Review of *A Guide to Rehabilitation*," by Paul Deutsch and Horace Sawyer. *American Journal of Forensic Psychiatry* 8, no. 1 (1987): 45-46.

130.  Brookshire, Michael, William Cobb, and Anthony M. Gamboa, Jr. "Worklife of the Partially Disabled." *Trial*, March 1987:44-47.

131.  Gamboa, Anthony M., Jr. "Wage Loss Analysis." Presentation given at the meeting of the National Council on Rehabilitation Education, Region IV Mid-Winter Conference, Atlanta, GA, February 6, 1987.

132.  Gamboa, Anthony M., Jr. "What the Infant or Child Could Have Been." The Audio Lawyer, American Law Institute, American Bar Association Committee on Continuing Professional Education, Philadelphia, 1987.

133.  Gamboa, Anthony M., Jr. "Introducing VALE: A Microcomputer Program Designed to Assess Earning Capacity." *Rehabilitation Counseling Bulletin* 30, no. 4 (June, 1987): 278-81.

134.  Gamboa, Anthony M., Jr. "Work Capacity Services for the Burn Patient." Presentation given at annual meeting of the International Society for Burn Injuries, The World Health Organization, Denver, CO, December 1986.

135.  Gamboa, Anthony M., Jr. "What the Infant or Child Could Have Been." *Trial*, September 1986:76-80.

136.  Gamboa, Anthony M., Jr. "Establishing Damages in Cases of Partial Disability." Presentation given at the meeting of the Division of Rehabilitation Psychology, American Psychological Association Annual Convention, Washington, DC, August 1986.

137.  Gamboa, Anthony M., Jr. *VALE (Vocational Assessment of Lost Earnings)*. Louisville, KY: Vocational Econometrics, Inc., 1986, Revised 1993. (software program designed to assess loss of earning capacity as a result of partial or total physical or mental impairment)

138.  Gamboa, Anthony M., Jr. "Value of Loss of Service." Discussant at the annual meeting for the University of Louisville Continuing Legal Education, *Dissolution: Practical Problems in Preparing and Presenting the Complex Action*, November 9, 1984.

139. Gamboa, Anthony M., Jr. "Role of Vocational Analysis in Evaluation of Occupational Disability." Presentation given at the Workers Compensation meeting for the Office of Continuing Legal Education, University of Louisville School of Law, June 15, 1984.

140. Gamboa, Anthony M., Jr. "Multiple Psychiatric Diagnosis: Alcoholism and Depression." Discussant at the annual meeting of the American Psychological Association (presented by J. T. Aponte, T. A. Bell, and C. E. Aponte), Anaheim, CA, August 1983.

141. Gamboa, Anthony M., Jr. "Welfare Recipients and Displaced Homemakers." Panelist at the statewide meeting of the Job Training Partnership Act, Kentucky Department for Human Resources, Frankfort, KY, July 1983.

142. Brookshire, Michael, William Cobb, and Anthony M. Gamboa, Jr. "Proof of Damages." Presentation given at a meeting of the Kentucky Trial Lawyers Association and University of Louisville School of Law, Louisville, Kentucky, May 1983.

143. Gamboa, Anthony M., Jr. "Rehabilitation of the Injured Worker." *Kentucky Self-Insured Newsletter*, December 1982.

144. Gamboa, Anthony M., Jr. "Behavior Modification and Its Use with the Physically Disabled." Presentation given at the meeting of the Kentucky Rehabilitation Nurses Association, May 1982.

145. Weinreich, S., and Anthony M. Gamboa, Jr. "Caveat Emptor: A Guide to Graduate Study in Counselor Education." *The Personnel and Guidance Journal*, December 1977:214-218.

146. Gamboa, Anthony M., Jr. "Review of *An Evaluation of Policy-Related Rehabilitation Research*," by Monroe Berkowitz, et al. *Personnel and Guidance Journal*, April 1977:447-448.

147. Gamboa, Anthony M., Jr. "Review of *Counseling Techniques That Work*," by Wayne W. Dyer and John Vriend. *Personnel and Guidance Journal*, April 1977:449.

148. Birkimer, J., J. Brown, Anthony M. Gamboa, Jr., and A. Frankel. "The Effects of Behavioral Consultation Workshop on the Reduction of Children's Problem Behaviors." *Journal of Corrective and Social Psychiatry* 23, no. 1 (1977): 22-26.

149. Brown, J., Anthony M. Gamboa, Jr., J. Birkimer, and R. Brown. "Some Possible Effects of Parent Self-Control Training on Parent-Child Interactions." In *Behavioral Modification and Families: Applications and Developments*. New York: Bruner-Mazel, Inc., 1976.

150. Gamboa, Anthony M., Jr., D. Tosi, and A. Riccio. "Race and Counselor Climate in the Counselor Preference of Delinquent Girls." *Journal of Counseling Psychology* 23, no. 2 (1976): 160-62.

151.   Brown, J., A. Frankel, J. Birkimer, and Anthony M. Gamboa, Jr. "The Effects of Classroom Management Workshop on the Reduction of Children's Problematic Behaviors." *Journal of Corrective and Social Psychiatry*, no. 2 (1976): 1-9.

152.   Gamboa, Anthony M., Jr. "Review of *Workshop Management: A Behavioral and Systems Approach*," by D. B. Simpson and P. M. Podsakoff. *Behavioral Science*, November 1976.

153.   Gamboa, Anthony M., Jr. "Professional Helping and Cultural Difference." Presentation given at the meeting of the International Association of Personnel in Employment Security, Louisville, KY, April 1976.

154.   Gamboa, Anthony M., Jr. "Counselor Self-Management: The First Step Toward an Effective Guidance Program." Presentation given at the meeting of the Kentucky Personnel and Guidance Association, with J.H. Brown, October 1974.

155.   Gamboa, Anthony M., Jr., and J. Garrett. "Re-Education: A Mental Health Service in an Educational Setting." *American Journal of Orthopsychiatry* 4, no. 3 (April 1974): 450-453.

156.   Gamboa, Anthony M., Jr., and T. Koltveit. "I-Level: A Differential Counseling Approach." *The Personnel and Guidance Journal*, October 1973:83-99.

157.   Gamboa, Anthony M., Jr. "Differential Education in the Inner-City." *Bureau of School Services Bulletin*, June 1973:43-51.

158.   Gamboa, Anthony M., Jr., W. Kelly, and T. Koltveit. "The Humanistic Counselor in a Technocratic Society." *The School Counselor*, January 1972:160-166.

159.   Gamboa, Anthony M., Jr. "Race and Counselor Climate as Selected Factors in the Counselor Preference of Delinquent Girls." Doctoral Dissertation, The Ohio State University, 1971.

## PROFESSIONAL ASSOCIATIONS:

American Law and Economics Association
American Psychological Association
       Division of Counseling Psychology
       Division of Rehabilitation Psychology
American Counseling Association
       National Employment Counselors Association
       American Rehabilitation Counseling Association
International Association of Rehabilitation Professionals

**SERVICE:**

| | |
|---|---|
| 9/87 to 6/88 | Appointed member of the Convention Program Committee, American Psychological Association, Division of Rehabilitation Psychology. |
| 1/83 to 12/85 | Appointed member of the Board of Advisors, Graduate Program in Rehabilitation Counseling, The Graduate School, University of Kentucky, Lexington, Kentucky. |
| 1/78 to 12/81 | Elected member of the Jefferson County Board of Education.  Represented 100,000 people from the City of Louisville and Eastern Jefferson County, Kentucky. |

Chairman of the Board, 1/81 to 12/81
Vice-Chairman of the Board, 1/80 to 12/80
Chairman of the Board's Superintendent Search Committee, 6/80 to 6/81
Member of the Task Force on Legislation, 1/78 to 12/80
Chairman of the Board - Finance Committee, 1/79 to 12/80
Member of the Task Force on Educational Funding, 1/79 to 12/79
Member of the Community Audit Committee, 1/79 to 12/79
Chairman of the Reorganization Advisory Committee, 1/78 to 12/79
Member of the Budget and Finance Committee, 1/78 to 12/79

Revised:  November 2013

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Republic of Sudan
Ali Ahmed Karti
Minister of Foreign Affairs
Embassy of The Republic of
Sudan Massachusetts Ave NW.
2210 Massachusetts Ave NW.
Washington, DC 20008

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7010 1060 0001 2306 4335

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

U.S. Postal Service™

**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | |
|---|---|---|
| Certified Fee | | Postmark Here |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To Republic of Sudan Ali Ahmed Karti Minister of Foreign Affairs
Street, Apt. No.; Embassy of The Republic of Sudan
or PO Box No. 2210 Massachusetts Avenue NW.
City, State, ZIP+4 Washington, DC 20008

PS Form 3800, August 2006    See Reverse for Instructions

7010 1060 0001 2306 4335

# HALL, LAMB AND HALL, P.A.

ATTORNEYS AT LAW

OFFICES AT GRAND BAY PLAZA

PENTHOUSE ONE

2665 SOUTH BAYSHORE DRIVE

MIAMI, FLORIDA 33133

1/24/14

TO:

Republic of Sudan
Ali Ahmed Karti
Minister of Foreign Affairs
Embassy of the Republic of Sudan
2210 Massachusetts Avenue NW
Washington, DC 20008

7010 1060 0001 2306 4335

Terrorism, al-Qaeda, the Sudan and the Bombing of the USS Cole
by Steven Emerson
January 24 2014

9870

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | | |
|---|---|---|
| AVINESH KUMAR, et al., | ) | |
| | ) | Civil Action No.: 2:10cv171 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REPUBLIC OF SUDAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' RULE 26(a)(2)(C) WITNESS SUMMARIES

Plaintiffs, by undersigned counsel, hereby provide the following witness summaries pursuant to Rule 26(a)(2)(C) on behalf of non-retained expert witnesses who are not required to provide a written report.

I.  Robert James Woolsey, Jr.
    Woolsey Partners, LLC
    Jim@woolseypartners.com

Plaintiffs will be relying on testimony previously given by Mr. James Woolsey in *Rux v. The Republic of Sudan*, No. 2:04-cv-428 (E.D. Va.). Mr. Woolsey's testimony is attached hereto as Exhibit "A." Mr. Woolsey served as Undersecretary of the Navy during President Carter's administration and as the Director of the Central Intelligence Agency during President Clinton's administration. Mr. Woolsey testified on the subject of the safe harbor, fundraising aid, and other assistance provided by Sudan to Al Qaeda in order to plan the attack on the USS Cole.

In particular, Mr. Woolsey testified that Sudan provided false diplomatic passports to allow Al Qaeda members to travel freely throughout Sudan, provided a place to conduct meetings of terrorists to plan terrorist attacks, and allowed Al Qaeda to set up training camps within Sudan. Mr. Woolsey also testified about the strategic location of Sudan in relation to the

{9870/00339701.1}

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 ·TEL. (305) 374-5030 · FAX (305) 374-5033

Port of Yemen in the Gulf of Aden, where the attack on the USS Cole took place, explaining that obtaining safe harbor in Sudan provided Al Qaeda with a very short passage from Sudan's coastline to the Port of Yemen.

Mr. Woolsey concluded that, in his opinion, the support provided by Sudan to Al Qaeda substantially assisted Al Qaeda in the attack on the USS Cole. In rendering his opinion, Mr. Woolsey relied on his own experience as Director of the Central Intelligence Agency and his knowledge of international terrorism, as well as State Department reports, Canadian intelligence reports, and information contained in press releases and other publications.

II.  **Douglas Farah**
     **7304 Carol Avenue**
     **# 101**
     **Tacoma Park, MD**

Plaintiffs will be relying on testimony previously given by Douglas Farah in *Rux v. The Republic of Sudan*, No. 2:04-cv-428 (E.D. Va.). The testimony given in that case is attached as Exhibit "B."

Mr. Farah has a BS in journalism and a BA in Latin American Studies from the University of Kansas. Mr. Farah has been actively engaged in investigating Islamist terrorism post 9/11 and has also testified on two occasions before the United States Congress on the issue of terror finance. He is also the author of "Blood from Stones, the Secret Financial Network of Terror."

Mr. Farah is expected to testify that Sudan provided material financial support to Al Qaeda which allowed for the bombing of the USS Cole to be carried out. In support of this testimony, Mr. Farah will rely on his research which shows the following:

{9870/00339701.1}

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

In the 1990s, Hassan Al Turabi, the leader of Sudan at the time, invited a number of terrorist organizations to meet in Sudan without visa or customs requirements. Sudan has hosted these terrorist conferences up until at least 2005. The admission to Sudan provided the terrorist organizations with a physical structure under which they could operate with the protection of government. Furthermore, the government protection allowed them to acquire property, businesses, launder money, obtain diplomatic passports, and provided a banking structure. In fact, Osama Bin Laden invested 50 million dollars with the Al Shamal Bank in Sudan. The government support also allowed the terrorist groups to easily move across the border to Yemen. Without the active support, infrastructure, and safety provided by Sudan, the bombing of the USS Cole would not have been carried out.

By: _s:/ Kevin E. Martingayle_____
KEVIN E. MARTINGAYLE, VA BAR # 33865
Bischoff Martingayle, P.C.
3704 Pacific Ave., Suite 200
Virginia Beach, VA 23451
E-mail: martingayle@bischoffmartingayle.com
Tel: (757) 416-6009
Fax: (757) 428-6982

ANDREW C. HALL*
Florida Bar # 111480
2665 S. Bayshore Dr., PH 1
Miami, FL 33133
andyhall@hlhlawfirm.com
Tel: (305) 374-5030
Fax: (305) 374-5033

JAMES COOPER-HILL*
Texas Bar # 04789300
320 Olympic Drive
Rockport, Texas 78382
corpuslaw@aol.com
Tel: (361) 729-3923
Fax: (361) 727-0447

NELSON M. JONES, III*
D.C. Bar # 320266
440 Louisiana St., Ste. 1575
Houston, Texas
njoneslawfirm@aol.com
Tel: (713) 236-8736
Fax: (713) 236-8990

Attorneys for Plaintiffs (*admitted *pro hac vice*)

{9870/00339701.1}

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

## CERTIFICATE OF SERVICE

We hereby certify that a true and correct copy of the foregoing has been served via U.S. Mail on this 24th day of January 2014, to: Republic of Sudan, Ali Ahmed Karti, Minister of Foreign Affairs, Embassy of the Republic of Sudan, 2210 Massachusetts Avenue NW, Washington, DC 20008.

s:/ *Kevin E. Martingayle*
KEVIN E. MARTINGAYLE

{9870/00339701.1}

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033