# EXPERT LORENZO VIDINO
# (Liability)

# Sudan and the Bombing of the USS Cole

Lorenzo Vidino

{9870/00339463.1}1

# Table of Contents

I.   Summary (p. 3)
II.  The Move to Sudan (p.3-5)
III. Al Qaeda's Financial Activities in Sudan (p.5-11)
IV.  Training Camps in Sudan and Terrorist Attacks During al Qaeda's Years in Sudan (p.11-14)
   a.  Additional Sudanese Government Assistance to al Qaeda (p.14-24)
V.   Sudan, Yemen, and Al Qaeda (p.24-28)
VI.  Fatwas (p.28-29)

     State Department Designation
     a.  Patterns of Global Terrorism 1997
     b.  Patterns of Global Terrorism 1998

## Summary

The October 12th, 2000, attack on the USS Cole that killed seventeen American sailors was part of a decade-long plan conceived by Osama Bin Ladin's terrorist organization, al Qaeda, to attack U.S. interests in the Middle East. Since the end of the 1980s, Bin Ladin had worked on creating a worldwide terrorist organization whose main aim was to strike at American targets. From 1991 to 1996, Osama Bin Ladin and his organization were sheltered and supported by the Sudanese government in Sudan. During these five years, al Qaeda and the Sudanese government established a symbiotic relationship and cooperated on many fronts. At that time, al Qaeda had already made public its intent to attack US forces in the Arabian Peninsula and had kept close relations with radical Islamist militants in Yemen. For example, Yemeni militants who were subsequently involved in the planning of the attack on the USS Cole traveled to Sudan to meet with Bin Ladin.

During the five years that the Sudanese government sheltered al Qaeda, the organization flourished both financially and militarily. It developed ties with several terrorist organizations and trained operatives who carried out attacks throughout the world. The help that the Sudanese government provided was indispensable, as al Qaeda could not have achieved such goals if it had not operated in a country that not only tolerated, but actually directly and knowingly helped its activities. It should be noted that, at the time, Sudan was arguably the only country in the world willing to shelter al Qaeda and that without that support the organization would have had to scatter throughout the world and constantly hide from the security apparatuses of countless countries. The shelter provided by the Sudanese government was indispensable for al Qaeda not just to survive but also to then develop the expertise, technical knowledge and wide network of contacts that allowed it to flourish and carry out attacks like the one against the USS Cole.

## The Move to Sudan

As an August 1996 U.S. State Department Fact Sheet[1] on Osama Bin Ladin states, "Bin Ladin relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan al-Turabi." According to a testimony in the Africa Embassy bombing trial, there were between 1,000 and 2,000 members of al Qaeda in Sudan by the end of 1991.[2] Following al Qaeda's move to the Sudan in or about 1991, Osama bin Ladin established a headquarters in the Riyadh section of Khartoum, Sudan, which was heavily populated by Saudis.[3] Bin Ladin remained in Sudan until May 1996, when the Sudanese government asked him to leave and he moved back to Afghanistan.[4] During its five years in Sudan, Bin Ladin's organization flourished.

---

[1] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[2] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 444-445, February 13, 2001.
[3] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Superseding Indictment, ¶14-h, April 16, 2001.
[4] "Osama Bin Ladin, a Chronology of his Political Life," PBS website,
http://www.pbs.org/wgbh/pages/frontline/shows/binLadin/etc/cron.html, accessed March 5, 2011.

The Sudanese government's support for al Qaeda, documented by the State Department in the above-mentioned 1996 Fact Sheet on Bin Ladin, became even more apparent during the 2001 Embassy Bombing trial. A 2001 *Wall Street Journal* article clearly summarizes how the Embassy Bombing trial revealed the Sudanese government's relationship with al Qaeda:

> The court documents also revealed that although bin Ladin has had a leading role in formulating and paying for Al-Qaeda, the organization did rely heavily on state sponsorship as well. For example, Sudanese President Omar Bashir himself authorized Al-Qaeda activities in his country and gave it special authority to avoid paying taxes or import duties. More remarkably, he exempted the organization from local law enforcement. Officials of the Iranian government helped arrange advanced weapons and explosives training for al-Qaeda personnel in Lebanon where they learned, for example, how to destroy large buildings.[5]

Jamal al-Fadl, a former Bin Ladin associate who testified during the Africa Embassy Bombing trial, made it clear that al Qaeda relocated to the Sudan largely due to the Sudanese government's offer to help the organization:

> Q. Yes. You just mentioned that you attended a meeting in Peshawar, Pakistan, attended by members of the National Islamic Front and Usama Bin Ladin. Can you tell us what was discussed at that meeting about what would happen in the Sudan?
>
> A. At that meeting three guys, they came over there and they talk about if the al Qaeda members come over there we help them, and also they make agreement with the group.
>
> MR. SCHMIDT: I am sorry, your Honor.
>
> THE COURT: The reporter will please read the answer back. (Record read)
>
> Q. Let me ask you some specific questions. Who did you understand the three persons for the National Islamic Front to be?
>
> A. They are members for Islamic National Front.
>
> Q. Did you understand from anything said at the meeting whether or not they had a relationship with the intelligence service in the Sudan?
>
> A. Not in a meeting, but later on.

---

[5] Emerson, Steven and Pipes, Daniel, "Terrorism on Trial," The Wall Street Journal, May 31, 2001, A16.

{9870/00339463.1}4

Q. When did you learn about whatever relationship they may have had with the intelligence service?

A. When I was in Sudan.

Q. How did you learn?

A. Because we got letter from the president of the Sudan --

Q. Before you describe the letter, did you see this letter yourself?

A. Yes, I got copy for it.

Q. Would you tell us who the president of the Sudan was.

A. Omar Hassan Ahmad al Bashir.

Q. Can you tell us what the letter to the president of the Sudan said.

MR. SCHMIDT: Objection, your Honor.

THE COURT: What is the theory on which it is offered?

MR. FITZGERALD: It explains the relationship between the Sudanese government and al Qaeda as set forth in the indictment.

THE COURT: The letter is not available, right?

Q. Do you have a copy of the letter?

A. Not now.[6]

## Al Qaeda's Financial Activities in Sudan

During his five years in Sudan, Osama Bin Ladin set up several businesses there. In a 1994 interview cited in the 1996 State Department Fact Sheet, Bin Ladin claimed to have surveyed business and agricultural investment opportunities in Sudan as early as 1983.[7] In Sudan in 1990, Bin Ladin embarked on several business ventures, which began to thrive following his move to Khartoum.[8] According to the State Department, bin Ladin also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf.[9] Among them are:

---

[6] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal Ahmed al-Fadl, pg. 232-234, February 6, 2001.
[7] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[8] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[9] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.

- Al-Hijrah for Construction and Development, Ltd., which built the Tahaddi (challenge) road linking Khartoum with Port Sudan, as well as a modern international airport near Port Sudan.[10]
- Taba Investment Company Ltd, an investment company.[11]
- Wadi al-Aqiq Company, Ltd., an import-export firm that, in conjunction with Taba Investment Company, Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members.[12]
- Al-Themar al-Mubarak-ah Agriculture Company, Ltd., which grew to encompass large tracts of land near Khartoum and in eastern Sudan.[13]
- Khartoum Tannery, a leather company,[14] which was still operating as of May 4, 2004.[15]
- Al Themar, a Sudanese agricultural company in which Bin Ladin had a financial interest.[16]
- The Blessed Fruits Company and al-Ikhlas, two companies that were involved in the production of honey, fruits and vegetables, and in which Bin Ladin also had a financial interest.[17]
- Al Qudurat Transportation.[18]

Jamal al-Fadl helped explain why Bin Ladin's companies were able to thrive in the Sudan when he testified in the Africa Embassy Bombing trial:

> Q. Without telling us what was in the letter from the president of the Sudan, can you tell us the circumstances under which you received a copy of the letter from the president of the Sudan?
>
> A. I got the letter because I go to different city in Sudan and also because when we --
>
> Q. Stop there. Who gave it to you?
>
> A. Abu Hassan al Sudani.
>
> Q. Who was Abu Hassan al Sudani?
>
> A. He has membership in al Qaeda group and also at that time he runs Taba Investments.

[10] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[11] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Indictment: Count 1, Overt Act 12.f., September 21, 1998.
[12] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[13] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[14] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Indictment: Count 1, Overt Act 12.f., September 21, 1998
[15] International Company Profile, http://www.icpcredit.com/ReportRequest.asp?sCompanyID=233437, and International Trade Center
http://www.intracen.org/dbms/leather/LT_Contact.Asp?DS=HS&CG=NAB&CD=&PD=&PG=1&JD=16824,
[16] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 241-242, February 6, 2001.
[17] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 900-902, February 20, 2001.
[18] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 245-246, February 6, 2001.

Q. Why don't we focus on that trip for a moment. What was it that Abu Hassan al Sudani wanted you to do on this business trip for which he gave you the letter?

A. Like when we go to Port of Sudan and we bring some stuff that comes -- when we have some guys from outside Sudan to go inside Sudan, that letter, we don't have to pay tax or custom, or sometime the Customs, you don't have to open our containers.

Q. So if you were going to the Port of Sudan to receive things being shipped from outside, what did you do with the letter?

A. It's held inside the Port Sudan, the custom, and also when we go from Port Sudan to Khartoum, it's a lot of local checking for the Custom and police. Every time I show them the letter and they say okay, no problem.

Q. And who was the letter addressed to?

A. To Wadi al Aqiq.

Q. And can you tell the jury what the Wadi al Aqiq Company is?

A. Wadi al Aqiq Company, it's the first company established for the group in Sudan.

Q. When you say the first company established for the group of Sudan, which group?

A. Al Qaeda group.

Q. Why don't we talk about the companies established in the Sudan. Did you work with the al Qaeda companies in the Sudan yourself?

A. Yes.[19]

When examining Bin Ladin's financial activities in the Sudan, the story of Al Shamal Islamic Bank is of particular note. According to the State Department, Bin Ladin and wealthy NIF members capitalized Al Shamal Islamic Bank in Khartoum.[20]

Al Shamal Islamic Bank was founded in 1983 by three individuals and entities:

- ▪ al Shamal for Investment and Development, a Sudanese company[21]

---

[19] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal Ahmed al-Fadl, pg. 238-239, February 6, 2001.
[20] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[21] Web Archive-Shamal Bank Website, http://web.archive.org/web/20011012232453/http://www.shamalbank.com/Statment.htm, accessed January 4, 2014.

- Saleh Abdullah Kamel, Chairman of the Saudi Dallah al Baraka Group LLC[22].
- The Sudanese Government of Northern State,[23] then controlled by Governor Mutasim Abdul-Rahim,[24] Secretary General of the National Congress Party in Khartoum,[25] and representative of Hassan al-Turabi.[26]

Al Shamal Islamic Bank was formed in Sudan on April 1983, and started operations on January 2, 1990, with a paid capital of $3.9 million.[27] Shares for subscription were issued between 1997 and 2000.[28] According to State Department documents, Bin Ladin invested $50 million in the bank.[29]

Bin Ladin's involvement in al Shamal Islamic Bank was confirmed by a 2002 Congressional Research Service report for Congress:

> In 1991, bin Ladin relocated to Sudan with the approval of Sudan National Islamic Front (NIF) leader Hasan al-Turabi. There, in concert with NIF leaders, he built a network of businesses, including an Islamic Bank (al Shamal), an import-export firm, and firms that exported agricultural products. An engineer by training, bin Ladin also used his family connections in the construction business to help Sudan build roads and airport facilities. The business in Sudan (…) enabled him to offer safe haven and employment in Sudan to al Qaeda members, promoting their involvement in radical Islamic movements in their countries of origin (especially Egypt) as well as anti-U.S. terrorism.[30]

Al Shamal Islamic Bank Chairman and shareholder,[31] Adil Abd el Aglil Botorgey (a.k.a. Adel Abdul Jalil Batterjee), is the Chairman of al-Bir Saudi Organization, whose U.S. branch, Benevolence International Foundation (BIF),[32] is a front for al Qaeda and whose assets have been frozen by the US Treasury Department.[33] Al Shamal Islamic Bank

[22] Web Archive-Shamal Bank Website, http://web.archive.org/web/20011012232453/http://www.shamalbank.com/Statment.htm, accessed January 4, 2014.
[23] Web Archive-Shamal Bank Website, http://web.archive.org/web/20011012232453/http://www.shamalbank.com/Statment.htm, accessed January 4, 2014.
[24] Website of the Embassy of the Republic of Sudan, http://www.sudanca.com/glance/glance.html, accessed January 4, 2014.
[25] Bol, Nhial, "Sudan-Politics: Returning Exiles Risk Trial," IPS-Inter Press Service/Global Information Network, December 5, 1996.
[26] Khaled, Mohamed, "Bashir-Turabi Confrontation Escalates," *Al-Ahram* Weekly online edition, December 23-29, 1999, available at http://weekly.ahram.org.eg/1999/461/re5.htm, accessed January 4, 2014..
[27] Web Archive-Shamal Bank Website, http://web.archive.org/web/20011012232453/http://www.shamalbank.com/Statment.htm, accessed January 4, 2014.
[28] Web Archive-Shamal Bank Website, http://web.archive.org/web/20011012232453/http://www.shamalbank.com/Statment.htm, accessed January 4, 2014.
[29] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[30] Katzman, Kenneth, "Terrorism: Near Eastern Groups and State Sponsors, 2002," Congressional Research Service, February 13, 2002, pg. 16.
[31] Web Archive-Shamal Bank Website, http://web.archive.org/web/20011031145208/http://www.shamalbank.com/english/ECorporate.htm, January 4, 2014.
[32] USA v. Benevolence International Foundation and Enaam M. Arnaout, NDIL 02-CR-414, Affidavit in Support of Complaint Against Benevolence International Foundation And Enaam Arnaout 7, April 29, 2002.
[33] Executive Order 13224 blocking Terrorist Property, U.S. Department of the Treasury, Office of Foreign Assets Control, April 30, 2004.

General Manager, Mohammad S. Mohammad, acknowledged that Osama bin Ladin had two accounts at the bank, opened on March 30, 1992 for al-Hijrah Construction and Development Ltd,[34] a company that the State Department says "work[ed] directly with Sudanese military officials to transport and provision terrorists training in [Osama bin Ladin's terrorist training camps in northern Sudan]."[35]

A third al Shamal account was opened in 1993 in the name of Osama bin Ladin's holding company, Wadi al Aqiq, a company registered in Saudi Arabia.[36] Al Shamal Bank has repeatedly been used to fund criminal and terrorist activities. Jamal al-Fadl testified during the 2001 Africa Embassy trial that Bin Ladin and at least six al Qaeda operatives held bank accounts at al Shamal Islamic Bank under their real names.

> Q. While you were in the Sudan, did you handle money for Osama bin Ladin?
> A. Could you repeat the question.
> Q. Did you work on the finances for al Qaeda while you were in the Sudan?
> A. Yes.
> Q. Did you know where the bank accounts of Osama bin Ladin and al Qaeda were?
> A. Yes.
> Q. Do you know whose names they were in?
> A. The bank account under Osama bin Ladin in Bank Shaml [al Shamal Islamic Bank], Khartoum.
> Q. That was under Osama bin Ladin's true name?
> A. Yes.
> Q. Were there accounts in other names?
> A. Yes. Afad Makkee got account also.
> Q. Afad Makkee, the account that he had under his name, do you know what name that is?
> A. I remember Madani Sidi al Tayyib.
> Q. Do you know of any other persons who had al Qaeda money in their accounts?
> A. Abu Rida al Suri.
> Q. Do you know his true name?
> A. Nidal.
> Q. Anyone else that you knew had al Qaeda money in bank accounts in their name?
> A. Abu Hajer al Iraqi.
> Q. Do you know his true name?
> A. Mamdouh Salim.
> Q. Did you have any accounts in your name?

---

[34] Web Archive-Shamal Bank Website, http://web.archive.org/web/20011012232453/http://www.shamalbank.com/Statment.htm, accessed January 4, 2014.
[35] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[36] Web Archive-Shamal Bank Website, http://web.archive.org/web/20011012232453/http://www.shamalbank.com/Statment.htm, accessed January 4, 2014.

A. Shared with Abu Fadhl.
Q. So you had accounts in your name that were shared with Abu Fadhl?
A. Yes.
Q. Do you recall anyone else that had bank accounts in their name for al Qaeda?
A. Abdouh al Mukhlafi.[37]

At the trial, Jamal Ahmed al-Fadl testified that al Qaeda operatives received monthly checks of several hundred dollars from al Shamal Islamic Bank accounts:

Q. When you worked for Osama bin Ladin, in the Sudan, how much were you paid?
A. $1,200 . . . per month.
Q. For how long did you work for him?
A. Almost two years.
Q. What banks did he keep his money at?
A. Bank el Shamar [Al Shamal Islamic Bank].
Q. Any other banks?
A. I think he had accounts in different banks, but I only recall Bank Shamar [al Shamal Islamic Bank].[38]

Al-Fadl also testified that he transferred $100,000 from al Shamal Islamic Bank to an al Qaeda representative in Jordan:

Q. How did you carry the $100,000?
A. In my bag with my clothes.
Q. Do you recall what kind of bills the $100,000 was in?
A. I remember they all hundred bill.
Q. Sorry?
A. They all hundred bill.
Q. They were all hundred dollar bills?
A. Yes.
Q. Who gave you the money?
A. Abu Fadhl, he bring it from Shamal Bank [al Shamal Islamic Bank] and he bring it to me.
Q. Abu Fadhl brought it from the Shamal Bank [al Shamal Islamic Bank]?
A. Yes.[39]

During the course of the Embassy Bombing trial, another Bin Ladin associate, Essam al Ridi, testified that al Qaeda used al Shamal Bank for operational purposes. He stated "$250,000 was wired from al Shamal Islamic Bank" in 1993 via Bank of New York to a

---

[37] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal Ahmed al-Fadl, pg. 332-333, February 6, 2001.
[38] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal Ahmed al-Fadl, pg. 882, February 20, 2001.
[39] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal Ahmed al-Fadl, pg. 318-319, February 6, 2001.

Bank of America account held in Dallas, Texas — where he used it to "buy a plane delivered to bin Ladin . . . intended to transport Stinger missiles. . . ." in 1993.[40]

Al Shamal Bank is the quintessential example of how the Sudanese government cooperated with al Qaeda and provided the organization with logistical help during its five years in Sudan.

Another bank that is linked to al Qaeda is Tadamon Islamic Bank, which was formed in Sudan on November 28, 1981 with an address in Khartoum, and started operations on March 24, 1983.[41] Tadamon Islamic Bank facilitated al Qaeda's financial operations. According to Jamal al-Fadl's testimony at the Embassy Bombing trial, Tadamon Islamic Bank held accounts of al Qaeda operatives:

> Q. Do you recall anyone else that had bank accounts in their name for al Qaeda?
> A. Abdouh al Mukhlafi.
> Q. Who was this person named Abdouh al Mukhlafi?
> A. He is from Yemen.
> Q. What role did he play for Bin Ladin?
> A. He goes with Bin Ladin when Bin Ladin travel outside or inside Sudan.
> Q. What role did he play for Bin Ladin when Bin Ladin traveled?
> A. He is like bodyguard for him, and also if Bin Ladin, he needs bank something, he use account for that.
> Q. Did he handle money during the travel?
> A. Yes.
> Q. Where were the accounts held? In what countries?
> A. In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank].[42]

Tadamon Islamic Bank is also a shareholder of Al Shamal Islamic Bank, which, as noted above, was formed in Sudan in April 1983. Tadamon Islamic Bank joined the provisional Board of Directors on July 1988 and has been a main shareholder of Al Shamal Islamic Bank since March 26, 1986.[43]

During its five years in Sudan, al Qaeda grew into a sophisticated organization. Several key figures in the organization portrayed al Qaeda at the time as a multinational corporation complete with a finance committee, investments and well-organized, concealed accounts and operations worldwide. These activities were clearly facilitated by the Sudanese government.

---

[40] Hilzenrath, David S. and Mintz, John, "European Bank Regulators Help Track al Qaeda Assets; Reports Solicited on Contact With Banks Tied to Bin Ladin," The Washington Post, September 29, 2001, at A19.
[41] Sudan Commercial Directory online-Tadamon Islamic Bank, http://www.sudancom.com/tadamon.htm, accessed May 3, 2004.
[42] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal Ahmed al-Fadl, pg. 333-334, February 6, 2001.
[43] Web Archive-Shamal Bank Website, http://web.archive.org/web/20011012232453/http://www.shamalbank.com/Statment.htm, accessed January 4, 2014.

## Training Camps in Sudan and Terrorist Attacks During al Qaeda's Years in Sudan

One of Osama Bin Ladin's main activities during the war against the Soviets in Afghanistan was creating and financing training camps, where volunteers would learn how to fight. Those camps remained open in Afghanistan after the end of war with the Soviet Union. When Bin Ladin moved to Sudan, he set up several terrorist training camps throughout the country, the main one being a 20-acre site near Soba,[44] 10 kilometers south of Khartoum. Osama bin Ladin and al Qaeda were allowed to operate freely in Sudan. Al Qaeda purchased communications equipment, radios, and rifles for the Sudanese NIF,[45] while the Sudanese government provided 200 passports to al Qaeda so that, in exchange, terrorists could travel widely with new identities.[46]

Important information al Qaeda's training camps in Sudan and the involvement of the Sudanese government came from Jamal al-Fadl's testimony. In or about the early 1990's, Jamal al-Fadl went to Hilat Koko, a suburb of Khartoum, where he met with representatives of al Qaeda and the Sudanese army to discuss the joint manufacture of chemical weapons.[47] At this time, al Qaeda was also experimenting with biological warfare – injecting or gassing dogs with cyanide.[48]

Al-Fadl testified about the cooperation between the NIF and al Qaeda on chemical weapons:

> Q. Did you ever travel to the section of Khartoum called Hilat Koko with any member of al Qaeda?
>
> A. Yes, I did.
>
> Q. Who did you go with?
>
> A. I remember one time I went with Abu Rida al Suri, and one time I went with Abu Hajer al Iraqi.
>
> Q. Anyone else?
>
> A. And one time I went with --
>
> Q. We will go through that name. M-U-Q-A-D-E-M. Is that a name or a title?
>
> A. No, a title. He got one eagle and one star.
>
> Q. Does that mean he is an officer?

[44] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Transcript of Jamal al-Fadl, pg. 262-264, February 6, 2001.
[45] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 353, February 7, 2001.
[46] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 440-442, February 13, 2001.
[47] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 291-293, February 6, 2001.
[48] Miller, Judith, "Qaeda Videos Seem to Show Chemical Tests," The New York Times, August 19, 2002, pg.1.

A. Yes, he is in the army.

Q. In which army?

A. Sudanese army.

Q. His name?

A. Yes. Abdul Baset Hamza.

Q. Tell us about the time you went to Hilat Koko with Abu Hajer al Iraqi, what you discussed.

A. I learn that in this building they try to make chemical 14 weapons with regular weapons.

Q. Can you explain what you mean by chemical weapons with regular weapons.

A. I remember another guy, he explain more to me about this.

Q. Who was that?

A. Amin Abdel Marouf.

Q. What did Amin Abdel Marouf explain to you?

A. He say the war between the government and the Sudan and the rebels in south Lebanon, it's like 30 years, and always the rebels during the rain time, they took the Sudanese army to north, and he say if we use weapons like that, it easy for us to win.

Q. Was there a war going on in the south of Sudan?

A. Yes.

Q. That was between who and whom?

A. Between Islamic National Front, they run the government, and John Garang group.

Q. Returning to your conversation with Abu Hajer al Iraqi, did he discuss with you who it was that was trying to make the chemical weapons in the area there of Hilat Koko?

> A. He tell me the al Qaeda group try to help Islamic National Front to do these weapons, to make these weapons[49].

Part of al-Fadl's testimony revealed the close relationship between al Qaeda and the Sudanese authorities. Al-Fadl refers to the "Egyptian Jihad Group", which is the Egyptian Islamic Jihad (EIJ). EIJ has always been very close to al Qaeda and today can be considered an organization merged with al Qaeda. The two groups formally merged in 1998, when they announced the formation of the "World Islamic Front for the Jihad against the Jews and the Crusaders."

> A. I remember the Egyptian Jihad Group, they got training inside the farm, and the explosive make noise, and the residential not far from the farm, they complain about that and they go to the local police and tell them it's a big noise come from the farm, and the police come to the farm, but we call the intelligence office because we have relationship with them, and the intelligence office came and they tell the local police we take care of that, and don't worry about that. And they take us to the jail, and they say you shouldn't do that, we tell you to refresh, not to make real explosives.[50]

## Additional Sudanese Government Assistance to al Qaeda

In his testimony, al-Fadl discussed how a member of the Sudanese army assisted al Qaeda:

> Q. While you were in the Sudan, how did al Qaeda in Khartoum maintain contact with the facilities in Damazine in the south and Port Sudan on the Khost by the Red Sea?
>
> A. We got radio.
>
> Q. You mentioned a radio. And was there any discussion in Al Qaeda of why you used a radio rather than the telephone?
>
> A. Because it's more safety when you talk.
>
> Q. Did you know who in Al Qaeda or who arranged to provide the radio system that was used to maintain contact?
>
> A. Muqadem Abdul Basit Hamza and Abu Hajer al Iraqi.
>
> Q. You said Muqadem Abdul Basit Hamza. Again, is that the person that you said was an officer of the Sudanese army?

---

[49] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 291-293, February 6, 2001.
[50] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 223, February 6, 2001.

A. Yes.

Q. During the time that you were in the Sudan, did anyone in al Qaeda have a satellite telephone?

A. Yeah, we got one.

Q. Who used the satellite telephone?

A. Abu Abdallah Bin Ladin.[51]

Al-Fadl also explained that the Sudanese government helped al Qaeda operatives obtain documents:

Q. And I gather now when you got to Sudan -- and I'm talking now after 1991 -- you were even able to obtain passports from the Sudanese government; is that correct?

A. Yes, we got a couple hundred.

Q. Okay, for your members of al Qaeda so they could travel outside the Sudan; is that right?

A. Yes.

Q. And these were again false passports; is that right?

A. No.

Q. All right, they were real passports?

A. Yes, real passport.

Q. For real people?

A. Yes, and making Sudanese citizenships.

Q. And giving them Sudanese citizenship?

A. Yes.

Q. Were these people, were all these people actually citizens Sudan?

A. No.

---

[51] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Transcript of Jamal al-Fadl, pg. 308, February 6, 2001.

Q. And also, al Qaeda developed ways of hiding the fact that their members were traveling, is that true?

A. I don't understand that.

Q. When al Qaeda members would travel and they did not want to be shown to be a member of al Qaeda or even a Muslim, they would -- they might shave their beard?

A. Yes.

Q. They might take magazines which a Muslim would not ordinarily read?

A. Yes.

Q. Is that correct?

A. Yes.

Q. They might carry, as you mentioned, cigarettes, even though it was prohibited to smoke?

A. Yes.

Q. As a means of escaping detection when they went through Customs; is that right?

A. Yes.[52]

In addition to providing some al Qaeda operatives with new passports, Sudanese officials also made sure that al Qaeda members traveling to Sudan with different passports could enter and leave the country without having their passports stamped. This was done because a stamp from Sudan (a country known for its support of terrorism) would have raised the attention of immigration officials in other countries:

Q. When you traveled outside of the Sudan, would your passport always be stamped?

A. Sometimes no.

Q. Can you tell us how you could travel without having your passport stamped.

A. If you want me explain that, like what I say before here, we have something called delegation office, and if I want to travel to country, I don't want them to see

---

[52] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Transcript of Jamal al-Fadl, pg. 441-442, February 13, 2001.

I come from Sudan, one of the delegation officers, he go to the immigration airport, and he took me through other way, that's means immigration not going to stamp my passport.[53]

According to the indictment in the Africa Embassy Bombing case, at various times approximately between 1992 and 1996, Osama bin Ladin and one of his lieutenants, Mamdouh Mahmud Salim, worked together with a ranking official in the NIF in order to obtain communications equipment on behalf of the Sudanese intelligence service.[54] The same indictment stated that on at least two occasions in the period from approximately 1992 until 1995, members of al Qaeda allegedly transported weapons and explosives from Khartoum to the coastal city of Port Sudan for trans-shipment to the Arabian peninsula, using vehicles associated with Osama bin Ladin's "businesses."[55] In 1993, al Qaeda paid $210,000 for an airplane in Tucson, Arizona, that was then flown to Khartoum, Sudan. This plane was intended to transport American Stinger Anti-Aircraft missiles from Pakistan to Sudan, although that missile transport did not take place.[56] All these activities happened under the watchful eyes of Sudanese authorities, who allowed al Qaeda to operate freely. The Sudanese government allowed these activities both because it received large amounts of money from Bin Ladin and because it shared a radical Islamic ideology with him.

Because of Sudan's active support for terrorism, the U.S. State Department put Sudan on the list of state sponsors of terrorism in 1993.[57] Sudan also played host and provided logistical support to several other terrorist organizations, which cooperated and trained with al Qaeda, forging alliances that are still important today. For example in 1995, Hassan al-Turabi organized an Islamic Peoples Congress where Osama bin Ladin was able to meet with militant groups from Pakistan, Algeria and Tunisia, as well as Palestinian Islamic Jihad and Hamas.[58] During the time that al Qaeda was based in Sudan, it forged alliances with Egyptian Islamic groups and other extremist groups. Bin Ladin's work force grew to include militant Afghan war veterans seeking to avoid a return to their own countries, where many stood accused of subversive and terrorist activities.[59] For example, according to the State Department, in May 1993, Bin Ladin financed the travel of 300 to 480 Afghan war veterans to Sudan after Islamabad launched a crackdown against extremists lingering in Pakistan.[60]

In addition to offering safe haven in Sudan, Bin Ladin has provided financial support to militants actively opposed to moderate Islamic governments and the West.[61] In fact, during al Qaeda's time in the Sudan, al Qaeda either financed or carried out several attacks throughout the world, proving that the attack on the USS Cole and 9/11 are only

---

[53] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 285-286, February 6, 2001.
[54] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Superseding Indictment, Pg. 16 ¶m, April 16, 2001.
[55] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Superseding Indictment, Pg. 20 ¶aa, April 16, 2001.
[56] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Essam al Ridi, pg. 561-564, February 14, 2001.
[57] State Department, Office of the Secretary of State, "Determination Sudan," Federal Register, Public Notice 1878, 58 FR 52523, Vol. 58, No. 194, October 8, 1993.
[58] Alexander, Yonah, "Sudan, the New Iran," Jerusalem Post, July 5, 1995.
[59] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[60] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[61] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.

part of a war that was waged by al Qaeda since the day it was founded. During al Qaeda's five years in Sudan, the group carried out the following attacks:

- In December 1992, Islamic extremists attempted to bomb a hotel in Aden, Yemen that was housing 100 U.S. servicemen who were billeted there to support U.N. relief operations in Somalia. The perpetrators claimed that Bin Ladin financed their group.[62] This was al Qaeda's first attack against US forces in Yemen and was an ominous precursor to the bombing of the USS Cole. The failed attack on the hotel (in which only two Austrian tourists died because US forces had already left) shows that al Qaeda has always aimed to attack American military targets in the Arabian Peninsula (mostly because the American presence is perceived as an invasion of land sacred to Muslims). Former FBI Director Louis Freeh confirmed al Qaeda's role in the 1992 attack in Yemen during his April 2004 testimony before the 9/11 Commission.[63]

- Bin Ladin told CNN in 1997 that one of his proudest achievements while he was based in Sudan was the role of his Afghan Arabs in the 1993 killings of more than a dozen American soldiers stationed in Somalia as part of a UN mission to feed starving Somalis.[64]

Moreover, according to a 1996 State Department Fact Sheet:

- By January 1994, Bin Ladin had begun financing at least three terrorist training camps in northern Sudan (camp residents included Egyptian, Algerian, Tunisian and Palestinian extremists) in cooperation with the NIF. Bin Ladin's Al-Hijrah for Construction and Development worked directly with Sudanese military officials to transport and provision terrorists training in such camps.[65]
- A joint Egyptian-Saudi investigation revealed in May 1993 that Bin Ladin business interests helped funnel money to Egyptian extremists, who used the cash to buy unspecified equipment, printing presses, and weapons.[66]
- Bin Ladin was the key financier behind the Kunar' camp in Afghanistan, which provide terrorist training to al-Jihad and al-Gama'at al-Islamiyyah members, according to suspect terrorists captured by Egyptian authorities.[67]

In addition to the failed attack on US forces in Aden, during the five years al Qaeda was based in Sudan, the group kept close ties with radical Islamic militants in Yemen. An example of this cooperation comes, once again, from the testimony of Jamal Al-Fadl.

Q. How did you become involved in moving weapons and explosives?

---

[62] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[63] Testimony of Louis Freeh, Former Director Federal Bureau of Investigation, Before the National Commission on the Terrorist Attacks Upon the United States, April 13, 2004.
[64] Bergen, Peter. "Interview with Osama Bin Ladin," CNN Website, March 1997.
[65] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[66] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.
[67] State Department Fact Sheet, "Usama Bin Ladin: Islamic Extremist Financier," August 14, 1996.

A. I remember Abu Fahdl al Makkee, he told me go to Ayoub al Iraqi.

Q. Just so we are clear, was that the same person who was the first emir of al Qaeda back in Afghanistan?

A. Yes.

Q. Then what happened?

A. He told me the Yemeni Communists, they try to take the government in Yemen.

Q. What did he tell you should do about that?

A. He say we try to give our brothers in south Yemen some weapons to help them to fight the Communists.

Q. What did you then do?

A. I went to Abu al Iraqi, and he told me I need to go with Abu Naem al Liby to the Port Sudan.

Q. What did you do then?

A. I went and I met Abu Naem al Liby, and he tell me we going to go in two days. He told me, and I want you to meet me in hangar, in Soba farm hangar. [Bin Ladin's Farm] I went over there, and we baggage, four baggage in his truck, one - -

Q. Let's go slowly. You went to Soba and you met Abu Iraqi, and you mentioned package. Can you tell the Arabic interpreter what word you are using for package.

THE INTERPRETER: Crate with weapons in it.

MR. SCHMIDT: I am sorry. I did not understand.

THE INTERPRETER: Crate, C-R-A-T-E, with weapons in it.

Q. How many crates or big boxes were there?

A. I remember four.

Q. Where were they?

A. They are in hangar in Soba farm.

Q. Can you describe what the hangar looks like.

A. It could be four times like this place.

Q. Is it a place like an airplane hanger, where airplanes are kept in the airport?

A. Yes, that's correct.

Q. What happened to these four large boxes?

A. I remember I went with him and other guy, his name Abu Ali Sudani, and Abu Ali, he work with delegation office. He is Islamic National Front membership and also he is intelligence officer in the government, and also sometimes he is one of the security for our group.

Q. So this Abu Ali was part of the National Islamic Front, the intelligence office in the Sudan, and helped with security with the group?

A. In delegation office.

Q. What happened then?

A. We went to Port Sudan, and we leave the truck outside the city, and we went to Palace Hotel.

Q. How did you get from Khartoum to Port Sudan?

A. We took the route.

Q. How long a drive was that?

A. 1,100 kilometers.

Q. You went to the Palace Hotel. Can you tell us, forgetting your night in the hotel, what did you do with the boxes?

A. When we went to the hotel, I meet Abu Ayoub al Iraqi and Mohamed Jara al Nabi, and they came together and we took the truck and we went to army base.

Q. The persons you were with were Abu Ayoub al Iraqi and Mohamed Jara al Nabi. What did you do when the two of them and you went to the army base?

A. We stop over there outside until Mohamed Jara al Nabi and Abu Ayoub al Iraqi went inside, and they give paperwork for the army office and they came back and let us go in one of the hangar in army base.

Q. Were the boxes or crates still in the truck?

A. When we went inside hanger, they change the box to another truck.

Q. Did you see anything else inside the hanger?

A. I remember it's all tank and military supplies.

Q. You said what type of tank?

A. I believe D55.

Q. But a military tank?

A. Yes, Sudanese army military tank.

Q. Then what happened to the crates or boxes?

A. In the midnight they took them to the port, north port. It all belong to the Sudanese army.

Q. You said at what time of day?

A. Midnight.

Q. What happened when the crates were brought to the port at midnight?

A. They shipped the boxes to the boat.

Q. Which boat?

A. It's our group boat.

Q. Who do you mean by our group?

A. It's al Qaeda member boat.

Q. What did it look like?

A. It's, I believe like 60 or 50 meter tall.

Q. What color is it?

A. I don't remember.

Q. Do you know who was in charge of the boat?

A. Yes, Abu Habib al Pakistani and Abu Mohamed al Yemeni.

Q. Does that mean he is from Pakistan?

A. Yes.

Q. The other person you said was?

A. Abu Mohamed al Yemeni.

Q. What happened then?

A. They put the box in the boat and after that, me and Abu Neam, we went.

Q. That was you and Abu Neam, the person you mentioned was Libyan before?

A. Yes. He is the truck driver.

Q. Did you ever actually open the crates and look inside yourself and see what was in there?

A. No.

Q. What did they tell you was in the crates?

A. Abu Khabuib al Sudani, he told me it's weapons to Saif

Islam Jannubi group in Yemen.

Q. The person who told you that the weapons were going to the Saif Islam Jannubi group was whom?

A. Abu Khabuib al Sudani.

Q. Abu Khabuib al Sudani was a member of the al Qaeda?

A. Yes, and also Abu Fadl al Makkee, he told me when I went back to Khartoum.

Q. When you went to Khartoum, what did Abu Fadl al Makkee tell you?

A. I remember he told me we try to help the Yemeni people group because the Communists try to take the government in Yemen.[68]

---

[68] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 336-340, February 6, 2001.

Jamal Ahmed al-Fadl also testified that al Qaeda cargo shipments of weapons went from Afghanistan to Sudan:

> Q. Sir, you testified this morning about the time at which al Qaeda relocated from Afghanistan and Pakistan to the Sudan, and you testified about how you brought some money. Did you have a conversation with any members of al Qaeda as to other equipment that was brought from Afghanistan or Pakistan to the Sudan?
>
> A. Yes.
>
> Q. Who did you speak with?
>
> A. Abu Fadhl al Makkee. Abu Rida al Suri.
>
> Q. What did they tell you about other things brought from Afghanistan to the Sudan?
>
> A. They say we have some of our weapons in Afghanistan and want to bring it to Sudan.
>
> Q. Did they describe what type of weapons they wanted to bring to the Sudan?
>
> A. I remember --
>
> MR. SCHMIDT: Your Honor, objection, unless we are going to identify which one of these individuals.
>
> MR. FITZGERALD: OK.
>
> Q. What did Abu Fadhl al Makkee tell you about the weapons?
>
> A. He tell me we have Milan and Stinger, we want to bring it to Sudan.
>
> Q. Can you explain to the jury first what Milan refers to.
>
> A. Milan, it's a rocket. We use it against tanks.
>
> Q. Besides the Milan rocket, can you tell us what a Stinger is.
>
> A. We have a Stinger number 3 also. We use it against airplane.
>
> Q. Did Abu Fadhl al Makkee tell you how they wished to get the Milan rockets and the Stingers to the Sudan?
>
> MR. SCHMIDT: Objection, your Honor, again combining the two individuals.

THE COURT:  Who was speaking?

MR. FITZGERALD:  I asked about one person, Abu Fadhl al Makkee.

Q.  Did he tell you how they were going to get the Milan rockets and the Stingers to the Sudan?  Yes or no.

A.  Yes.

Q.  What did Abu Fadhl al Makkee tell you?

A.  He tell me that we have Milan and Stinger, we need to bring it from Pakistan to Sudan.

Q.  Just going with Abu Fadl al Makkee, did he tell you how they were going to get the rockets and the Stingers from Afghanistan to the Sudan?

A.  He tell me they rent one of the Sudan airways plane and it's cargo plane, to help them, and he tell me we want to take  some supplies from Sudan, sugar for Afghani people, and when the cargo come back, we want to bring our supplies, our weapons.[69]

In another part of his testimony, al-Fadl explained the military cooperation between the Sudanese NIF and Bin Ladin:

Q.  What if anything did Bin Ladin say?

A. He say our agenda is bigger than business. We not going to make business here, but we need to help the government and the government help our group, and this is our purpose.

Q. Are you familiar with something known as the Defaa al Shabi?

A. Yes.

Q. Can you explain to the jury what the Defaa al Shabi is.

A. Defaa al Shabi is the Islamic National Front. They make army under the Sudanese army. They just say bring the students from the college and from high school and they give them training, they try to use him in war in southern Sudan against Christians.

Q. Did the al Qaeda provide any assistance to the Defaa al Shabi?

A. Yes.

---

[69] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 272-273, February 7, 2001.

{9870/00339463.1}24

Q. What did the al Qaeda provide?

A. We buy for them communications for the offices, and also like radio and telephone, and also we buy Kalashnikovs for them.[70]

## Sudan, Yemen, and Al Qaeda

Yemeni Islamic extremists have always played a crucial role in the worldwide jihad waged by Osama Bin Ladin. First, Bin Ladin's father was born in the Yemeni region of Hadramaut[71] and Usama has always given special attention to Yemen. Yemen made significant contributions to the war against the Soviets in Afghanistan. It was during this war that a group of men, guided by the words of Palestinian sheik Abdullah Azzam, decided to create an organization to wage jihad against all those they considered enemies of Islam. This organization is al Qaeda. Osama Bin Ladin and Ayman al Zawahiri, currently al Qaeda's number 1 and 2, were among these men. Among the most prominent figures of the organization was (and still is) Sheik Abdul Majid al Zindani, a prominent Yemeni cleric and member of the al Islah Party.

Reports describe Zindani as Bin Ladin's "mentor."[72] From 1984 until the end of that decade, Al-Zindani sent between 5000 and 7000 Arabs, including Yemenis, to Afghanistan and Pakistan via Saudi Arabia for military training and religious teaching under his guidance.[73] After the war in Afghanistan ended al Zindani remained an active supporter of al Qaeda. A 1995 State Department cable about the Jordanian trial of radical Islamists who bombed a movie theater in Jordan proves that al Zindani was still cooperating with Bin Ladin when Bin Ladin was in Sudan.[74] The cable states that: "The third defendant, Zakariya, stayed for three months in one of the military camps belonging to Bin Ladin, during which he was trained in how to assemble handmade bombs and how to detonate bombs by remote control, using children's electronic toys. He also learned how to produce toxic materials. He also received $10,000 from Abd-al Majid al Zandani."[75]

Sheik Zindani is a prominent figure in the worldwide jihad and has ties to radicals throughout the world. Zindani, who was designated as a supporter of terrorism by the U.S. Treasury Department on February 24, 2004,[76] has a long-standing relationship with Hassan al Turabi, the former leader of Sudan who invited Bin Ladin to Sudan. Besides

---

[70] USA v. Bin Ladin, et al., SDNY 98-CR-1023, Trial Testimony of Jamal al-Fadl, pg. 353, February 7, 2001.

[71] Burke, Jason, "The Making of the World's Most Wanted Man," The Guardian, October 28, 2001.

[72] O'Neill, Brian, "US Puts Yemen in a Bind over 'Terror' Sheikh," Asia Times, April 2, 2004.

[73] Jane's Intelligence Review, April 1, 1995, Vol. 7; No. 4; pg. 175 cited in Karmon, Ely, "The Bombing of the USS Cole: An Analysis of the Principal Suspects." International Policy Institute for Counter-Terrorism Website, October 25, 2000, http://www.ict.org.il/articles/Cole_bombing.htm

[74] State Department Cable, "Prosecutor Issues 'Explosions' Case Indictment," Date illegible.

[75] State Department Cable, "Prosecutor Issues 'Explosions' Case Indictment," Date illegible.

[76] Treasury Department, "United States Designates Bin Ladin Loyalist," February 24, 2004, http://www.ustreas.gov/press/releases/js1190.htm,

several visits paid by Turabi to Yemen and by Zindani to Sudan, the relationship between the two is proven by their membership in the Popular Arab and Islamic Conference, a loose hierarchy of radical clerics and politicians from the Muslim world that openly advocates violence to defeat the enemies of Islam. In 1995, Turabi chaired the Conference, while Zindani was one of its top officials.[77] The *Yemen Times,*[78] described Zindani as a friend of Turabi. Moreover, Zindani headed a delegation of clerics that in April of 2001 traveled to Sudan to negotiate the release of Turabi with Sudanese President Omar al Bashir.[79]

The testimony of Al-Fadl reported at page 18 has proven that al Qaeda was shipping weapons from Sudan to the Northern Yemeni forces during the Yemeni civil war. It is noteworthy that Zindani played a major role during the civil war,[80] rallying his "Arab Afghans" to fight on behalf of the North.[81] Some analysts put the numbers of fighters recruited by Zindani to fight against the South in the thousands.[82] Not only al Qaeda, but allegedly the Sudanese government itself also helped the North during the Yemeni civil war. The Southern government repeatedly accused Sudan of shipping arms to the North.[83] The Sudanese government has always denied these accusations.[84]

The radical Sudanese government and Yemeni Islamists cooperated for several years. Al Qaeda, which was headquartered in Sudan and had a strong foothold in Yemen, often served as the go-between, facilitating the contacts between them. For example, in January 1997, according to a BBC translation, the Yemeni opposition newspaper, *Al Ittihad al Dawliyyah,* reported that Sudan's NIF leaders in Khartoum received a contingent of terrorists from Yemen and that the contingent was sent by Al Zindani to be trained in NIF-sponsored camps.[85] By the same token, while Zindani was sending militants to Sudan for training under the supervision of the NIF, in the mid-'90s trained al Qaeda militants moved to Yemen under the supervision of al Zindani. Reports from the highly influential Arab newspaper *Al Watan al Arabi* reveal that in 1997 Bin Ladin had "substantial business interests" in Yemen, where he "works in cooperation with members of the Yemeni Alliance for Reform (Islah)." [86]

Another example of cooperation between radical Islamists in Yemen and the Sudanese government comes from evidence gathered by an Egyptian military court during the 1994

[77] Segev, Shmuel, "Iran Continues to Forge Sudan Connections," The Jerusalem Post, January 4, 1995.
[78] "Islah prepares for visit from speaker of former Sudanese govt" Middle East News Item, December 29, 1999
[79] "Sudanese president announces failure of Islamic mediation with Turabi" Agence France Press, April 15, 2001
[80] O'Neill, Brian, "US Puts Yemen in a Bind Over Terror Sheikh," Asia Times, April 2, 2004.
[81] The Arab volunteers who fought in Afghanistan during the war against the Soviets are commonly referred to "Arab Afghans." Abdel Majid al Zindani was the undisputed leader of the Arab Afghans that resided in Yemen.
[82] Hawthorne, Amy, "Yemen and the Fight against Terror," Policywatch, Washington Institute of Near East Policy, Oct 11, 2001.
[83] Bol, Nhial, "Khartoum Denies Involvement in Conflicts," Inter Press Service, May 10, 1994.
[84] Bol, Nhial, "Khartoum Urges Yemeni Leaders to Resort to Dialogue," Inter Press Service, May 19, 1994. .
[85] "Opposition Radio says Fundamentalist Terrorists from Yemen Trained in Sudan,", January 31, 1997, BBC Translation of Voice of Sudan,  in Arabic, January 30, 1997.
[86] Islah is Zindani's political party.

trial of two militants, Ahmed Mohammed Gomaa and Sherif Mohammed Hassan.[87] The court said the two who were sentenced to death had received espionage training in Sudan and terrorist training in both Sudan and Yemen.[88]

Zindani, Turabi (and therefore the Sudanese government) and Bin Ladin, united by the same extremist ideology, worked together for more than a decade. Zindani is Bin Ladin's man in Yemen and worked together with the Sudanese government in supporting al Qaeda throughout the '90s. It is therefore important to note what Hamood Abdulhamid Hitar, a judge in Yemen's High Court, said about Zindani's involvement in the USS Cole bombing.[89] Hitar revealed that several prisoners held in connection with the attack on the USS Cole have told local authorities that Al Zindani issued a decree ordering the strike.[90] Officials in Zindani's al Islah party have denied the accusation.[91]

But even if Zindani did not play a direct role in the bombing, for years the Yemeni cleric has been the most important al Qaeda representative in Yemen, playing a significant role in fundraising and recruiting. His close cooperation with Sudanese authority is another example of how Sudan has been for years involved in al Qaeda activities that have resulted in attacks beyond Sudanese territory, Yemen included.

According to press reports, one of the key planners of the USS Cole bombing and al Qaeda chief of operations in Yemen, Qaed Salim Sinan al-Harethi, met with Bin Ladin in Sudan.[92] The FBI called al-Harethi al Qaeda's "godfather in Yemen."[93] According to the *Times of London*,[94] the *al-Sahwa* newspaper[95] reported on November 4, 2002 that Abu Ali had been a close companion of bin Ladin when al-Qaeda had its headquarters in Sudan. Bin Ladin is reported to have sent his old friend to Yemen to investigate the possibility of moving there.[96] More information on al-Harethi is provided in the attached memo on the individuals involved in the attack on the USS Cole.

Moreover, the attack against the USS Cole did not happen in a vacuum. It was clearly part of a strategy to attack US troops in the Middle East. Attacks that preceded (Somalia, Khobar Towers, and the failed attack on the USS The Sullivans[97]) and followed (attacks

---

[87] Ghalwash, Mae, "Death Sentence for Two Militants," Agence France Press, September 20, 1994.
[88] Ghalwash, Mae, "Death Sentence for Two Militants," Agence France Press, September 20, 1994.
[89] Slackman, Michael, "Yemeni Religious Leader Tied to *Cole*," The Los Angeles Times, January 15, 2003.
[90] Slackman, Michael, "Yemeni Religious Leader Tied to *Cole*," The Los Angeles Times, January 15, 2003.
[91] Slackman, Michael, "Yemeni Religious Leader Tied to *Cole*," The Los Angeles Times, January 15, 2003.
[92] "Yemen Arrests Mastermind of Attacks on USS *Cole*," Fox News, November 25, 2003, http://www.foxnews.com/story/0,2933,104067,00.html
[93] Monaghan, Elaine and McGrory, Daniel, "Death of Terror Chief Deals Severe Blow to al-Qaeda," The Times of London, November 5, 2002.
[94] Monaghan, Elaine and McGrory, Daniel, "Death of Terror Chief Deals Severe Blow to al-Qaeda," The Times of London, November 5, 2002.
[95] *Al Sahwa* is the official newspaper of Zindani's Islah party. http://www.interet-general.info/article.php3?id_article=598
[96] Monaghan, Elaine and McGrory, Daniel, "Death of Terror Chief Deals Severe Blow to al-Qaeda," The Times of London, November 5, 2002.
[97] In January 2000, al Qaeda operatives attempted to use a small boat to bomb the USS *The Sullivans* while it refueled in Aden. The explosives-laden boat sank before it could reach its target. This botched assault is considered to be a precursor to the bombing of the *Cole*, which used the same tactic. See: "Cole Attack was Terrorists' Second Try, U.S. Officials Say," CNN, November 9, 2000, http://www.cnn.com/2000/US/11/09/uss.cole.02/

on US forces in Kuwait and Saudi Arabia) the bombing of the USS Cole show the continuity in al Qaeda's strategy. A significant example is provided by the story of a telephone number in Yemen that al Qaeda operatives linked to several plots over the years have all used.

As noted in a February 2002 *Washington Post* report on Sameer al-Hada, who blew himself up with a hand grenade after being cornered by Yemeni security police outside the capital of Sanaa,[98] Al-Hada was a member of a clan that has been linked by U.S. investigators to three al Qaeda attacks: the 1998 Africa Embassy bombing, the bombing of the USS Cole and the September 11 attacks on New York and the Pentagon.[99] The *Post* reported that a cell phone number traced to the clan has been used for years as a "switchboard" by al Qaeda leaders, and had been linked to the bombings of U.S. embassies in Kenya and Tanzania, according to evidence presented by U.S. prosecutors in the case.[100] FBI investigators have subsequently tied the same telephone number to the 2000 bombing of the USS Cole and to some of the Sept. 11 hijackers, according to the *Washington Post* article.[101]

One of the hijacking leaders, Khalid Almihdhar, who was married to al-Hada's sister, is known to have called the number, according to U.S. officials.[102] The Yemen connection to al Qaeda surfaced frequently also in the 2001 Embassy bombing trial. One of the convicted defendants, Mohamed Rashed Daoud Owhali, traveled to Yemen in the months before the bombings and was given the al-Hada phone number to reach a contact named in the court transcript as Ahmed al Hazza.[103] Sources said that "al Hazza" is merely another way to spell al-Hada's name.[104] According to trial testimony, Owhali made calls to the number both before and after the Nairobi attack, including efforts to get money and a passport in order to leave Kenya. The same number received two calls from bin Ladin's satellite phone in the middle of Owhali's attempts.[105] The al Hada story proves that al Qaeda is a transnational organization, whose members have been trained and operate in different parts of the world, but share the same goal. The foundations of this organization were laid in Sudan, where al Qaeda was able to operate freely for more than five years.

The thesis that the USS Cole just represents a step in al Qaeda's plan to attack US interests in the Middle East and that such a plan was conceived as early as 1989 is also

---

[98] Eggen, Dan and Walter Pincus, "US, Yemen Step up Anti Terror Cooperation," The Washington Post, February 16, 2002.

[99] Eggen, Dan and Walter Pincus, "US, Yemen Step up Anti Terror Cooperation," The Washington Post, February 16, 2002.

[100] Eggen, Dan and Walter Pincus, "US, Yemen Step up Anti Terror Cooperation," The Washington Post, February 16, 2002.

[101] Eggen, Dan and Walter Pincus, "US, Yemen Step up Anti Terror Cooperation," The Washington Post, February 16, 2002.

[102] Eggen, Dan and Walter Pincus, "US, Yemen Step up Anti Terror Cooperation," The Washington Post, February 16, 2002.

[103] Eggen, Dan and Walter Pincus, "US, Yemen Step up Anti Terror Cooperation," The Washington Post, February 16, 2002.

[104] Eggen, Dan and Walter Pincus, "US, Yemen Step up Anti Terror Cooperation," The Washington Post, February 16, 2002.

[105] Eggen, Dan and Pincus, Walter, "US, Yemen Step up Anti Terror Cooperation," The Washington Post, February 16, 2002.

sustained by the US government. In fact, the indictment of two of the perpetrators of the attack on the USS Cole, Jamal Badawi and Fahd Quso,[106] clearly states that:

> At various times from at least as early as 1989 until the date of the filing of this Indictment, coconspirator Usama Bin Ladin, and others known and unknown, engaged in financial and business transactions on behalf of al Qaeda, including, but not limited to: purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing communication and electronics equipment; transferring funds between corporate accounts; and transporting currency and weapons to members of al Qaeda and its affiliated groups. To carry out some of these transactions, the defendants BADAWI, and QUSO traveled on behalf of al Qaeda and its affiliated groups to various places, including Saudi Arabia, Yemen, and Thailand.

### Fatwas

The glue that keeps al Qaeda's operatives together is their religious fanaticism. Fatwas (Islamic religious decrees) issued by al Qaeda's religious committee, bind all its operatives. A fatwa marking US forces in the Arabian Peninsula as targets was issued for the first time in 1992, when al Qaeda was headquartered in Sudan. Osama bin Ladin and al Qaeda have shown a prolonged willingness to strike at US military targets in the Arabian Peninsula. Bin Ladin and al Qaeda perceive the presence of US forces in the Arabian Peninsula as an invasion and they have repeatedly issued fatwas threatening and providing the religious justification for attacks against US forces in the region.

One of these fatwas, issued in 1996,[107] is significantly entitled "Message from Usamah Bin Muhammad Bin Ladin to His Muslim Brothers in the Whole World and Especially in the Arabian Peninsula: Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula." The 1996 fatwa underlined the importance of Yemen to al Qaeda, stating that "[t]he presence of a population of fighters in the south of Yemen, fighting in the cause of Allah, is a strategic threat to the Zionist-Crusaders alliance in the area."

Over the years, fatwas and tapes sent to the media by Bin Ladin have repeatedly stated that one of al Qaeda's main reasons of enmity against the US is the presence of American troops in the Arabian Peninsula. But it is extremely important for the case that the first fatwa condemning the presence of US troops in the Arabian Peninsula was issued in 1992, when Bin Ladin was in Sudan. In fact, the indictment of two men charged for their role in the bombing of the USS Cole reveals that "[a]t various times in or about 1992, coconspirator Usama Bin Ladin, working together with members of the fatwa committee of al Qaeda, disseminated fatwas (rulings on Islamic law) to other members and associates of al Qaeda that the United States forces stationed on the Arabian Peninsula, including both Saudi Arabia and Yemen, should be attacked."[108] This proves that the idea

---

[106] USA v. Al-Badawi, et al. SDNY S12 98-CR-1023. Indictment, pg. 9-I, May 15, 2003.
[107] USA v. Al-Badawi, et al. SDNY S12 98-CR-1023. Indictment, pg. 9-j, May 15, 2003.
[108] USA v. Al-Badawi, et al. SDNY S12 98-CR-1023. Indictment, pg. 9-j, May 15, 2003.

of attacking US troops in the Arabian Peninsula (and here Yemen is specifically mentioned) was, if not conceived, at least carefully considered during Bin Ladin's stay in Sudan.

## State Department Designation

Sudan was designated as a state supporter of international terrorism in 1993. Patterns of Global Terrorism, the annual report issued by the US Department of State, makes it clear that in the years after Bin Ladin's departure and before the attack on the USS Cole, Sudan was still active in supporting terrorist organizations, including al Qaeda.

### Patterns of Global Terrorism - 1997[109]

**Sudan**

*Sudan in 1997 continued to serve as a haven, meeting place, and training hub for a number of international terrorist organizations, primarily of Middle East origin. The Sudanese Government also condoned many of the objectionable activities of Iran, such as funneling assistance to terrorist and radical Islamic groups operating in and transiting through Sudan. The Department of State in November 1997 announced new comprehensive economic sanctions against Sudan. The sanctions convey the gravity of US concerns about Sudan's continued support for international terrorism and regional opposition groups as well as its abysmal human rights record.*

*Sudan has not complied with UN Security Council Resolutions 1044, 1054, and 1070 passed in 1996, despite efforts that year by the regime to distance itself somewhat from terrorism, including ordering the departure of terrorist financier Usama Bin Ladin. The Security Council's demands include that Sudan cease its support to terrorists and turn over the three Egyptian al-Gama'at fugitives linked to the 1995 attempted assassination of Egyptian President Mubarak in Ethiopia. President Bashir, consistent with Khartoum's repeated denials that its officials had any foreknowledge of the planning of the event, in October 1997 scoffed at the idea Sudan could be seen to have had anything to do with the attack.*

*Since Sudan was placed on the list of state sponsors of terrorism in August 1993, the Sudanese Government has continued to harbor members of several of the most violent international terrorist and radical Islamic groups. These groups include Lebanese Hizballah, the PIJ, the ANO, and HAMAS. The Sudanese Government also supports regional Islamic and non-Islamic opposition and insurgent groups in Ethiopia, Eritrea, Uganda, and Tunisia.*

*Sudan's support to terrorist organizations has included paramilitary training, indoctrination, money, travel documentation, safe passage, and refuge in Sudan. Most of*

---

[109] State Department, Patterns of Global Terrorism, Overview of State Sponsored Terrorism, 1997.

*the organizations present in Sudan maintain offices or other types of representation. They use Sudan as a base to organize some of their operations and to support compatriots elsewhere. Sudan also serves as a transit point and meeting place for several Iranian-backed terrorist groups.*

### Patterns of Global Terrorism 1998[110]

**Sudan**
*<u>Sudan continued to serve as a meeting place, safehaven, and training hub for a number of international terrorist groups, particularly Usama Bin Ladin's al-Qaida organization.</u> The Sudanese Government also condoned many of Iran's objectionable activities, such as funding terrorist and radical Islamic groups operating and transiting Sudan.*

*Sudan still has not complied fully with UN Security Council Resolutions 1044, 1054, and 1070, passed in 1996, despite the regime's efforts to distance itself publicly from terrorism. The UNSC demands that Sudan end all support to terrorists. It also requires Khartoum to hand over three Egyptian al-Gama'at fugitives linked to the assassination attempt in 1995 against Egyptian President Mubarak in Ethiopia. Sudanese officials continue to deny that they are harboring the three suspects and that they had a role in the attack.*

*Khartoum continues to provide safehaven to members of several of the world's most violent terrorist groups, including Lebanese Hizballah, the PIJ, the ANO, and HAMAS. Khartoum also supports regional Islamic and non-Islamic opposition and insurgent groups in Ethiopia, Eritrea, Uganda, and Tunisia.*

*Sudanese support to terrorists includes provision of paramilitary training, money, religious indoctrination, travel documents, safe passage, and refuge. Most of the organizations in Sudan maintain offices or other types of representation.*

*In August the United States accused Sudan of involvement in chemical weapons development. On 20 August the United States conducted military strikes against the al-Shifa pharmaceutical plant in Khartoum, which was associated with Usama Bin Ladin's terrorist network and believed to be involved in the manufacture of chemical weapons, to prevent an anti-US attack. Sudan has denied that the plant was involved in chemical weapons production and vigorously has protested the US bombing.*

---

[110] State Department, Patterns of Global Terrorism, Overview of State Sponsored Terrorism, 1998.

### *Statement as to Rate of Pay*

I am being paid $200.00 per hour for my time in this case.

### *Documents Relied Upon*

In addition to the documents identified in the report and footnotes, I may also rely upon the following deposition transcripts:

1.  Steve Emerson, attached hereto as Exhibit "A."

2.  Douglas Farah, attached hereto as Exhibit "B."

3.  James Woolsey, attached hereto as Exhibit "C."

### *Testimony in the Last Four Years*

1.  2012 - *Harrison, et. al. v. Republic of Sudan,* Case No.: 10-1689, United States District Court for the District of Columbia. (Testimony through deposition)

### Qualifications

My CV is attached as Exhibit "D."



Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

OLIVIA RUX, et al.,          )
        Plaintiff,           )
    vs.                      ) C.A. 204 CV 42
REPUBLIC OF SUDAN,           )
        Defendant.           )
        *    *    *    *    *

The videotaped deposition of STEVEN A. EMERSON was taken on Friday, March 2, 2007, commencing at 2:09 p.m., at the offices of Greenberg Traurig, 800 Connecticut Avenue, N.W., Washington, D.C., before Paula L. Lowery, Notary Public.

        *    *    *    *    *

Page 2

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
    ANDREW C. HALL, ESQUIRE
    MARK E. STEINER, ESQUIRE
    Hall, Lamb and Hall, P.A.
    1428 Brickell Avenue
    Miami, Florida  33131-3491
    (305) 374-5030
    (305) 374-5033 - fax
    msteiner@hihlawfirm.com

    NELSON M. JONES, III
    Nicholas & Jones
    440 Louisiana
    475 Lyric Office Centre
    Houston, Texas 77002
    (713) 224-5323
    (713) 224-8525 - fax

(Appearances continued on the next page.)

Page 3

APPEARANCES (continued):

ON BEHALF OF THE DEFENDANT:
    (No counsel present.)

ALSO PRESENT:
    JAMES COOPER, ESQUIRE
    SCOTT PRESTON, Videographer

Page 4

I N D E X

DEPOSITION OF STEVEN A. EMERSON
MARCH 2, 2007

EXAMINATION BY:              PAGE
Mr. Hall                      6

EMERSON DEPOSITION EXHIBITS:  PAGE MARKED
(No exhibits marked.)

EXHIBIT
A

1 (Pages 1 to 4)

Page 5

PROCEEDINGS

- - - -

THE VIDEOGRAPHER: Good afternoon. This is the video deposition of Steven Emerson taken by counsel for the plaintiff in the matter of Olivia Rux, et al., vs. Republic of Sudan, held in the United States District Court, Eastern District of Virginia, Civil Action 204 CV 428.

The deposition is held today in the offices of Greenberg Traurig, 800 Connecticut Avenue, Washington, D.C., on this date, March 2, 2007, at approximately 2:13 p.m.

My name is Scott Preston. I'm the video specialist. The court reporter today is Ms. Lowery from the firm of M.A.R. Reporting.

Counsel will now introduce themselves.

MR. HALL: Andrew Hall, together with James Cooper and Nelson Jones, representing the plaintiff.

THE VIDEOGRAPHER: You may now swear in the witness.

Whereupon --

Page 6

STEVEN A. EMERSON,
a witness, called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HALL:

Q. Please state your full name.

A. Steven Emerson.

Q. Mr. Emerson, in what city do you work?

A. In Washington, D.C.

Q. How old are you, sir?

A. I'm 52 years old.

Q. Let's go through your educational background. Would you tell the court your educational background, please.

A. I have a combined BA and MA from Brown University.

Q. What year did you receive those degrees?

A. In '76, '77.

Q. What did you get your degrees in?

A. I got my BA -- it's been a while. I believe I got it in urban studies, and my MA in

Page 7

sociology.

Q. Mr. Emerson, do you have a relationship with The Investigative Project?

A. Yes, I do.

Q. What is that relationship?

A. I'm the executive director of The Investigative Project on Terrorism.

Q. Would you tell the court exactly what that organization does.

A. The organization investigates, analyzes and combats the spread of radical Islamic fundamentalism in the United States and around the world.

Q. How long have you been investigating terrorism involving radical fundamentalist Islamic terrorism?

A. Formally, as part of the institute since 1995, but before that I wrote several books while I was in journalism at CNN, as well as at U.S. News & World Report.

Q. Let's go through your career and how you became dedicated to studying and taking positions

Page 8

involving terrorism. Tell us the story.

A. Well, when I graduated Brown, I came down to Washington. My first job was a graduate internship with the Carnegie Endowment for International Peace. My first full-time career position was a researcher on the U.S. Senate Foreign Relations Committee, and I was assigned to work on the Middle East.

Q. How long did you work for the committee?

A. I worked for the committee for three years.

Q. Researching?

A. Primarily the Middle East, as well as some other economic matters. I was ultimately assigned to the Subcommittee for Foreign Economic Policy, but I worked a lot on the Middle East and traveled there multiple times.

I left in 1980 as the Senate was reconstituted. I wrote my first book in 1995 called The American House of Saud, the Secret Petrol Dollar Connection, about Saudi petrol dollars being recycled in the United States with

Page 9

1 political strings attached.
2      I joined U.S. News & World Report after
3 that as their national security correspondent, and
4 wrote a lot of articles, and I also wrote a book
5 about U.S. counter-terrorist forces called The
6 Secret Warriors Inside the Covert Military
7 Operations of the Reagan Era.
8      Q.   And how did you come to be directly
9 involved in doing this as a full-time occupation?
10      A.   I became very intellectually stimulated
11 and interested by counter-terrorism, and I could
12 see looking down the tracks that this was going to
13 be a dominant issue in the United States as well
14 as the world. I felt I wanted to attach myself to
15 it, so I focused on this to the exclusion of
16 almost any other issue in terms of reading, in
17 terms of writing books.
18      So all of my books have pertained in one
19 way or the other to the issue of terrorism, and
20 all of my documentaries that I've worked on have
21 pertained to international terrorism, and so have
22 all my jobs.

Page 10

1      Q.   How many books have you written on
2 international terrorism, other than the ones you
3 just identified?
4      A.   Well, I've written a total of six books.
5 The last one that just came out two months ago
6 called Jihad Incorporated, a Guide to Military
7 Islam in the United States.
8      Q.   All on the subject of terrorism?
9      A.   Right, except for the first one, The
10 Secret Petrol Dollar Connection, which was about
11 Saudi petrol dollars.
12      Q.   You also talked about doing specials or
13 film or television shows.
14      A.   Yes, I did a documentary in 1994 called
15 Jihad in America that aired on public television
16 in November of that year, and it won the George
17 Polk Award and the IRE Award. It was recognized
18 as one of the top documentaries that year, and to
19 this day is recognized as the foremost documentary
20 on radical Islam in the United States and still
21 stands up.
22      Q.   How did you come to expand your work from

Page 11

1 studying radical Islam in the United States to
2 terrorism involving the radical Islamic movement
3 world wide?
4      A.   Because you can't contain radical Islam
5 in the United States. It's not compartmented. If
6 you're studying Hamas in New York, you have to
7 study Hamas in Cairo. If you're studying Al Qaeda
8 in New York, you have to study Al Qaeda in the
9 Sudan. It's the entire globe. That was one of
10 the problems that the FBI experienced. The
11 compartmented it too much.
12      Q.   As a result of this effort, you
13 ultimately formed The Investigative Project in
14 what year?
15      A.   I formed it in 1995 right after the
16 broadcast of the film Jihad in America.
17      Q.   And how many people work at The
18 Investigative Project?
19      A.   A total of about 28 people, and then we
20 have some freelancers.
21      Q.   And tell us exactly what you do at The
22 Investigative Project on a routine basis to be

Page 12

1 familiar with terrorism and the historic
2 development of terrorism.
3      A.   Well, there's really no general routine.
4 We're an unusual organization. People come and
5 sort of look at us as a startup. I look for
6 people that are very creative, who are self
7 starters, who are smart and know how to
8 investigate.
9      We have an incredible database, Probably
10 the largest open-source archival database of its
11 sort on militant Islam. It's a high learning
12 curve to get up to speed on these groups.
13      When one comes there, they're assigned
14 groups to follow, issues to follow and things to
15 investigate. The priorities are assigned either
16 by me, or by the issues of the day in terms of
17 what is being discussed in the news.
18      Q.   Is one of the things you study Al Qaeda?
19      A.   Al Qaeda is the principal thing we study.
20      Q.   Do you study Al Qaeda and its various
21 networking with state sponsors of Al Qaeda?
22      A.   We drill down and drill up on Al Qaeda.

3 (Pages 9 to 12)

Page 13

1    Q.  What does "drill down and drill up" mean?
2    A.  We look at state sponsorship, and we look
3  at its various incarnations.  Basically, how it
4  reincarnates itself.  It's reconstituted entities
5  up and down.
6    Q.  Do you have investigators in the field in
7  the Middle East as well?
8    A.  We have -- I'd rather not disclose the
9  country.  It is an Arab county.  We have an office
10  there.
11    Q.  And do you monitor the newspapers, media,
12  television and radio in the Arab language?
13    A.  Yes, we monitor that -- well, we
14  subscribe to a couple of monitoring services,
15  including FBIS.
16    Q.  Which is what?
17    A.  Foreign Broadcast Information Service run
18  by the CIA, as well as Memory, which is Middle
19  East -- well, it's an incredibly helpful
20  translation service.  And our own organization.
21  Of course our own organization collects
22  intelligence from the country in which it

Page 14

1  operates.
2    Q.  Do you consult with any government
3  agencies based upon your knowledge and experience?
4    A.  We work very closely with numerous
5  government agencies although we're not paid by any
6  of them.
7    Q.  When you say very close, you mean you
8  meet with them and provide them with information?
9    A.  We provide them with information, or
10  sometimes they provide us with information in
11  order to figure out -- in order for us to figure
12  out how to connect the dots.
13    Q.  And that's what you do for them?
14    A.  That's one thing we would do for them.
15  Other things we might do would be to help them to
16  initiate an investigation based on intelligence
17  that we collect.
18    Q.  Which organizations do you consult with?
19    A.  I'm going to tell you the names -- I'm
20  not going to tell you all of the organizations
21  because we're constrained in terms of revealing
22  all of it.

Page 15

1    Q.  Just tell me the ones that you feel like
2  you're --
3    A.  I can tell you that the FBI is one of
4  them.  The Department of Justice is another.
5    Q.  Do you consult with any security
6  agencies, or are you not able to say that?
7    A.  I am not allowed to tell you that.
8    Q.  Have you consulted with any governments
9  other than the United States in order to assist
10  them in their activities against terrorism?
11    A.  When I have traveled overseas, I have
12  consulted with the Australian police and
13  Australian intelligence agency.  We have been
14  contacted by the MI-5 in Britain, and we've been
15  contacted by the German intelligence organization.
16    Q.  Did there come a time based upon your
17  database that I approached you to ask you whether
18  or not you would undertake to review your
19  materials to tell me if there was a relationship
20  between the United States Cole and any state
21  sponsor of terrorism?
22    A.  Yes.

Page 16

1    Q.  Do you remember when that was?
2    A.  Do I remember what that was or when?
3    Q.  When?
4    A.  I'm sorry, I don't remember when that
5  was.
6    Q.  Well, I have a report that you wrote
7  dated May 11, 2004.  Does that help you a little
8  bit?
9    A.  Yes.
10    Q.  Okay.  So when did I come to see you?
11    A.  Probably two months before or something
12  like that.
13    Q.  Did you conduct a study and reach an
14  opinion based upon a study that you conducted as
15  to the cause of the bombing of the Cole and
16  whether or not it was state sponsored and whose
17  direct efforts were involved in the Cole?
18    A.  Well, we're very methodical, and I can
19  assure you -- in fact, now I remember that I
20  didn't offer an opinion when you came to see me,
21  because I don't speculate.  We only investigate
22  and then we form our conclusions.  We're not into

4 (Pages 13 to 16)

Page 17

1 forming preconclusions.
2       Then our conclusion was that the Sudan
3 was a state sponsor of terrorism, and that it was
4 a prime supporter of Al Qaeda in assisting it to
5 carry out the attack on the Cole.
6     Q. In that regard, sir, would you tell me
7 exactly what you did in your investigation in
8 order to reach that opinion.
9     A. Well, we researched extensively Al
10 Qaeda's role in the Sudan for years prior to the
11 attack on the Cole, and we researched the role of
12 the Sudanese in terms of their assistance to Al
13 Qaeda.
14     Q. There are a lot of people who believe
15 that when Osama bin Laden left Sudan on a
16 full-time basis in May of 1996, that that
17 terminated the relationship between Sudan and Al
18 Qaeda. Was that true, sir?
19     A. You know what? Interesting enough, I had
20 thought so. But when our researchers began
21 investigating, they discovered it was not true.
22 In fact, there were continued investments,

Page 18

1 assistance training and provision of military
2 explosives to the Sudanese throughout the period
3 past 2000.
4     Q. In that regard, I want to call your
5 attention to a footnote on page 480 of the 9/11 Report that's
6 located on page 480, and I'll just read it to you
7 for expediency.
8     Referring to the activities are Osama bin
9 Laden left, it says essentially, "The CIA official
10 read the Sudanese portfolio, met with the Sudanese
11 on numerous occasions and told us the Sudanese
12 were not going to deliver, and the perceived
13 moderates were just flat-out lying."
14     It goes on to say that, "Offers were
15 passed and dismissed by the National Security
16 Council because it believed Sudan is all talk and
17 little action, and that U.S. officials feared
18 Sudan would exploit positive American responses
19 for their own political purposes."
20     In that regard, sir, did you reach the
21 same conclusion yourself?
22     A. This was about delivering bin Laden, I

Page 19

1 presume.
2     Q. Right.
3     A. Yes, I felt that it was all B.S. That
4 they had no intention whatsoever. They lied
5 through their teeth. That this was typical of the
6 Muslim Brotherhood regime that dominated the
7 Sudanese regime.
8     Q. So let me take you to the beginning. Did
9 you come to identify exactly how Al Qaeda came to
10 have a presence in Sudan?
11     A. I don't recall the actual date that Al
12 Qaeda cemented its ties or originated its ties. I
13 think it went back to 1991 when it moved there,
14 and when Al Qaeda was actually formed.
15     Al Qaeda was actually formed -- the base
16 was formed in 1989, but I don't think it expanded
17 its operations much until 1991. I think at that
18 point it established a relationship with Sudan.
19     Q. Are you familiar with the relationship
20 between Omar al Bashir and Hassan al Turabi on the
21 one hand and Al Qaeda on the other?
22     A. Yes, I am.

Page 20

1     Q. Tell us who Bashir and Turabi were.
2     A. Well, Turabi became head of the Muslim
3 Brotherhood, was a fierce ideologue and was also
4 head of the Sudan. Al Bashir was also head of the
5 Sudan. My memory is a little bit shaky here in
6 terms of chronology.
7     Q. Let me see if I can help you with the
8 date. We have independently identified at least
9 two men as coming into power as a result of a coup
10 d'etat in 1989. Does that help you?
11     A. Yes, yes. What I was trying to think of
12 is when one left power and the other one assumed
13 it exclusively. That's what I was trying to think
14 of.
15     Q. Well, let's talk about the types of
16 support Sudan gave. First of all, are you
17 familiar with the annual meetings that occurred in
18 Sudan every year?
19     A. The Popular Front meetings. These are
20 these meetings that Turabi held every year
21 featuring the top radical Islamic leaders from all
22 over, including bin Laden, that were

Page 21

1  extraordinary.
2      Q.  Why do you say they're extraordinary?
3      A.  Because they were sort of like the annual
4  mafia meetings, gathering the top mob leaders.
5  You know, to gather them in one place, they all
6  talked about jihad.  They called for jihad.  You
7  know, as a researcher and investigator, I would
8  love to have been a fly on the wall.
9      Q.  Now, did these meetings facilitate the
10  planning of the Cole in any way in your opinion?
11      A.  I believe there's a great likelihood that
12  they facilitated the planning of the Cole as well
13  as the planning of other attacks.  This is the
14  modus operandi of these Islamists.
15      Q.  What do you mean by that?
16      A.  Generally speaking, when these Islamic
17  leaders get together on such a grand basis, they
18  use it as an opportunity to cover themselves for
19  secret plannings of other attacks.  I have seen
20  this over and over again, whether it's in the
21  United States or whether it's in Europe or whether
22  it's in Africa.

Page 22

1      Q.  Was Osama bin Laden and the Al Qaeda
2  location important to Sudan because of the money
3  that they would bring to Sudan?
4      A.  The Al Qaeda organization brought an
5  incredible amount of investment to the Sudanese.
6      Q.  Why was that important to Sudan?
7      A.  Sudan was a very poor country.  It didn't
8  have the foreign investments.  There were
9  embargoes imposed by the West, so to the extent
10  that the Sudanese were able to get bank
11  investments, were able to get construction
12  companies, were able to get roads built, that was
13  very important.
14      Q.  And to your knowledge, has that activity
15  ever come to an end?
16      A.  To my knowledge, it has not come to an
17  end.
18      Q.  Are you familiar with a bank --
19      A.  Al Shamal.
20      Q.  -- Al Shamal?
21      A.  Yes.
22      Q.  Is that a Sudanese bank?

Page 23

1      A.  Well, it's an Al Qaeda bank operating in
2  the Sudan.  The Sudan will claim that it's a
3  Sudanese bank.
4      Q.  But you say it's an Al Qaeda bank?
5      A.  Absolutely.
6      Q.  When you say it's an Al Qaeda bank, what
7  does this bank do for Al Qaeda?
8      A.  I'm sure it launders money for it.
9      Q.  Was that laundry money important relative
10  to the Cole?
11      A.  Well, every terrorist organization needs
12  to launder money.  It can't operate on the basis
13  of receipts for purchasing explosives, paying off
14  people, so it needs cash.  The way you generate
15  cash is you launder it through illicit
16  transactions, and this was one way of doing it.
17      Q.  Now, you're familiar with the freeze
18  assets that were imposed on Al Qaeda in 1999?
19      A.  Right.
20      Q.  What did Al Qaeda do to finance its
21  operations after that freeze?
22      A.  They changed the operational nature of

Page 24

1  the way they did business as a bank.  They adopted
2  the Sheria way of doing business at the bank.
3      Q.  What does that mean?
4      A.  Well, I think they stopped the western
5  process, and they adopted the Islamic process,
6  which would have been ostensibly little record
7  keeping, more of these unofficial loans, which are
8  done on a handshake, and gives rise and latitude
9  for money laundering.
10      Q.  You are familiar with the sworn testimony
11  of Jamal al Fadil in the case of United States of
12  America vs. Bin Laden, correct?
13      A.  Yes, he was an informer.
14      Q.  Right.  Did he provide you information in
15  his sworn testimony that you would, as somebody
16  who investigates, rely upon?
17      A.  Yes, I would.
18      Q.  What did he provide you relative to the
19  use of these banks as a money laundry for Al Qaeda
20  relative to the Cole?
21      A.  If I recall correctly, Fadil stated that
22  the bank was used as a conduit for cash for

Page 25

1  himself and for others in the lead up to the Cole
2  to pay for living expenses and for the explosives.
3  I have not reviewed Fadil's testimony in several
4  years, however.
5      Q.  Let me take you forward a little bit.
6  Are you familiar with the use of Sudanese
7  diplomatic pouches to transfer explosives into
8  Yemen?
9      A.  Yes, I am.
10     Q.  Tell me about that.
11     A.  Diplomatic pouches are, ostensibly, free
12 of any type of inspection, and Sudan would exploit
13 that through them to transfer explosives around
14 the world, not just from the Sudan into Yemen.
15 They would use it in the United States for that
16 matter.
17     Q.  Specifically, where we noted the Cole
18 bombing occurred in the report of Aden in Yemen --
19     A.  Right.
20     Q.  -- with explosives that Al Qaeda got,
21 from your experience and your opinion, do you have
22 an opinion as to where the source of those

Page 26

1  explosives would have been?
2      A.  I have no doubt the source came from Al
3  Qaeda and was transported to Yemen from Al Qaeda
4  or by the Sudanese government through most
5  probably the diplomatic pouch.
6      Q.  Now, safe houses -- are they important to
7  terrorism?
8      A.  Essential to terrorism.
9      Q.  Why?
10     A.  You need a vehicle and a venue where
11 terrorists can hang out without being detected in
12 the months or even years prior to the attack, as
13 reconnaissance is being done, as planning is being
14 done. It's absolutely critical.
15     Q.  Did Sudan provide safe houses for Al
16 Qaeda?
17     A.  Absolutely. It provides sanctuary and
18 safe houses.
19     Q.  What do you mean by "sanctuary"?
20     A.  Well, they need a place where they're not
21 going to get arrested or bombed or interdicted, so
22 Sudan protected them. It was a large --

Page 27

1  essentially, it was an island of freedom for
2  terrorists where they could go to and not be
3  caught or arrested.
4      Q.  During what period of time were those
5  safe houses provided?
6      A.  From at least the time that Bashir and
7  Turabi took over.
8      Q.  Until?
9      A.  Until probably the new leader took over.
10     Q.  Which would be which year?
11     A.  That was relatively recently.
12     Q.  2000 --
13     A.  2005?
14     Q.  Let's talk about another issue. That's
15 shipping commodities -- gold and conflict gems --
16 into Sudan in order to finance Al Qaeda. Are you
17 familiar with that?
18     A.  Not as much. I'm familiar with the work
19 of Douglas Farrah, who I think pioneered the
20 investigation into those, but I'm not a specialist
21 in this area.
22     Q.  Okay. So we'll leave that for

Page 28

1  Mr. Farrah.
2      How about the issuance of diplomatic
3  passports to Al Qaeda members starting in 1998?
4  You're familiar with that, aren't you?
5      A.  I'm familiar with the use of diplomatic
6  passports by terrorist regimes who in turn
7  transferred them to Al Qaeda.
8      Q.  Were those diplomatic passports from
9  Sudan?
10     A.  Sudan was one of the regimes that with
11 Iran actually helped mock up the diplomatic
12 passports with the pictures of Al Qaeda members
13 and passed them off as genuine diplomatic
14 passports.
15     Q.  We know that in 1998 there was a
16 relationship between Sudan and its use of
17 embassies and Al Qaeda. Would you tell me about
18 that, please?
19     A.  I'm sorry, could you repeat the question?
20     Q.  Let me invite you to paragraph 40 of a
21 document -- take a moment to look at that, please.
22     MR. HALL: Let's go off the record for a

Page 29

1  second, please.
2          (Pause in the proceedings.)
3          BY MR. HALL:
4      Q.  Mr. Emerson, there's a document which is
5  called Text:  State Department Issues Fact Sheet
6  on Bin Laden, dated August 14, 1996.  Did you
7  provide this to me?
8      A.  Yes, I believe we did.
9      Q.  Take a look at that.
10     A.  (Reviewing document.)  Yes.
11     Q.  And where did you obtain that from, sir?
12     A.  From the State Department.
13     Q.  That's the United States Department of
14  State?
15     A.  Yes, sir.
16     Q.  All right.  In that regards there's a
17  good deal of information on Al Qaeda through the
18  date of the document.
19     A.  That was the first time the State
20  Department had issued anything on Al Qaeda.
21     Q.  Now, I want to take you back to 1998.  Do
22  you recall an agreement between the Sudanese, the

Page 30

1  Yemenese organization and Al Qaeda relative to
2  budget and the use of embassies and diplomatic
3  passports?
4      A.  Yes, I do.
5      Q.  What do you understand that to mean?
6      A.  There was an agreement made to allow the
7  use of Sudanese embassies in various cities around
8  the world to be used by terrorists, as well as
9  financial institutions controlled by the Sudanese
10  also to be used by terrorists.
11     Q.  I want to read you a particular sentence
12  from a Canadian intelligence report that we
13  obtained from you which was filed in the Federal
14  Court of Canada in relation to Mohammed Mashoud --
15  is it?
16     A.  I think it's Mashoud.
17     Q.  Let me read it to you.  "A 1998 agreement
18  between Al-Zawahiri and leaders of the Sudanese,
19  Iranian, Ugandan, Yemeni and Egyptian groups
20  established budgets for financing international
21  terrorist organizations and plans to mobilize
22  officials in Sudan's embassies in London, New

Page 31

1  York, Rome, Karachi and Mogadishu.
2          "It was also agreed at the meeting to
3  open Sudan's doors to international Islamic fund
4  raising organizations and to facilitate the
5  movement of extremists by providing them with
6  Sudanese diplomatic passports."  You're familiar
7  with that?
8      A.  Yes, I am.
9      Q.  And tell me exactly what is the
10  significance of that.
11     A.  That would be, on a scale of 1 to 10 of
12  importance of a terrorist development, a
13  number 10, 10 being the most important.
14         That would provide terrorists with the
15  absolute perfect cover -- a diplomatic cover -- to
16  carry out terrorist attacks.  To travel around the
17  world with the protection of diplomatic passports,
18  with the ability to use diplomatic pouches, with
19  the ability to use diplomatic funds.
20         It would be absolutely critical for the
21  success of an operation, and it is considered the
22  prime vehicle for a terrorist to exploit and the

Page 32

1  prime desire of a terrorist to acquire.
2      Q.  And in that regard, sir, do you recall
3  the name of the Al Qaeda operative who was the
4  planner of the Cole bombing?  I've got the name
5  here, but I want to see if you can recall it -- al
6  Harethi?  Did I mispronounce it?  Let me show you.
7      A.  (Reviewing document.)
8      Q.  How do I pronounce that name?
9      A.  Al-Harethi -- Qaed Salim Sinan
10  al-Harethi -- now I'm recalling it, al-Harethi.
11     Q.  You recall he lost his life during a CIA
12  attack?
13     A.  Right.
14     Q.  And do you recall what his role was in
15  the Cole?
16     A.  What his goal was?
17     Q.  Role.
18     A.  Role?
19     Q.  If you need to refresh your recollection
20  and look at your papers, we'll go off the record
21  for a second.
22         (Pause in the proceedings.)

Page 33

1    BY MR. HALL:
2       Q.  Have you been able to locate this man's
3    name in your research papers?
4       A.  I remember now -- I had not remembered
5    the name, but now I recall al-Harethi.  I remember
6    that bin Laden had worked with another guy in
7    planning the operation.
8       Q.  And this is al-Harethi?
9       A.  That's exactly true.
10      Q.  Where was he trained?
11      A.  He was trained in the Sudan.
12      Q.  At Al Qaeda training bases in the Sudan?
13      A.  Throughout the Sudan.
14      Q.  Does Al Qaeda maintain training bases in
15   the Sudan to train --
16      A.  Does it do it today in 2007?
17      Q.  No.  Did it do it from, you know, 1991 on
18   through the bombing of the Cole?
19      A.  Absolutely.
20      Q.  Is that important?
21      A.  Again, the ability to have the safety and
22   sanctuary of a country is vital, and the ability

Page 34

1    to train someplace without worrying about either
2    being bombed or interdicted or arrested is
3    critical.
4       Q.  Sir, without the training camps, safe
5    houses, use of diplomatic passports, the shipment
6    of explosives, the use of money laundering and
7    businesses, and all the other Sudanese support of
8    Al Qaeda, could the Cole have been bombed in
9    Yemen?
10      A.  No, you would have deprived them of the
11   oxygen needed to operate.
12      MR. HALL:  Thank you.  That's all I have.
13      (Reading and signature waived.)
14      (Whereupon, the proceedings at 2:56 p.m.
15   were concluded.)
16
17
18
19
20
21
22

Page 35

1    COMMONWEALTH OF VIRGINIA, to wit:
2       I, Paula L. Lowery, before whom the
3    foregoing deposition was taken, do hereby certify
4    that the within-named witness personally appeared
5    before me at the time and place herein set out,
6    and after having been duly sworn by me, according
7    to law, was examined by counsel.
8       I further certify that the examination
9    was recorded stenographically by me and this
10   transcript is a true record of the proceedings.
11      I further certify that I am not of
12   counsel to any party, nor an employee of counsel,
13   nor related to any party, nor in any way
14   interested in the outcome of this action.
15      As witness my hand and notarial seal this
16   _____ day of _____, 2007.
17
18
19      _____
19      Paula L. Lowery
20      Notary Public
21   My Commission expires:
22   May 31, 2007

1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION


OLIVIA RUX, et al,

      Plaintiffs,

vs.                   CIVIL ACTION NO: 204 CV 42

REPUBLIC OF SUDAN,

      Defendants.

- - - - - - - - - - - /




      The deposition of DOUGLAS CHARLES FARAH,
taken by the Plaintiffs, at 1428 Brickell Avenue,
Suite 800, Miami, Florida, February 5th, 2007, at
11:58 a.m., pursuant to notice.



APPEARANCES;

ANDREW HALL, Esq.
Hall, Lamb & Hall
1428 Brickell Avenue
Suite 800
Miami, Florida.



      Donald N. Leavell, RPR

EXHIBIT
B

2

1  THE VIDEOGRAPHER:  This is the

2  videotaped deposition of Douglas Farah taken by

3  attorney Andrew Hall in the matter of Olivia Rux et

4  al versus The Republic of Sudan in The United

5  States District Court Eastern District of Virginia,

6  Norfolk Division.  The civil action number is 204

7  CV 428.  This deposition is taking place at 1428

8  Brickell Avenue, Suite 800, Miami, Florida.

9  Today's date is February 5th, 2007.  The time on

10  the video monitor is 11:58 a.m.  Would counsel

11  please state their appearances for the record?

12  MR. HALL:  My name is Andrew Hall.  I

13  appear for the plaintiffs in this matter.  There is

14  no one from the firm of Hunter and Williams

15  representing the Republic of Sudan.  The Republic

16  of Sudan has sent the Court a letter indicating

17  that it declines to proceed, to participate in

18  these proceedings.  Notwithstanding that fact, this

19  deposition was duly noticed in accordance with the

20  Federal Rules of Civil Procedure for today, at this

21  location, Miami, Florida, for Monday, February 5,

22  2007.  And with that, we'll begin.

23  Would you swear the witness, please?

24  Thereupon,

25  DOUGLAS CHARLES FARAH

U.S. Legal Support
(305) 373-8404

3

having been first duly sworn, was examined and
testified as follows:

DIRECT EXAMINATION

BY MR. HALL:

A.    Please state your name, sir.

A.    Douglas Charles Farah.

Q.    **Mr. Farah, would you give me your
business address?**

A.    7304 Carol Avenue, number 101, Tacoma
Park, Maryland, 20912.

Q.    **Let's go through your background, sir.
What is your educational background?**

A.    I have a BS in journalism and a BA in
Latin American Studies from the University of
Kansas in 1985 with highest honors in both degrees.

Q.    **Following your graduation from college
did you become active in the investigation and
analysis of terrorism?**

A.    I did.  As I covered a series of wars
and conflicts in Central America and then began
investigating drug related terrorism and then
eventually in the post 9-11 era, moved on to
Islamist terrorism.

Q.    **When you say you began, tell us about
your work background, please, sir.**

4

1    A.    I worked as a freelance journalist and

2 then as a bureau chief for the Washington Post in

3 Central America in --

4    Q.    **From what years to what years?**

5    A.    I began on staff with the Washington

6 Post in 1988. I became the investigative,

7 international investigative correspondent for the

8 Washington Post in 1997, and in 2000 I became the

9 West Africa bureau chief for the Washington Post

10 until I left at the end of 2001.

11    Q.    **And in that regard, sir, have as you**

12 **also become a senior fellow for any organization**

13 **regarding the study intelligence?**

14    A.    I did. I took a leave of absence from

15 the Washington Post while writing a book and I was

16 then hired as a senior fellow for the National

17 Strategy Information Center and The Consortium for

18 the Study of Intelligence looking at intelligence

19 reform and how intelligence agencies work together,

20 information on terrorist organizations.

21    Q.    **Did you also consult with the Fletcher**

22 **School of War and Strategy at Tufts University?**

23    A.    I have spoken to, with, at Tufts on

24 several occasions, and one of the directors of The

25 Consortium for the Study of Intelligence is the

1    Director of the Fletcher School.

2        Q.    Did you publish any papers for that

3    school?

4        A.    I published with Richard Schultz, the

5    director of the Fletcher School, a paper that was

6    published by the United States Air Force on

7    insurgencies in armed groups and failed states.

8        Q.    What other organizations have you been

9    a consultant for with regard to the issues of

10   terrorism?

11       A.    I was, served as a consultant for the

12   Criminal Investigative Unit of United Nations in

13   Bosnia based in Sarajevo.  I have dealt with, as a

14   consultant with a European government on terror

15   finance and how money moves.  And I currently work

16   with International Assessment and Strategy Center

17   under a contract that's partly funded by the

18   Department of Homeland Security in the United

19   States also looking at terrorism issues.

20       Q.    Have you been asked to provide

21   testimony before the United States Congress with

22   regard to terrorism and the movement of money?

23       A.    I have testified two times before the

24   United States Congress on the issues of terror

25   finance.

6

1    Q.    Have you ever spoken to the United

2    States military as a featured speaker and expert in

3    the area of terrorism?

4    A.    I have been invited to speak to the

5    European command based in Germany on terrorism

6    related issues specifically in Africa.  I have

7    addressed the special operations forces in Tampa,

8    Florida.  I have addressed West Point classes on

9    counter-insurgency and terrorism and numerous other

10   military academies that have asked me to come in

11   and speak to them.

12   Q.    Among those academies did you ever

13   address the Center for Army Analysis?

14   A.    I did.  That was one of the people

15   that brought me in to give a class on terrorist

16   finance and how terrorism, terrorists like to use

17   commodities to maintain financial value.

18   Q.    Have you ever had occasion to give a

19   lecture at the United States Army War College?

20   A.    I have.  And I have lectured there on

21   the same basic topic, yes.

22   Q.    Now, have you ever had a chance, an

23   opportunity to lecture or speak at any American

24   institutions, specifically Yale?

25   A.    I have spoken at Yale University; I

7

1   have spoken at Tufts University; I have spoken at

2   the University of Florida; and many other

3   educational institutions.

4        Q.    I'm tempted to say "Go Gators."  But I

5   suspect we need to be a little more serious than

6   that today.

7             Did you ever have occasion to speak

8   before any formal policy groups like the Brookings

9   Institute or anything like that?

10       A.    I have spoken to the Brookings

11  Institution on numerous occasions.  I'm part of a

12  working group on failed states that meets regularly

13  there both to present and to hear other presenters

14  on the topic.  I have participated as an expert in

15  the Princeton Project which was a gathering of

16  knowledgeable people on terrorism and future

17  threats that provided an extensive analysis of the

18  over-the-horizon threats for the public and for the

19  US Government that was published late last year.  I

20  have served on the Failed States and Armed Group

21  Committee of that project.  And, so, yes.

22       Q.    How about The American Enterprise

23  Institute?

24       A.    I have spoken to the American

25  Enterprise Institute also on the issue of terror

8

1   financing in Africa.

2        Q.    Woodrow Wilson International,

3   International Center for scholars?

4        A.    Yes, I have.

5        Q.    What was your relationship with that

6   group?

7        A.    It was an invitation to speak again on

8   terror finance issues.

9        Q.    What is the NEFA?

10       A.    That's the 9-11 Finding Answers

11  Foundation.  It's a group I consult with.  It is a

12  foundation that is dedicated to looking at terror

13  finance and how it works and I am an investigator

14  with them on contract.

15       Q.    And what -- are you employed by IBI

16  Consultants at this time?

17       A.    IBI Consultants is my company, yes.

18       Q.    And do you write regularly on the

19  subject of terrorism?

20       A.    I do.  Primarily for the International

21  Assessment and Strategy Center which is a private

22  foundation also looking at terrorism issues.  I

23  generally write at least once a month.  I also

24  recently published in the New Republic Magazine, in

25  Foreign Policy Magazine, the Washington Post

9

1    Outlook section.

2        Q.    Have you written any books on the

3    subject of terrorism or funding of terrorism?

4        A.    I wrote a book that was published in

5    May of 2004 by Broadway Books in New York called

6    Blood From Stones, The Secret Financial Network of

7    Terror which deals extensively and primarily with

8    terrorist funding, yes.

9        Q.    Did you write -- do you have another

10   book in progress right now?

11       A.    I have another book that is completed

12   and now in the printing process, to be released in

13   August, called The Merchants of Death.  It's the

14   story of Victor Boot and the illicit arms movements

15   around the world to terrorist organizations.

16       Q.    Have you written chapters of books as

17   well?

18       A.    I have written chapters for several

19   books, one which will be published also this year

20   by Brown University, on the relationship between

21   commodities and terror finance.  I have written a

22   chapter for a book on Latin American Insurgencies

23   that came out, I believe, in 1998, and I think

24   that's, I think that's it.

25       Q.    And what magazines have you published

1    in?

2          A.    I have published in Foreign Policy

3    Magazine; I have published in Russie which is a

4    respected great, publication in Great Britain

5    dealing with intelligence and terrorism issues.

6          Q.    Is that the Royal United Services

7    Institute?

8          A.    Yes, it is.   I have published in the

9    Washington Post Magazine.   I have published in

10   Mother Jones Magazine.   I have published in --

11         Q.    What is Mother Jones magazine?

12         A.    It's a liberal magazine, advocacy

13   magazine that's been around for about a hundred

14   years.   I have published for several European

15   publications as well, Anjou International

16   (Phonetic) from Belgium.   I have had pieces in the

17   Financial Times, ed piece, not a magazine piece,

18   and other publications.

19         Q.    Now, sir, in this case, do you recall

20   my contacting you to ask you to consult and to

21   provide expert testimony regarding the role of

22   Sudan in connection with the bombing of the United

23   States Cole?

24         A.    Yes, I do.

25         Q.    Do you recall how long ago that was?

11

1          A.     That was in 2006, I would guess the
2     middle of 2006.
3          Q.     Now, with regard to the issue of Sudan
4     and its role in, as an active state sponsor of
5     terrorism, are you familiar with that at all?
6          A.     I have come across the role and
7     studied the role of Sudan and, in extensive, in
8     various cases, yes.
9          Q.     Let's talk about that role.  Do you
10    have an opinion as to what role Sudan played with
11    regard to the sponsoring of terrorist activities?
12         A.     I think Sudan provided a fundamental
13    role in the early 1990s, particularly when the
14    groups of Islamic radicals were beginning to form
15    into viable armed groups when Hassan Al Turabi who
16    was the leader of the National Arabic Front invited
17    all of the Arab fighters to come into Sudan without
18    visa requirements, without having to go through
19    customs to be checked.  And that was a fundamental
20    moment in the allowing these groups to shape
21    themselves into coherent military units.
22         Q.     Now, when you say, now Mr. Turabi, was
23    he an official of the government of Sudan?
24         A.     Yes, he was.  He was the leader of the
25    National Islamic Front which was the party that

12

1   through a coup became power in Sudan.

2        Q.    **Was he the head of government in**

3   **Sudan?**

4        A.    He was.  And he also was

5   simultaneously the leader of the Muslim Brotherhood

6   which is an over-arching branch of Islamists and he

7   provided the infrastructure both on behalf of Sudan

8   and on behalf of the Brotherhood to give a base for

9   these groups to form and a financial center from

10  which they could operate.

11       Q.    **Now, you started with the idea of**

12  **inviting the terrorists to come to Sudan.  Are they**

13  **still invited to be in Sudan?**

14       A.    Sudan has gone to great lengths to

15  distance itself from terrorism.  But I think it's

16  an artificial distancing.  There are current

17  reports from United Nations and elsewhere, there

18  are still Islamist training camps in Sudan and they

19  clearly have not severed their links as you can

20  see, given the preponderance of the Islamist

21  radicals that are caring out the Darfur massacres.

22  They have clearly not distanced themselves from

23  the terrorist infrastructure.

24       Q.    **Have you studied the relationship of**

25  **the Sudan Support of Al-Qaeda and the bombing of**

13

1    the Cole?

2         A.    I have looked at that, yes.

3         Q.    Why don't you tell us historically

4    about how that support involved into a major

5    meaningful role toward the bombings of the Cole.

6    Can you do that, sir?

7         A.    In my experience in dealings with 20

8    years of armed groups and terrorist groups, they

9    always need a physical structure from which they

10   can operate.  And particularly terrorist

11   organizations need a place from which they can come

12   and go, where they or their friends control the

13   entry and exit points of that country to guarantee

14   that they will not be impeded in their movements.

15   Sudan provided that beginning in 1992.

16        Q.    Are you talking about a, but are you

17   talking about a safe place to work from?

18        A.    I'm talking about a safe place, a safe

19   haven under government protection where they can be

20   guaranteed that other people will not come looking

21   for them.  And Sudan provided that beginning in

22   1991, '92 to Osama Bin Laden and continued to

23   provide that same service after he left in 1996.

24   But I think in looking at how terrorist

25   organizations work, that's a primary requirement.

14

1   And without Sudan allowing those groups to form

2   into a cohesive infrastructure in Sudan and be able

3   to move elsewhere with impunity, including across

4   the fairly open border into Yemen, it would have

5   been very difficult for them to put together the

6   infrastructure that could carry out the Cole

7   attack.

8        Q.     But we know that actually Sudan got

9   closer and did more over time, did it not?

10       A.     Did more in what sense, sir?

11       Q.     In, in, more in terms of Al-Qaeda and

12  supporting Al-Qaeda, and the Cole?

13       A.     Well, what made Sudan unusual, I

14  wouldn't say unique because Afghanistan also played

15  the same role, is it provided them with a central

16  government protection which is an unusually

17  valuable commodity if you're an armed group,

18  especially if you're a terrorist group.  That

19  states's protection of their infrastructure allowed

20  them to acquire property, acquire businesses,

21  launder money through those properties, obtain

22  diplomatic passports which allowed them to move

23  around the world with impunity and unable to be

24  searched and it also provided them fundamentally

25  with a banking structure, Islamic structure that's

15

1    out of the norm of the banking rules that we're
2    acquainted with in the west and allowed them
3    channels to move money through that would be
4    virtually undiscoverable to the outside world.
5            Q.      Let's just go through the passage of
6    time.  Did Al-Qaeda acquire financial interest in
7    business in Sudan which allowed Al-Qaeda to launder
8    money through these Sudanese businesses?
9            A.      Yes, we know that they acquired a
10   tannery, they acquired agricultural businesses,
11   they acquired a number of farms, they had a virtual
12   corner on the gum Arabic market which is used in a
13   variety of sodas and things like that.  So they
14   were able to put together a fairly large
15   intrastructure.  And they also invested, Bin Laden
16   personally invested tens of millions of dollars in
17   this, a particular bank, in the Al Shamal bank.
18           Q.      Do you recall the precise amount?
19           A.      50 million dollars is what the State
20   Department has said and what other people have told
21   me as well, out of his personal inheritance, that
22   that was his, that was the last chunk of his family
23   money and he put it into a bank which gave him
24   partial ownership of the bank and a way to set up
25   accounts and move money that were completely off

16

1  the books for anyone else looking for it.  And

2  that's an incredibly important asset when you're

3  looking at funding armed groups and you don't want

4  people to determine whether the money comes from.

5       Q.    Are you able, sir, to have something,

6  for example, if you have a sleeper cell in Yemen,

7  like the bombers of the Cole were a sleeper cell in

8  Yemen for Al-Qaeda, is it necessary for you to be

9  able to have money off the books to fund them so

10  they can be a sleeper cell?

11       A.    Absolutely.  They can't do anything

12  without money and can't do anything without

13  training.  And Sudan provided the financial

14  infrastructure and the training infrastructure for,

15  for the people involved in that attack.

16       Q.    Now, let me just go forward in time.

17  We have heard that somewhere in 1996, the

18  leadership of Sudan expelled Osama Bin Laden.  Did

19  Sudan at the same time terminate its relationship

20  as a state sponsor of Al-Qaeda?

21       A.    No, it did not.  Al-Qaeda remained,

22  retained its business interest there.  On the books

23  it appears as though those businesses lost

24  significant amounts of money.  They don't look like

25  good investments.  He also had to pay into the

17

1  National Islamic Front structure so they could make

2  money off of his being there. But in reality a lot

3  of the losses appeared to me from what I have seen

4  to be money laundering losses, not actual losses.

5  There are ways of moving money through a cycle so

6  that it simply will disappear. And the businesses,

7  those businesses stayed intact well into this

8  century, years after.

9  Q. **Well, well into the year 2000?**

10  A. Well into, well after the year 2000,

11  yes.

12  Q. **Do you recall where Sudan actually**

13  **started issuing official documents to members of**

14  **Al-Qaeda so that they could conduct their terrorist**

15  **activities, specifically passports?**

16  A. I have been -- from what I know, they

17  began at least in 1998 and probably before to issue

18  diplomatic passports and order their Embassies

19  around the world to assist Al-Qaeda in whatever way

20  necessary. So they were able, and that's a very

21  important point because diplomatic passports and

22  diplomatic protection means you can't be searched

23  and questioned as you go across borders. And

24  that's something the terrorists have always wanted

25  and sought to acquire, and almost anywhere. And

18

1    Sudan gave it to them on a silver platter.

2         Q.    You're aware, are you not, that after

3    these diplomatic facilities were being offered to

4    Al-Qaeda starting in 1998, that those same pouches,

5    diplomatic pouches were used to ship at least one

6    shipment of explosives into Yemen?

7         A.    Yes, they were used to ship at least

8    one bag of explosives or pouch of explosives into

9    Yemen, which again I say is incredibly important.

10   Without a state sponsor you can't do that, because

11   diplomatic passport -- pouches are not searched.

12   And so you can do numerous things through

13   diplomatic channels that would be much more

14   difficult to do otherwise.

15        Q.    Now, we know from various official

16   accounts that in January of 2000 there was an

17   effort in Yemen by Al-Qaeda to sink the United

18   States ship The Sullivans which failed when the

19   boat filled with explosives sunk, and then

20   ultimately the second effort was on the Cole also

21   with explosives.  Where would those explosives come

22   from based on your knowledge and experience in this

23   area?

24        A.    They can't appear from nowhere and

25   they can't travel across borders that aren't secure

19

for the people who are moving them.  So I would --
my best guess would be they would have to come from
Sudan which was the closest place to Yemen in which
they had the safe quarter in which to be able to
move this type of goods across the border.

Q.   When you say your best guess, are you
talking about your studied opinion, or are you
guessing?

A.   I'm talking about my studied opinion
and having discussed this case with intelligence
officials who believe the same this I do.

Q.   Intelligence officials of which
nations?

A.   United States and Europe.

Q.   Now, sir, do you recall that there
came a point in time where the government of the
United States started freezings assets --

A.   Yes, sir.

Q.   -- of Al-Qaeda?  Do you recall when
that was?

A.   They, the main freeze came following
the August, 1998, bombings of the US Embassies in
East Africa.  It was an attempt to, and according
to the officials involved in actually doing the
freeze, it was a wild attempt to take some

20

retaliatory action against Al-Qaeda without
realizing, that in fact, Al-Qaeda and the Taliban
had money in the United States banking system.

    Q.    Now, sir, do you recall the
administration in its rataliatory action directed a
cruise missile strike against Sudan?

    A.    Yes, sir.

    Q.    And that would be 1998?

    A.    That would be 1998, yes, sir.

    Q.    Now, following that missile strike and
the freeze of assets, did something else happen
with regard to the movement of money and/or things
that could be used to buy munitions and support?

    A.    Well, what happened was that the
United States effort to freeze the assets of
terrorists led to the freezing of 220 million
dollars in gold that was in the US Federal Reserve
system, something that a part of which belonged to
Bin Laden and a part of which belonged to the
Taliban in Afghanistan.  And following that the
Al-Qaeda members decided to move all of their
assets that they could out of the formal banking
structure and into commodities that could be moved
easily across borders and would be very difficult
to trace.

21

1    Q.    And you personally became involved in
2    uncovering that, did you not?
3    A.    I did in the weeks after the 9-11
4    attack in 2001, I was told by people directly
5    involved in the trade that, in fact, Al-Qaeda, had
6    been buying a large sum of diamonds in Liberia and
7    Sierra Leone, profiting from those particularly
8    ugly wars in those two countries that were
9    essentially one conflict spilling over into two
10   different countries.  And it was, Al-Qaeda was
11   buying up the Alluvial diamond harvest in 2001 in
12   order to move its money into commodities and out of
13   banking.
14       Q.    Now, did you, were you in Sierra Leone
15   at the time you made that discovery?
16       A.    Yes, I was.  I traveled extensively to
17   Sierra Leone, Liberia, Ghana and elsewhere on the
18   story, but I was in Sierra Leone, yes, sir.
19       Q.    And did you identify the actual
20   Al-Qaeda operatives that were engaged in the
21   purchase of these gems?
22       A.    I did.
23       Q.    And how did you identify them as
24   Al-Qaeda operatives?
25       A.    Initially through an eyewitness who

22

had dealt with them directly on the diamonds who
had carried -- who had driven them into the bush
from Liberia into Sierra Leone to purchase
diamonds.  His account and his identification were
backed up by two other people who had also dealt
directly with the three Al-Qaeda operatives that I
identified in the story I wrote for the Washington
Post as being involved in the diamond trade on
behalf of Al-Qaeda.

    Q.    **Were you able once you started that
investigation to go backwards and trace in time how
Al-Qaeda started moving in commodities, that is to
say gold and gems, after its assets were frozen?**

    A.    I did.  I was not only in Liberia and
Sierra Leone but I spent time in Pakistan and the
United Arab Emirates also to people who dealt
directly with Al-Qaeda and the Taliban, who told
me, explained to me the rationale for their moving
into diamonds and why it had happened.  And further
investigations as it went along began to gather
documents that were coming out and being
translated, we have declarations by Osama Bin
Laden's body guards while he's in the Sudan talking
about the need to aid the Liberian conflict.  He
viewed it, according to the document that, that was

1  published by a newspaper account of an extensive
2  interview with one of Bin Laden's body guards that
3  in fact, he was very Bin Laden, himself, was very
4  concerned while in the Sudan.  And there's another
5  man named Mamoun Darkanzali in his trial in Germany
6  also was asked what he was -- if he knew Bin Laden.
7  He said yes, he knew Bin Laden and he was involved
8  in the gem stone trade with Bin Laden while Bin
9  Laden was in the Sudan.  So my conclusion from
10 those and other documents is that the movement into
11 commodities actually bagan probably somewhat before
12 '98 and accelerated in '98 but was directed by Bin
13 Laden while he was in the Sudan.
14     Q.     **Over time, did you discover the**
15 **movement of those commodities into Sudan?**
16     A.     What I discovered in 2002 was that a
17 very high level European intelligence task force
18 had become aware of gold, of flights of gold mixed
19 with other commodities that were flying out of
20 Afghanistan and Pakistan into Sudan, yes, and Sudan
21 was still a harbor where they felt safe, where they
22 could take their money to, as the Taliban fell and
23 Al-Qaeda fled Afghanistan following the US
24 occupation of Afghanistan.  They were flying gold
25 bars out in shipments in Russian aircraft to Sudan

24

1  which clearly indicated to the intelligence

2  analysts looking at this that Sudan was still a

3  safe haven for them.

4          Q.    Did you go back and trace those

5  shipments to periods of time in 1998, 1999, and

6  2000?

7          A.    The shipments of what, sir?

8          Q.    Gold.

9          A.    The shipments of gold, I only became

10 aware of in the 2002 time period, that were going

11 back in that, at that time.

12         Q.    Now, let's go back to Sudan and the

13 banking structure.  You made the comment that this

14 particular bank was, in Sudan, played an important

15 role because it was unlike western banks.  Can you

16 explain that?

17         A.    Beginning in 1981, 1982, there was a

18 concerted move to establish a separate Islamic

19 banking structure that would be separate from the

20 western banking structure.  In the extensive

21 literature that the Islamists wrote about this as

22 they did it which I, which I have reviewed

23 extensively and written about, they decided that

24 they wanted a whole system where they could operate

25 under Sharia law or Islamic law where you don't

25

1    collect interest and other different, things,

2    things are different from the western banking

3    system.

4         What developed in reality since then were a

5    series of very difficult to trace financial

6    institutions where ownership overlaps among a small

7    group of people and a small number of banks, and

8    where the way the bookkeeping is done and the way

9    the secrecy that surrounds these banks makes it

10   virtually impossible to understand how transactions

11   actually transpire in there.  And numerous of these

12   banks have been, come under investigation in

13   terrorist finance cases including the Al Shamal

14   bank in which Mr. Bin Laden invested his, his 50

15   million dollars.  And they're particularly

16   attractive because even if you can get into the

17   banking records you can basically not understand

18   them at all unless someone will walk you through

19   that and if someone won't, you're left with a,

20   pretty much a worthless pile of papers and books

21   that are unintelligible to the outside world.

22        Q.    Did Sudan allow its banking system and

23   this bank in particular to be used by Al-Qaeda to

24   fund its terrorism and its various sleeper cells

25   and networks?

A.     As I said, what made Sudan interesting and unique was that it was a centrally directed operation from the central government of Sudan, so they clearly had control over the banking system. It was a very centralized government structure. And so Al-Qaeda could not have used those banks with the impunity, and we have witnesses in trials and talking about their constantly going to Al Shamal banks and other banks to open accounts. They couldn't have operated with that degree of freedom and openness if they had not been sanctioned by the central government to do so.

Q.     So, let's, and then let's go to a different subject.   Terrorist conferences:  Does Sudan harbor terrorist conferences including Al-Qaeda at its terrorist conferences?

A.     Sudan has hosted at least one conference a year for, going back to at least 1995. And what you see, what makes these conferences --

Q.     Would that be 2000, 2001, 2002?

A.     2000, up until my last information was at least 2002, 2005 they were allowing these groups to, to come in.

Q.     What is the importance of having these conferences relative to the ability to have an

27

1    event like the bombing of the Cole?

2        A.    Well, I think the significance of

3    these conferences is it allows different terrorist

4    groups with different expertise to get together and

5    exchange information, exchange methods of

6    operation, exchange pipelines to different types of

7    goods that all the terrorists needs, for example,

8    false passports, dynamite, explosives, that sort of

9    thing.  And I think that to set up a network that

10   can reach across borders, these meetings where

11   you're safe and can sit down and actually talk to

12   people extensively who share your basic etiology,

13   are incredibly important because that is where the

14   networks begin.  And those networks then flow out

15   from Sudan into Yemen and elsewhere.

16       Q.    Now let's just put that together and

17   see if you have given us a picture, sir.  I think

18   you have told us that in your opinion, the bombing

19   of the Cole was, actively was supported by Sudan,

20   is that correct, sir?

21       A.    I don't think the bombing of the Cole

22   could have happened without the active support of

23   the government of Sudan.

24       Q.    Is there anything else you would like

25   to say about that subject or have we completed your

28

1    testimony?

2         A.    I think that it's important as I said

3    to be aware of the central nature of the Sudanese

4    government in the participation of Al-Qaeda in the

5    Sudan and in the establishment of the networks,

6    both physical and financial that existed there.

7    Al-Qaeda tried in other countries to go in and do

8    similar things and they couldn't, because they

9    didn't have the central government backing.

10        Sudan gave them essentially the breath

11   of life that they needed to become a focused,

12   energetic group that could then move out from there

13   into extensive training with financial backing

14   around the world and leading to not only the Cole

15   but to 9-11.

16        Q.    One more thought before we're done.

17   We know that following the expulsion of Osama Bin

18   Laden or the theoretical expulsion of Osama Bin

19   Laden from Sudan, Sudan provided some documents,

20   but not a lot of documents regarding its activities

21   and its support of terrorism.  Do you know why it

22   withheld documents?

23        A.    I would -- my best -- to the best of

24   my knowledge it would be because the documents

25   would be incriminating to them at a very senior

1  level and would demonstrate their state sponsorship

2  of terrorism.

3          My understanding from dealing with

4  people who dealt with Sudan in that particular case

5  was that most of the documents they received were

6  the most, were the oldest and least relevant

7  documents, which was an attempt by Sudan not to get

8  punished by the United States for possible

9  involvement also in the 2001 bombing when President

10 Bush said you're either for us or against us; but

11 they withheld the most relevant information because

12 there is no doubt in my mind that it would show the

13 highest levels of government from Hassan Al Turabi

14 down through the NIF structure as directly and

15 knowingly supporting terrorism.

16     Q.    So would it be accurate to say that

17 from the original Al Fatwa declaration of war and

18 the statement that US military assets should be

19 attacked which was made in Sudan by Osama Bin Laden

20 in 1992, directly through the attack on the Cole,

21 there is a continuous and unending support by Sudan

22 of Al-Qaeda which allowed the Cole to, bombing to

23 occur?

24     A.    Absolutely.  I think that from 1992

25 through the Cole bombing, Sudan provided an

30

1   incredibly necessary and vital infrastructure for

2   Al-Qaeda to be able to prepare and move the

3   explosives and carry out the attacks on the Cole.

4   And it was not clandestine or hidden presence, but

5   rather fairly overt and knowing presence by senior

6   members of the NIF government in Sudan.

7           MR. HALL:  Thank you, sir.  That is

8   all I have.

9           THE WITNESS:  Well, we're done.

10          (Thereupon, the deposition was

11  concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

31

CERTIFICATE

STATE    OF    FLORIDA:

SS.

COUNTY OF MIAMI-DADE

I, Donald Leavell, Registered Professional Reporter and Notary Public for the State of Florida at Large, do hereby certify that I reported the proceedings in the above-styled matter; that the foregoing pages constitute a true and correct transcription of my shorthand notes of the proceedings on this date.

I further certify that I am not attorney or counsel of any of the parties, nor relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Witness my hand in the City of Miami, County of Miami-Dade, State of Florida, this 18th day of February, 2007.

_____

Registered Professional Reporter

Notary Public, State of Florida at Large

My Commission, #DD188899, Expires 2/27/07

R. James Woolsey

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT

 2        FOR THE EASTERN DISTRICT OF VIRGINIA

 3                   NORFOLK DIVISION

 4    --------------------------x

 5  OLIVIA RUX., et al.,          :

 6              Plaintiffs    : Civil Action No.

 7                            : 2:04CV428

 8  v.                        :

 9                            : PAGES 1 through 34

10  THE REPUBLIC OF THE       :

11  SUDAN,                    :

12              Defendant     :

13    --------------------------x

14

15      Videotaped Deposition of R. James Woolsey

16                  Washington, DC

17            Wednesday, June 22, 2005

18

19

20

21  Reported by:  Joanne Liverani, RMR

22  JOB NO.  168034
```

EXHIBIT
C

R. James Woolsey

**Page 2**

1
2
3
4                    June 22, 2005
5                    9:34 a.m.
6
7 Videotaped Deposition of R. James Woolsey, held at the
8 offices of:
9
10      Greenberg Traurig LLP
11      800 Connecticut Avenue, Northwest
12      Suite 500
13      Washington, DC  20006
14
15 Pursuant to notice, before Joanne Liverani, RMR, a
16 Notary Public of the District of Columbia.
17
18
19
20
21
22

**Page 4**

1                CONTENTS
2 EXAMINATION OF THE WITNESS:              PAGE
3 Examination By Mr. Hall              6
4 ROBERT JAMES WOOLSEY, JR.
5
6 Woolsey Deposition Exhibits          PAGE
7 1      multipage document re The Federal      14
        Court of Canada, In relation to
8       Mohamed Zeki Mahjoub
9 2    Patterns of Global Terrorism 2000, US    30
       State Department, April 2001
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 3**

1 APPEARANCES:
2 For the Plaintiffs, OLIVIA RUX, ET AL.
3   Hall, David & Joseph
4       1428 Brickell Avenue
5       Miami, Florida  33131-9133
6       (305)374-5030
7 BY:  Andrew Hall, Esq.
8
9 Also Present:
10      Douglas Farah, Consultant - Analyst
11      Jonathan Perry, Videographer
12
13
14
15
16
17
18
19
20
21
22

**Page 5**

1              VIDEOGRAPHER:  This is tape
2 number one of the videotaped deposition of R. James
3 Woolsey taken in the matter of Rux versus Republic
4 of Sudan.  We are at the offices of Greenberg
5 Traurig, 800 Connecticut Avenue, Northwest,
6 Washington, DC.  Today's date is June 22, 2005.
7 The time on the video screen is currently 9:34 and
8 16 seconds a.m.  My name is Jonathan Perry.  I am
9 the videographer from Esquire Deposition Services.
10 The court reporter is Joanne Liverani, also from
11 Esquire Deposition Services.
12         Will counsel present please introduce
13 themselves and state whom they represent.
14         MR. HALL:  My name is Andrew
15 Hall, I represent the plaintiffs in this matter.
16 By way of beginning, the -- a lawyer, Gregory
17 Stanton, just filed a notice of appearance in this
18 matter last week.  Mr. Stanton sent my colleagues
19 and not me a letter requesting that we cancel all
20 depositions that were set, but in light of the
21 court's pending order for final hearing, we aren't
22 able to accommodate that request.  I informed

2 (Pages 2 to 5)

## R. James Woolsey

Page 6

1 Mr. Stanton of that information verbally this past
2 Friday and in letter – in a letter yesterday, in
3 prompt response to his, we normally wait some more
4 time for him to arrive. He is late. But in light
5 of his letter, and in light of everything else
6 that's going on, and more importantly in light of
7 Mr. Woolsey's very tight schedule, we are unable to
8 accommodate further delay. So let's proceed.
9        VIDEOGRAPHER: Have the reporter
10 swear in the witness, please.
11     Thereupon,
12        ROBERT JAMES WOOLSEY, JR.,
13 the Witness, called for examination by counsel for the
14 Plaintiffs, and, after having been sworn by the notary,
15 was examined and testified as follows:
16 EXAMINATION BY COUNSEL FOR THE PLAINTIFFS, OLIVIA RUX,
17 ET AL.
18 BY MR. HALL:
19    Q    Please state your full name.
20    A    Robert James Woolsey, Jr.
21    Q    Mr. Woolsey, what is your business
22 address?

Page 7

1    A    8283 Goldsboro [sic] Drive, McLean,
2 Virginia. I am a vice president of Booz Allen
3 Hamilton consulting firm.
4    Q    And, would you provide me, sir, with
5 your educational background starting with your
6 attendance in public schools?
7    A    I attended the public schools of Tulsa,
8 Oklahoma, graduating from Tulsa Central High School
9 in 1959. I received a bachelors of arts degree
10 from Stanford University in 1963; a masters from
11 Oxford University in England, in 1965; and a law
12 degree from Yale University Law School in 1968.
13    Q    Would you please, sir, tell us whether
14 or not you distinguished yourself through any
15 awards or honors or achievements at Stanford?
16    A    I graduated Phi Beta Kappa with great
17 distinction from Stanford.
18    Q    And, what does "great distinction" mean
19 in that system?
20    A    It's in the top few percent of
21 graduates, I don't know, I imagine around the top
22 5 percent.

Page 8

1    Q    Did you distinguish yourself while you
2 were taking your masters at Oxford?
3    A    I attended there on a Rhodes
4 Scholarship, got a degree in philosophy, politics,
5 and economics, and then returned to law school.
6    Q    Would you tell us what a Rhodes scholar
7 is?
8    A    It is a student who is selected, one of
9 about 100 a year, from United States, Germany, and
10 former British Commonwealth, pursuant to a trust
11 established by Cecil Rhodes. Scholarships began
12 around 1903 -- 1904, at the beginning of the
13 twentieth century. It is a competitive scholarship
14 based on academics, and to some extent on service
15 and -- and athletics, depending on the panel that's
16 doing the selecting.
17        There are about 30 -- I think there's 32
18 Americans of the hundred some every year.
19    Q    Were you at Oxford when President
20 Clinton was obtaining his time there?
21    A    No, no. I did not know President
22 Clinton until he declared for the presidency. He's

Page 9

1 five years younger than I, so he was actually still
2 in high school when I began Oxford.
3    Q    Did you distinguish yourself while
4 attending Yale Law School?
5    A    I was managing editor of the Yale Law
6 Journal.
7    Q    And, could you tell us what that means?
8    A    A small percentage of the classes
9 selected usually either by grades or by writing
10 ability to edit the law school's legal publication.
11 At Yale it's called the Yale Law Journal, and I was
12 the managing editor of that journal.
13    Q    Could you describe for us your work
14 experience?
15    A    In -- as soon as I graduated from law
16 school, I went on active duty in the US Army. I
17 had a ROTC commission. I was assigned to the
18 Pentagon to work on intelligence matters in the
19 Office of the Secretary of Defense. I worked on
20 those matters for about nine months, and then I
21 began working directly for former deputy Secretary
22 of Defense, Paul Nitze, who had returned in March

3 (Pages 6 to 9)

R. James Woolsey

Page 10

1 of 1969 to head up arms control work for the
2 Pentagon.
3          I accompanied him to Helsinki and Vienna
4 as an adviser on the delegation to the strategic
5 arms limitation talks with the Soviet Union. I
6 worked for him until the summer of 1970, when I
7 finished my two years active duty in the Army.
8          I was assigned for a six-month period,
9 agreed to work for a six-month period in the
10 National Security Council Staff, helping on arms
11 control matters.
12          I left right at the end of 1970, to
13 become general counsel of the Senate Armed Services
14 Committee, a post I held for three years, until in
15 late 1973, I moved to Shea and Gardner law firm as
16 an associate. I practiced law there until late
17 1976 when I served on the transition team for the
18 incoming Carter administration. I was asked to
19 serve as undersecretary of the Navy, in the Carter
20 administration, and was nominated, confirmed by the
21 Senate, served in that job for three years until
22 late 1979, when I returned to Shea and Gardner, as

Page 11

1 a partner.
2          Practiced law at Shea and Gardner
3 through the 1980s, until 1989, for three years
4 during that time, in the mid-1980s, from '83 to '86
5 I was appointed by President Reagan to be
6 delegate-at-large to the Arms Control negotiations
7 with the Soviets in Geneva on nuclear and space
8 weapons.
9          That was a part-time undertaking. I did
10 that on a continual basis for some number of weeks
11 a year. In -- from '83 to '86.
12          In 1989 I was nominated by President
13 Bush, 41, to be the ambassador and negotiator for
14 the Conventional Forces in Europe Treaty in Vienna.
15 I took over those negotiations in early November of
16 1989. I concluded them successfully, and the
17 treaty was approved by the Senate for ratification
18 in the summer of '91.
19          I returned to my law firm in late
20 summer/early fall of 1991, to Shea and Gardner. I
21 practiced law until early 1993. I was asked by
22 President -- then President-elect Clinton to serve

Page 12

1 as Director of Central Intelligence. I served in
2 that position from early February of '93 to early
3 January of '95. Resigned, went to my -- back to my
4 law firm, where I practiced from early '95 until
5 the summer of 2002. My practice in those years at
6 Shea and Gardner was the fields of civil litigation
7 and alternative dispute resolution, particularly
8 arbitrations -- commercial arbitrations.
9          I went in 19 -- summer of 2002, to Booz
10 Allen Hamilton, large international consulting
11 firm, where I work today as a partner and vice
12 president on issues related to counterterrorism,
13 law enforcement, counterintelligence, continuity of
14 government and continuity of operations of
15 government departments.
16     Q    If we were to talk about the overall
17 period of time involving government, how much time,
18 how many years have you spent in which the issue of
19 terrorism and counterterrorism, including your
20 current job, has been a focus of your work?
21     A    Well, I would say only the two years at
22 the CIA of the full-time government work was

Page 13

1 focused in important measure on terrorism and
2 counterterrorism. And then, the years since 2002,
3 the last three years, I have worked on those issues
4 a good deal while at Booz Allen Hamilton.
5          During the '90s, after early '95, until
6 the summer of 2002, I followed these issues
7 principally through the press and through
8 friendships with various people who were working on
9 them and discussing them, but there was an
10 extracurricular matter.
11     Q    Are you generally familiar with the
12 attack and resulting deaths of 17 sailors on the
13 USS Cole in October 2000?
14     A    Yes.
15     Q    How did you become familiar with that
16 event?
17     A    Through the press.
18     Q    Now, sir, we've asked you to come here
19 to provide your opinion by way of deposition
20 testimony, and you've agreed to do this without
21 subpoena and without compensation; is that correct?
22     A    That's correct.

4 (Pages 10 to 13)

## R. James Woolsey

Page 14

1    Q    And we've provided some materials for
2 you to familiarize yourself with, and go over, in
3 anticipation of your deposition, and I would like
4 to go over those with you briefly
5    A    Yes.
6    Q    Let me hand you first a document that
7 was filed by Canadian Intelligence in the Federal
8 Court trial division in the matter of, quote:  A
9 certificate issued pursuant to Section 40.1 of the
10 Immigration Act, and -- and the application of
11 Muhammad Zeki Mahjoub, and ask you if that was one
12 of the documents we had provided to you?
13    A    Yes.
14        MR. HALL:  Let's mark that as Exhibit 1,
15 please.
16        (Woolsey Exhibit No. 1 - multipage document
17        re The Federal Court of Canada, In relation
18        to Mohamed Zeki Mahjoub - was marked for
19        identification.)
20 BY MR. HALL:
21    Q    We've also provided to you a book and an
22 opportunity to meet and speak with Douglas Farah

Page 15

1 and the book authored by Mr. Farah, "Blood From
2 Stones"; is that correct, sir?
3    A    That's correct.
4    Q    And we have, in addition to that, we
5 have provided to you sections from the official
6 publication of the United States State Department
7 called Patterns of Terrorism?
8    A    That's correct.
9    Q    And I want to go through the information
10 that we've provided to you, specifically, sir.
11        Turning, first of all, to the report
12 that was filed in the Federal Court of Canada, in
13 relation to Mohamed Zeki Mahjoub -- Mahjoub,
14 rather.  Are there several references in that
15 report that are of significance to you in your
16 expert opinion regarding the issues of Sudan and
17 it's relationship to terrorist support?
18    A    Yes, I remember a couple.  You should
19 point me to the --
20    Q    Yes, let's start with Page 15.
21        On Page 15, Paragraph 20, the AJ
22 terrorist, that is the Egyptian jihad, terrorist

Page 16

1 training camps are located in Sudan, Bosnia, and
2 Afghanistan.  And in Sudan, Bosnia  AJ camps are
3 financed by Saudi dissident and terrorist financier
4 Osama Bin Laden.  In addition, Al-Zawaheri has met
5 with leaders of Sudanese, Eritrean, Ugandan, Yemeni
6 and Egyptian Islamic groups.  In May of 1998, these
7 leaders agreed to build training camps in new areas
8 inside Sudan.  One example of training in the
9 United States has been uncovered.
10        That section was provided to you?
11    A    That's correct.
12    Q    Now, is this the type of report that
13 you, from the Canadian Intelligence authorities,
14 which was filed in an immigration proceeding in a
15 court in Canada, the type of document that you as
16 an expert in terrorism, counterterrorism during
17 your days at the CIA would rely on?
18    A    It is an unclassified version of the
19 kind of material that we relied on.  Canadian
20 Intelligence, CSIS is a small but -- but fine
21 intelligence service, and the cooperation of course
22 between American and Canadian intelligence was very

Page 17

1 close, has been for many years, and certainly was
2 during the two years I was director of Central
3 Intelligence, so the document that they prepared
4 and authorized for disclosure I would have great
5 confidence in.
6    Q    Now, on page, I believe it is 20 and 21,
7 there are some further references that I would like
8 to point to your attention concerning Sudan.
9        On Paragraph 28 --
10        MR. FARAH:  26.
11        MR. HALL:  I'm sorry, let's go
12 earlier.
13 BY MR. HALL:
14    Q    Paragraph 26:  A 1998 agreement between
15 Al-Zaw -- Al-Zawaheri and leaders of the Sudanese,
16 Eritrean, Ugandan, Yemeni, and the Egyptian Islamic
17 groups established budgets -- budgets for financing
18 international terrorist operations and plans to
19 mobilize officials in Sudanese embassies in London,
20 Sanaa, New York, Rome, Karachi, and Mogadishu.
21        Is it significant, sir, that there would
22 be an agreement to use Sudanese embassies in 1998,

5 (Pages 14 to 17)

## R. James Woolsey

Page 18

1 in terms of being able to facilitate acts of
2 terrorists?
3     A   Yes, I believe so.  Because this is
4 after Bin Laden left his residency in Sudan and
5 moved to Afghanistan in '96, so I believe it is
6 significant that his number two, Al-Zawaheri and
7 leaders of Sudanese and other Islamic groups are
8 establishing budgets, and operations, and financing
9 operations and plans to mobilize officials in
10 Sudanese embassies in several countries.
11     Q   I want to continue in the same
12 paragraph, sir, in the intelligence report provides
13 quote: These leaders also agreed at the meeting to
14 open Sudan's doors to international Islamic
15 fund-raising organizations and to facilitate the
16 movement of extremists, by providing them a
17 Sudanese diplomatic passports.
18          What is the relationship of that type of
19 support to an organization like al-Qaida in being
20 able to implement an attack on the Cole?
21     A   Well, it's extremely important for an
22 international terrorist operation to be able to

Page 19

1 have such things as even passports, but certainly
2 diplomatic passports, which would permit them to
3 move material without scrutiny in a number of
4 circumstances, and would, I think, be quite helpful
5 in helping them prepare to -- for any terrorist
6 attack.
7     Q   Let me show you also, sir, the -- from
8 patterns of terrorism, which is the 2000 report,
9 and I am going to hand that to you and ask the
10 reporter to mark that as Exhibit 2.
11          MR. HALL:  We will do the
12 marking after the deposition is over, so that we
13 don't interrupt the flow of the witness's
14 testimony.
15 BY MR. HALL:
16     Q   On Page 35 of that report, which is an
17 official United States State Department
18 publication, there is a reference to Sudan, the
19 pertinent parts of which say, as follows:  The
20 United States and Sudan in mid-2000 entered into a
21 dialogue to discuss US counterterrorism concerns.
22 The tasks, which were ongoing at the end of the

Page 20

1 year were constructive and obtained some positive
2 results.  By the end of the year Sudan had signed
3 all 12 international conventions for combating
4 terrorism and taken several other positive
5 counterterrorism steps, including closing down the
6 Popular Arab Islamic Conference which served as a
7 forum for terrorists.
8          Let me ask you, sir, prior to closing
9 this down in 2000, at the end of 2000, were you
10 familiar with the annual meeting of terrorists that
11 occurred in Sudan, at the Popular Arab and Islamic
12 Conference in --
13     A   Yes.  This was taking place in -- under
14 this name or some other, in the -- at least one of
15 the years I was Director of Central Intelligence in
16 the early '90s.  And, we used to call it sort of
17 the terrorist equivalent of the Paris Air Show.
18          It was really quite remarkable.  Those
19 of us working in US intelligence thought that Sudan
20 would be this blatant in pulling all of these
21 terrorist organizations together in an annual
22 conference.

Page 21

1     Q   Now even after closing down the
2 conference, this report continues:  Sudan continued
3 to be used as a safe haven for members of the
4 various groups including associates of Osama Bin
5 Laden's al-Qaida organization, Egyptian Al-Gama's
6 al -- and I can't pronounce the term.
7     A   Islamiyya.
8     Q   Thank you.
9          Egyptian's Islamic Jihad, the Palestine
10 Islamic Jihad, and Hamas.  Most of the groups used
11 Sudan primarily as a secure base for assisting
12 operations elsewhere.
13          So, sir, can you help me with that and
14 tell me what the significance of Sudan's allowing
15 itself to be used as a safe haven and safe base for
16 operations elsewhere?
17     A   Well, I would say the significance of
18 this situation, as of the end of 2000, in this
19 April 2001 State Department document, is that Sudan
20 has made something of a transition to try to give a
21 less terrorist friendly impression to the rest of
22 the world, but still is permitting itself to be

6 (Pages 18 to 21)

## R. James Woolsey

Page 22

1 used as a safe haven by al-Qaida and other
2 terrorist organizations, so it has gone to some
3 extent from overt to slightly less overt assistance
4 to these terrorist groups.
5      Q    And in terms of Sudan and Yemen, is
6 there a common border between these two countries?
7      A    Well, there's the sea, right across
8 the -- right across the Gulf of Aden.  It is very,
9 very close.
10      Q    Right.  And in terms of being able to
11 provide terrorists operating in Yemen, for example,
12 with regard to the attack on the Cole, is there a
13 path that runs from Sudan over?
14      A    It's a very short trip by Dow across
15 that Gulf of Aden, I would -- I would think.
16      Q    Yes, sir.  Now, let me show you a
17 a -- quote a passage from Douglas Farah's book.  He
18 fortunately is with us today, so -- and he has had
19 a chance to talk to you this morning, has he not?
20      A    Yes.
21      Q    And in that, the passage talks about
22 movement of gold.

Page 23

1      A    Yes.
2      Q    And specifically the passage starts on
3 Page 125.  Let me hand that to you, sir.
4      A    Mm-hmm.
5      Q    And, this is again --
6      A    Yes, I read this just before the
7 deposition this morning.
8      Q    -- and this is again, post the Osama Bin
9 Laden, this is as late as 2001 and 2002?
10      A    This is, according to its text, in the
11 summer of 2002.
12      Q    What is the significance -- can events
13 like that described in this section, that is to say
14 flying in plane loads of products with gold
15 intermixed in them, occur in Sudan without the
16 active knowledge and permission of the government?
17      A    Assuming this is correct, and I have no
18 reason to believe otherwise, I think the answer to
19 the question is it's not reasonable to assume that
20 shipments of this sort would come without the
21 permission and acquiescence of the Sudanese
22 government.

Page 24

1      There was, then and still is to some
2 extent -- there was a civil war.  There is now a --
3 for the time being settled civil war, but
4 nonetheless, a great deal of hostility against the
5 Sudanese government in the south, in -- among
6 Christian and animist tribes that are not Muslim,
7 but these types of flights and this type of
8 trafficking would not find support or safe haven
9 among the followers of John Garang and the rebels
10 against the Khartoum government in the south and in
11 the rest of the country, where the government's
12 writ runs, this is not the sort of thing that would
13 be undertaken successfully without the government's
14 acquiescence.
15      Q    And from all of this information, is it
16 your view that the government of Sudan is still,
17 although more covertly than in the mid-'90s,
18 involved in support -- providing support to
19 al-Qaida and safe haven to its operatives?
20      A    As of this period of -- of time, of late
21 2000, I believe that the State Department report,
22 the Canadian Intelligence declassified report, and

Page 25

1 unrefuted information, such as that included in
2 Douglas Farah's book, strongly suggest Sudanese
3 government acquiescence and continued acquiescence
4 and assistance to groups like al-Qaida and to
5 al-Qaida in particular.
6      There has been a good deal of
7 controversy about the question whether al-Qaida, a
8 Sunni Islamist organization, would work with Shiite
9 groups, such as the -- let's say the intelligence
10 services of the nation of Iran or with secular
11 government organizations, such as intelligence
12 organization for Baathist Iraq.
13      But, I think those connections have been
14 demonstrated to exist, and with respect to al-Qaida
15 connections with Sunni Islamist Sudan, there is no
16 ideological or religious tensions really that would
17 gainsay cooperation between Sudanese government and
18 the -- and al-Qaida, as of that time, so my
19 judgment, given the information I've seen here, and
20 given my understanding of the propensities of these
21 types of organizations in that part of the world,
22 I'd say it's quite likely that there was

7 (Pages 22 to 25)

# R. James Woolsey

Page 26

1 cooperation between Sudanese government
2 principally, probably through its intelligence
3 services and al-Qaida, as of late 2000.
4     Q    Now, in terms of -- we've talked about
5 things like the actual presence of a training camp.
6 I believe that was in the -- one of the documents
7 from the Canadian report on Page 15. I think we
8 found that earlier.
9     A    Yes, I think that's right. It says as
10 of the time of the Canadian document, which is, as
11 I understand it, early 2001, pre-9/11, in Sudan and
12 Bosnia, AJ, Al-Jihad camps are financed by Saudi
13 dissident and terrorist financier Osama Bin Laden.
14     Q    And, they're--they're in Sudan, these
15 camps?
16     A    Yeah, that's what it says, in Sudan.
17     Q    And of course we made you aware of the
18 fact that Osama Bin Laden has several active
19 businesses that are generating funds that are used
20 by Osama Bin Laden for his al-Qaida efforts in
21 Sudan at this time?
22     A    Well, I recall from press reports

Page 27

1 that -- and I've seen it here this morning, that
2 even after he left his residence in Sudan in '96 to
3 move to Afghanistan, he had business interests, the
4 one I recall is construction. That was a business
5 his father was in in Sudan.
6     Q    Right. Now, let me just see if I can
7 wrap it up very quickly, because you have been kind
8 enough to give us this hour, and I don't want to
9 overstay the time or actually it's a half-hour but
10 I wanted -- I promised you I would get done with
11 you as quickly as we -- as time permitted, so last
12 area, sir.
13         Has providing economic support a basis
14 for training terrorism -- terrorists, false
15 documentation, including passports for members of
16 al-Qaida, assistance through the embassies of
17 Sudan, assisted al-Qaida in its success in
18 performing its jihads and its attacks against
19 American interests throughout the world, and
20 particularly attack of the Cole?
21     A    And that is, what you just read --
22     Q    Is my question.

Page 28

1     A    -- is a question.
2     Q    Assume --
3     A    Read it -- read it.
4     Q    Let me go through --
5     A    All right.
6     Q    -- I will put it in front of you --
7     A    All right.
8     Q    -- so we can go through it together.
9     A    All right.
10     Q    Has providing economic support provided
11 training camps and a basis for training of
12 terrorists, false documents for members of
13 al-Qaida, including identities on passports, and
14 assistance through the embassies of Sudan, has
15 that -- have those support measures assisted
16 al-Qaida in its success in performing jihads
17 through attacks against American interests
18 throughout the world, in particular the Cole?
19     A    Based on the Canadian report we have
20 here, the State Department reports, and the Douglas
21 Farah material, which as far as I know is
22 unrefuted, I would say yes, that's a fair judgment.

Page 29

1     Q    And would it be as easy for al-Qaida to
2 have launched the attack on the Cole without the
3 support of Sudan?
4     A    It would not have been as easy. It
5 might have been possible, but it would not have
6 been as easy. The proximity of Sudan to -- to
7 Yemen, the need for a protected logistics
8 infrastructure, the confused situation in the
9 government of Yemen at the time all suggest to me
10 that the amount of explosives that needed to be put
11 in the boat that attacked the Cole, all that
12 suggests to me that the logistical support and base
13 of operations that could have been available in
14 Sudan could have been of substantial assistance to
15 an attack in Yemen, such as one that occurred.
16     Q    It's your opinion that that is a -- is a
17 more likely than not source of those materials?
18     A    I believe that to be the case. More
19 likely than not is a fair way to put it.
20         MR. HALL: Thank you. That's
21 all I have.
22         VIDEOGRAPHER: The time is

8 (Pages 26 to 29)

# R. James Woolsey

**Page 30**

1 10:03. We are going off the record. This is the
2 end of tape number one and the end of today's
3 deposition.
4   (Woolsey Exhibit No. 2 - Patterns of Global
5   Terrorism 2000, US State Department, April
6   2001 - was marked for identification.)
7   (Thereupon, at 10:05 a.m. the deposition was
8   concluded.)
9   (The witness reserved signature.)
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 31**

1
2
3        *    *    *
4
5   ACKNOWLEDGMENT OF DEPONENT
6
7   I, R. James Woolsey, do hereby acknowledge I have
8 read and examined the foregoing pages of testimony, and
9 the same is a true, correct and complete transcription
10 of the testimony given by me, and any changes and/or
11 corrections, if any, appear in the attached errata sheet
12 signed by me.
13
14 _____
15 Date            R. James Woolsey
16
17
18
19
20
21
22

**Page 32**

CERTIFICATE OF NOTARY PUBLIC

1
2   I, Joanne Liverani, the officer before whom the
3 foregoing deposition was taken, do hereby certify that
4 the witness whose testimony appears in the foregoing
5 deposition was duly sworn by me; that the testimony of
6 said witness was taken by me in stenotype and thereafter
7 reduced to typewriting under my direction; that said
8 deposition is a true record of the testimony given by
9 said witness; that I am neither counsel for, related to,
10 nor employed by any of the parties to the action in
11 which this deposition was taken; and, further, that I am
12 not a relative or employee of any attorney or counsel
13 employed by the parties hereto, nor financially or
14 otherwise interested in the outcome of this action.
15
16
            Joanne Liverani,
17          Registered Merit Reporter
            and Notary Public for the
18          District of Columbia
   My Commission expires:
19 July 31, 2005
20
21
22

**Page 33**

1
   Andrew Hall, Esq.
2 Hall David & Joseph
   1428 Brickell Avenue
3 Miami, Florida 33131-9133
4   IN RE: RUX V. SUDAN
        DEPO OF: R. JAMES WOOLSEY
5
6
   Dear Mr. Hall:
7
   Enclosed for review is your original and copy of the
8 above referenced deposition. Please have the deponent
   read the transcript and sign the enclosed certificate of
9 deponent. Also enclosed is an errata sheet which the
   deponent should use to note corrections and the reasons
10 for such corrections. This and any additional errata
   sheets should be signed and dated by the deponent.
11
   The deponent has thirty days in which to read and sign
12 the transcript. After the deponent has reviewed the
   copy of the transcript, please return the certificate of
13 deponent and any errata sheets to 1020 19th Street,
   Northwest, Suite 620, Washington, D.C. 20036.
14
   Sincerely,
15
16
17
18 Joanne Liverani
19
20
21
22

9 (Pages 30 to 33)

### R. James Woolsey



1  ESQUIRE DEPOSITION SERVICES
   1020 19TH STREET, NORTHWEST
2  SUITE 620
   WASHINGTON, D.C.  20036
3
         ERRATA SHEET
4
   Case Name:  RUX V. SUDAN
5  Witness Name:  R. JAMES WOOLSEY
   Deposition Date: 6/22/05
6  Job No.: 168-34
7  Page No.   Line No.   Change
8
9
10
11
12
13
14
15
16
17
18
19
20
21
   _____        _____
   Signature                 Date
22

Page 34

R. James Woolsey

| A | | | | |
|---|---|---|---|---|
| **ability** 9:10 | **Al-Zaw** 17:15 | **attached** 31:11 | **briefly** 14:4 | **Cole** 13:13 18:20 |
| **able** 5:22 18:1,20 | **Al-Zawaheri** 16:4 | **attack** 13:12 18:20 | **British** 8:10 | 22:12 27:20 |
| 18:22 22:10 | 17:15 18:6 | 19:6 22:12 27:20 | **budgets** 17:17,17 | 28:18 29:2,11 |
| **academics** 8:14 | **ambassador** 11:13 | 29:2,15 | 18:8 | **colleagues** 5:18 |
| **accommodate** | **American** 16:22 | **attacked** 29:11 | **build** 16:7 | **Columbia** 2:16 |
| 5:22 6:8 | 27:19 28:17 | **attacks** 27:18 | **Bush** 11:13 | 32:18 |
| **accompanied** 10:3 | **Americans** 8:18 | 28:17 | **business** 6:21 27:3 | **combating** 20:3 |
| **achievements** 7:15 | **amount** 29:10 | **attendance** 7:6 | 27:4 | **come** 13:18 23:20 |
| **acknowledge** 31:7 | **Analyst** 3:10 | **attended** 7:7 8:3 | **businesses** 26:19 | **commercial** 12:8 |
| **ACKNOWLED...** | **Andrew** 3:7 5:14 | **attending** 9:4 | | **commission** 9:17 |
| 31:5 | 33:1 | **attention** 17:8 | C | 32:18 |
| **acquiescence** | **and/or** 31:10 | **attorney** 32:12 | **C** 4:1 | **Committee** 10:14 |
| 23:21 24:14 25:3 | **animist** 24:6 | **authored** 15:1 | **call** 20:16 | **common** 22:6 |
| 25:3 | **annual** 20:10,21 | **authorities** 16:13 | **called** 6:13 9:11 | **Commonwealth** |
| **Act** 14:10 | **answer** 23:18 | **authorized** 17:4 | 15:7 | 8:10 |
| **action** 1:6 32:10 | **anticipation** 14:3 | **available** 29:13 | **camp** 26:5 | **compensation** |
| 32:14 | **appear** 31:11 | **Avenue** 2:11 3:4 | **camps** 16:1,2,7 | 13:21 |
| **active** 9:16 10:7 | **appearance** 5:17 | 5:5 33:2 | 26:12,15 28:11 | **competitive** 8:13 |
| 23:16 26:18 | **APPEARANCES** | **awards** 7:15 | **Canada** 4:7 14:17 | **complete** 31:9 |
| **acts** 18:1 | 3:1 | **aware** 26:17 | 15:12 16:15 | **concerning** 17:8 |
| **actual** 26:5 | **appears** 32:4 | **a.m** 2:5 5:8 30:7 | **Canadian** 14:7 | **concerns** 19:21 |
| **addition** 15:4 16:4 | **application** 14:10 | | 16:13,19,22 | **concluded** 11:16 |
| **additional** 33:10 | **appointed** 11:5 | B | 24:22 26:7,10 | 30:8 |
| **address** 6:22 | **approved** 11:17 | **Baathist** 25:12 | 28:19 | **conference** 20:6 |
| **Aden** 22:8,15 | **April** 4:9 21:19 | **bachelors** 7:9 | **cancel** 5:19 | 20:12,22 21:2 |
| **administration** | 30:5 | **back** 12:3 | **Carter** 10:18,19 | **confidence** 17:5 |
| 10:18,20 | **Arab** 20:6,11 | **background** 7:5 | **case** 29:18 34:4 | **confirmed** 10:20 |
| **adviser** 10:4 | **arbitrations** 12:8 | **base** 21:11,15 | **Cecil** 8:11 | **confused** 29:8 |
| **Afghanistan** 16:2 | 12:8 | 29:12 | **Central** 7:8 12:1 | **Connecticut** 2:11 |
| 18:5 27:3 | **area** 27:12 | **based** 8:14 28:19 | 17:2 20:15 | 5:5 |
| **agreed** 10:9 13:20 | **areas** 16:7 | **basis** 11:10 27:13 | **century** 8:13 | **connections** 25:13 |
| 16:7 18:13 | **Armed** 10:13 | 28:11 | **certainly** 17:1 | 25:15 |
| **agreement** 17:14 | **arms** 10:1,5,10 | **began** 8:11 9:2,21 | 19:1 | **construction** 27:4 |
| 17:22 | 11:6 | **beginning** 5:16 | **certificate** 14:9 | **constructive** 20:1 |
| **Air** 20:17 | **Army** 9:16 10:7 | 8:12 | 32:1 33:8,12 | **Consultant** 3:10 |
| **AJ** 15:21 16:2 | **arrive** 6:4 | **believe** 17:6 18:3,5 | **certify** 32:3 | **consulting** 7:3 |
| 26:12 | **arts** 7:9 | 23:18 24:21 26:6 | **chance** 22:19 | 12:10 |
| **al** 1:5 3:2 6:17 | **asked** 10:18 11:21 | 29:18 | **Change** 34:7 | **continual** 11:10 |
| 21:6 | 13:18 | **Beta** 7:16 | **changes** 31:10 | **continue** 18:11 |
| **Allen** 7:2 12:10 | **assigned** 9:17 10:8 | **Bin** 16:4 18:4 21:4 | **Christian** 24:6 | **continued** 21:2 |
| 13:4 | **assistance** 22:3 | 23:8 26:13,18,20 | **CIA** 12:22 16:17 | 25:3 |
| **allowing** 21:14 | 25:4 27:16 28:14 | **blatant** 20:20 | **circumstances** | **continues** 21:2 |
| **alternative** 12:7 | 29:14 | **Blood** 15:1 | 19:4 | **continuity** 12:13 |
| **Al-Gama's** 21:5 | **assisted** 27:17 | **boat** 29:11 | **civil** 1:6 12:6 24:2 | 12:14 |
| **Al-Jihad** 26:12 | 28:15 | **book** 14:21 15:1 | 24:3 | **control** 10:1,11 |
| **al-Qaida** 18:19 | **assisting** 21:11 | 22:17 25:2 | **classes** 9:8 | 11:6 |
| 21:5 22:1 24:19 | **associate** 10:16 | **Booz** 7:2 12:9 13:4 | **Clinton** 8:20,22 | **controversy** 25:7 |
| 25:4,5,7,14,18 | **associates** 21:4 | **border** 22:6 | 11:22 | **Conventional** |
| 26:3,20 27:16,17 | **assume** 23:19 28:2 | **Bosnia** 16:1,2 | **close** 17:1 22:9 | 11:14 |
| 28:13,16 29:1 | **Assuming** 23:17 | 26:12 | **closing** 20:5,8 | **conventions** 20:3 |
| | **athletics** 8:15 | **Brickell** 3:4 33:2 | 21:1 | **cooperation** 16:21 |

# R. James Woolsey

25:17 26:1
copy 33:7,12
correct 13:21,22
  15:2,3,8 16:11
  23:17 31:9
corrections 31:11
  33:9,10
Council 10:10
counsel 5:12 6:13
  6:16 10:13 32:9
  32:12
counterintellige...
  12:13
counterterrorism
  12:12,19 13:2
  16:16 19:21 20:5
countries 18:10
  22:6
country 24:11
couple 15:18
course 16:21
  26:17
court 1:1 4:7 5:10
  14:8,17 15:12
  16:15
court's 5:21
covertly 24:17
CSIS 16:20
current 12:20
currently 5:7

**D**
date 5:6 31:15
  34:5,21
dated 33:10
David 3:3 33:2
days 16:17 33:11
DC 1:16 2:13 5:6
deal 13:4 24:4
  25:6
Dear 33:6
deaths 13:12
declared 8:22
declassified 24:22
Defendant 1:12
Defense 9:19,22
degree 7:9,12 8:4
delay 6:8
delegate-at-large
  11:6
delegation 10:4

demonstrated
  25:14
Department 4:9
  15:6 19:17 21:19
  24:21 28:20 30:5
departments
  12:15
depending 8:15
DEPO 33:4
deponent 31:5
  33:8,9,9,10,11
  33:12,13
deposition 1:15
  2:7 4:6 5:2,9,11
  13:19 14:3 19:12
  23:7 30:3,7 32:3
  32:5,8,11 33:8
  34:1,5
depositions 5:20
deputy 9:21
describe 9:13
described 23:13
dialogue 19:21
diplomatic 18:17
  19:2
direction 32:7
directly 9:21
director 12:1 17:2
  20:15
disclosure 17:4
discuss 19:21
discussing 13:9
dispute 12:7
dissident 16:3
  26:13
distinction 7:17
  7:18
distinguish 8:1 9:3
distinguished 7:14
District 1:1,2 2:16
  32:18
division 1:3 14:8
document 4:7
  14:6,16 16:15
  17:3 21:19 26:10
documentation
  27:15
documents 14:12
  26:6 28:12
doing 8:16
doors 18:14

Douglas 3:10
  14:22 22:17 25:2
  28:20
Dow 22:14
Drive 7:1
duly 32:5
duty 9:16 10:7
D.C 33:13 34:2

**E**
E 4:1
earlier 17:12 26:8
early 11:15,21
  12:2,2,4 13:5
  20:16 26:11
EASTERN 1:2
easy 29:1,4,6
economic 27:13
  28:10
economics 8:5
edit 9:10
editor 9:5,12
educational 7:5
efforts 26:20
Egyptian 15:22
  16:6 17:16 21:5
Egyptian's 21:9
either 9:9
embassies 17:19
  17:22 18:10
  27:16 28:14
employed 32:10
  32:13
employee 32:12
enclosed 33:7,8,9
enforcement
  12:13
England 7:1
entered 19:20
equivalent 20:17
Eritrean 16:5
  17:16
errata 31:11 33:9
  33:10,13 34:3
Esq 3:7 33:1
Esquire 5:9,11
  34:1
established 8:11
  17:17
establishing 18:8
et 1:5 3:2 6:17

Europe 11:14
event 13:16
events 23:12
examination 4:2,3
  6:13,16
examined 6:15
  31:8
example 16:8
  22:11
Exhibit 14:14,16
  19:10 30:4
Exhibits 4:6
exist 25:14
experience 9:14
expert 15:16
  16:16
expires 32:18
explosives 29:10
extent 8:14 22:3
  24:2
extracurricular
  13:10
extremely 18:21
extremists 18:16

**F**
facilitate 18:1,15
fact 26:18
fair 28:22 29:19
fall 11:20
false 27:14 28:12
familiar 13:11,15
  20:10
familiarize 14:2
far 28:21
Farah 3:10 14:22
  15:1 17:10 28:21
Farah's 22:17
  25:2
father 27:5
February 12:2
Federal 4:7 14:7
  14:17 15:12
fields 12:6
filed 5:17 14:7
  15:12 16:14
final 5:21
financed 16:3
  26:12
financially 32:13
financier 16:3

26:13
financing 17:17
  18:8
find 24:8
fine 16:20
finished 10:7
firm 7:3 10:15
  11:19 12:4,11
first 14:6 15:11
five 9:1
flights 24:7
Florida 5:3 33:3
flow 19:13
flying 23:14
focus 12:20
focused 13:1
followed 13:6
followers 24:9
follows 6:15 19:19
Forces 11:14
foregoing 31:8
  32:3,4
former 8:10 9:21
fortunately 22:18
forum 20:7
found 26:8
Friday 6:2
friendly 21:21
friendships 13:8
front 28:6
full 6:19
full-time 12:22
funds 26:19
fund-raising
  18:15
further 6:8 17:7
  32:11

**G**
gainsay 25:17
Garang 24:9
Gardner 10:15,22
  11:2,20 12:6
general 10:13
generally 13:11
generating 26:19
Geneva 11:7
Germany 8:9
give 21:20 27:8
given 25:19,20
  31:10 32:8

# R. James Woolsey

Global 4:9 30:4
go 14:2,4 15:9
    17:11 28:4,8
going 6:6 19:9
    30:1
gold 22:22 23:14
Goldsboro 7:1
good 13:4 25:6
government 12:14
    12:15,17,22
    23:16,22 24:5,10
    24:16 25:3,11,17
    26:1 29:9
government's
    24:11,13
grades 9:9
graduated 7:16
    9:15
graduates 7:21
graduating 7:8
great 7:16,18 17:4
    24:4
Greenberg 2:10
    5:4
Gregory 5:16
groups 16:6 17:17
    18:7 21:4,10
    22:4 25:4,9
Gulf 22:8,15

**H**

half-hour 27:9
Hall 3:3,7 4:3 5:14
    5:15 6:18 14:14
    14:20 17:11,13
    19:11,15 29:20
    33:1,2,6
Hamas 21:10
Hamilton 7:3
    12:10 13:4
hand 14:6 19:9
    23:3
haven 21:3,15
    22:1 24:8,19
head 10:1
hearing 5:21
held 2:7 10:14
help 21:13
helpful 19:4
helping 10:10 19:5
Helsinki 10:3

hereto 32:13
high 7:8 9:2
honors 7:15
hostility 24:4
hour 27:8
hundred 8:18

**I**

identification
    14:19 30:6
identities 28:13
ideological 25:16
imagine 7:21
immigration
    14:10 16:14
implement 18:20
important 13:1
    18:21
importantly 6:6
impression 21:21
included 25:1
including 12:19
    20:5 21:4 27:15
    28:13
incoming 10:18
information 6:1
    15:9 24:15 25:1
    25:19
informed 5:22
infrastructure
    29:8
inside 16:8
intelligence 9:18
    12:1 14:7 16:13
    16:20,21,22 17:3
    18:12 20:15,19
    24:22 25:9,11
    26:2
interested 32:14
interests 27:3,19
    28:17
intermixed 23:15
international
    12:10 17:18
    18:14,22 20:3
interrupt 19:13
introduce 5:12
involved 24:18
involving 12:17
Iran 25:10
Iraq 25:12

Islamic 16:6 17:16
    18:7,14 20:6,11
    21:9,10
Islamist 25:8,15
Islamiyya 21:7
issue 12:18
issued 14:9
issues 12:12 13:3,6
    15:16

**J**

James 1:15 2:7
    4:4 5:2 6:12,20
    31:7,15 33:4
    34:5
January 12:3
jihad 15:22 21:9
    21:10
jihads 27:18 28:16
Joanne 1:21 2:15
    5:10 32:2,16
    33:18
job 1:22 10:21
    12:20 34:6
John 24:9
Jonathan 3:11 5:8
Joseph 3:3 33:2
journal 9:6,11,12
Jr 4:4 6:12,20
judgment 25:19
    28:22
July 32:19
June 1:17 2:4 5:6

**K**

Kappa 7:16
Karachi 17:20
Khartoum 24:10
kind 16:19 27:7
know 7:21 8:21
    28:21
knowledge 23:16

**L**

Laden 16:4 18:4
    23:9 26:13,18,20
Laden's 21:5
large 12:10
late 6:4 10:15,16
    10:22 11:19 23:9
    24:20 26:3
launched 29:2

law 7:11,12 8:5
    9:4,5,10,11,15
    10:15,16 11:2,19
    11:21 12:4,13
lawyer 5:16
leaders 16:5,7
    17:15 18:7,13
left 10:12 18:4
    27:2
legal 9:10
letter 5:19 6:2,2,5
let's 6:8 14:14
    15:20 17:11 25:9
light 5:20 6:4,5,6
limitation 10:5
Line 34:7
litigation 12:6
Liverani 1:21 2:15
    5:10 32:2,16
    33:18
LLP 2:10
loads 23:14
located 16:1
logistical 29:12
logistics 29:7
London 17:19

**M**

Mahjoub 4:8
    14:11,18 15:13
    15:13
managing 9:5,12
March 9:22
mark 14:14 19:10
marked 14:18
    30:6
marking 19:12
masters 7:10 8:2
material 16:19
    19:3 28:21
materials 14:1
    29:17
matter 5:3,15,18
    13:10 14:8
matters 9:18,20
    10:11
McLean 7:1
mean 7:18
means 9:7
measure 13:1
measures 28:15

meet 14:22
meeting 18:13
    20:10
members 21:3
    27:15 28:12
Merit 32:17
met 16:4
Miami 3:5 33:3
mid 24:17
mid-1980s 11:4
mid-2000 19:20
Mm-hmm 23:4
mobilize 17:19
    18:9
Mogadishu 17:20
Mohamed 4:8
    14:18 15:13
months 9:20
morning 22:19
    23:7 27:1
move 19:3 27:3
moved 10:15 18:5
movement 18:16
    22:22
Muhammad
    14:11
multipage 4:7
    14:16
Muslim 24:6

**N**

N 4:1,1
name 5:8,14 6:19
    20:14 34:4,5
nation 25:10
National 10:10
Navy 10:19
need 29:7
needed 29:10
negotiations 11:6
    11:15
negotiator 11:13
neither 32:9
new 16:7 17:20
nine 9:20
Nitze 9:22
nominated 10:20
    11:12
NORFOLK 1:3
normally 6:3
Northwest 2:11

R. James Woolsey

5:5 33:13 34:1
notary 2:16 6:14
32:1,17
note 33:9
notice 2:15 5:17
November 11:15
nuclear 11:7
number 5:2 11:10
18:6 19:3 30:2

**O**

O 4:1
obtained 20:1
obtaining 8:20
occur 23:15
occurred 20:11
29:15
October 13:13
Office 9:19
officer 32:2
offices 2:8 5:4
official 15:5 19:17
officials 17:19
18:9
Oklahoma 7:8
OLIVIA 1:5 3:2
6:16
ongoing 19:22
open 18:14
operating 22:11
operation 18:22
operations 12:14
17:18 18:8,9
21:12,16 29:13
operatives 24:19
opinion 13:19
15:16 29:16
opportunity 14:22
order 5:21
organization
18:19 21:5 25:8
25:12
organizations
18:15 20:21 22:2
25:11,21
original 33:7
Osama 16:4 21:4
23:8 26:13,18,20
outcome 32:14
overall 12:16
overstay 27:9

overt 22:3,3
Oxford 7:11 8:2
8:19 9:2

**P**

page 4:2,6 15:20
15:21 17:6 19:16
23:3 26:7 34:7
pages 1:9 31:8
Palestine 21:9
panel 8:15
paragraph 15:21
17:9,14 18:12
Paris 20:17
part 25:21
particular 25:5
28:18
particularly 12:7
27:20
parties 32:10,13
partner 11:1
12:11
parts 19:19
part-time 11:9
passage 22:17,21
23:2
passports 18:17
19:1,2 27:15
28:13
path 22:13
patterns 4:9 15:7
19:8 30:4
Paul 9:22
pending 5:21
Pentagon 9:18
10:2
people 13:8
percent 7:20,22
percentage 9:8
performing 27:18
28:16
period 10:8,9
12:17 24:20
permission 23:16
23:21
permit 19:2
permitted 27:11
permitting 21:22
Perry 3:11 5:8
pertinent 19:19
Phi 7:16

philosophy 8:4
place 20:13
plaintiffs 1:6 3:2
5:15 6:14,16
plane 23:14
plans 17:18 18:9
please 5:12 6:10
6:19 7:13 14:15
33:8,12
point 15:19 17:8
politics 8:4
Popular 20:6,11
position 12:2
positive 20:1,4
possible 29:5
post 10:14 23:8
practice 12:5
practiced 10:16
11:2,21 12:4
prepare 19:5
prepared 17:3
presence 26:5
present 3:9 5:12
presidency 8:22
president 7:2 8:19
8:21 11:5,12,22
12:12
President-elect
11:22
press 13:7,17
26:22
pre-9/11 26:11
primarily 21:11
principally 13:7
26:2
prior 20:8
probably 26:2
proceed 6:8
proceeding 16:14
products 23:14
promised 27:10
prompt 6:3
pronounce 21:6
propensities 25:20
protected 29:7
provide 7:4 13:19
22:11
provided 14:1,12
14:21 15:5,10
16:10 28:10
provides 18:12

providing 18:16
24:18 27:13
28:10
proximity 29:6
public 2:16 7:6,7
32:1,17
publication 9:10
15:6 19:18
pulling 20:20
pursuant 2:15
8:10 14:9
put 28:6 29:10,19

**Q**

question 23:19
25:7 27:22 28:1
quickly 27:7,11
quite 19:4 20:18
25:22
quote 14:8 18:13
22:17

**R**

R 1:15 2:7 5:2
31:7,15 33:4
34:5
ratification 11:17
read 23:6 27:21
28:3,3 31:8 33:8
33:11
Reagan 11:5
really 20:18 25:16
reason 23:18
reasonable 23:19
reasons 33:9
rebels 24:9
recall 26:22 27:4
received 7:9
record 30:1 32:8
reduced 32:7
reference 19:18
referenced 33:8
references 15:14
17:7
regard 22:12
regarding 15:16
Registered 32:17
related 12:12 32:9
relation 4:7 14:17
15:13
relationship 15:17

18:18
relative 32:16
relied 16:19
religious 25:16
rely 16:17
remarkable 20:18
remember 15:18
report 15:11,15
16:12 18:12 19:8
19:16 21:2 24:21
24:22 26:7 28:19
Reported 1:21
reporter 5:10 6:9
19:10 32:17
reports 26:22
28:20
represent 5:13,15
Republic 1:10 5:3
request 5:22
requesting 5:19
reserved 30:9
residence 27:2
residency 18:4
Resigned 12:3
resolution 12:7
respect 25:14
response 6:3
rest 21:21 24:11
resulting 13:12
results 20:2
return 33:12
returned 8:5 9:22
10:22 11:19
review 33:7
reviewed 33:12
Rhodes 8:3,6,11
right 10:12 22:7,8
22:10 26:9 27:6
28:5,7,9
RMR 1:21 2:15
Robert 4:4 6:12
6:20
Rome 17:20
ROTC 9:17
runs 22:13 24:12
Rux 1:5 3:2 5:3
6:16 33:4 34:4

**S**

S 4:1
safe 21:3,15,15

R. James Woolsey

| | | | | |
|---|---|---|---|---|
| 22:1 24:8,19 | sign 33:8,11 | strongly 25:2 | tape 5:1 30:2 | transcription 31:9 |
| sailors 13:12 | signature 30:9 | student 8:8 | tasks 19:22 | transition 10:17 |
| Sanaa 17:20 | 34:21 | subpoena 13:21 | team 10:17 | 21:20 |
| Saudi 16:3 26:12 | signed 20:2 31:12 | substantial 29:14 | tell 7:13 8:6 9:7 | Tranrig 2:10 5:5 |
| says 26:9,16 | 33:10 | success 27:17 | 21:14 | treaty 11:14,17 |
| schedule 6:7 | significance 15:15 | 28:16 | tensions 25:16 | trial 14:8 |
| scholar 8:6 | 21:14,17 23:12 | successfully 11:16 | term 21:6 | tribes 24:6 |
| scholarship 8:4,13 | significant 17:21 | 24:13 | terms 18:1 22:5,10 | trip 22:14 |
| Scholarships 8:11 | 18:6 | Sudan 1:11 5:4 | 26:4 | true 31:9 32:8 |
| school 7:8,12 8:5 | Sincerely 33:14 | 15:16 16:1,2,8 | terrorism 4:9 | trust 8:10 |
| 9:2,4,16 | sir 7:4,13 13:18 | 17:8 18:4 19:18 | 12:19 13:1 15:7 | try 21:20 |
| schools 7:6,7 | 15:2,10 17:21 | 19:20 20:2,11,19 | 16:16 19:8 20:4 | Tulsa 7:7,8 |
| school's 9:10 | 18:12 19:7 20:8 | 21:2,11,19 22:5 | 27:14 30:5 | Turning 15:11 |
| screen 5:7 | 21:13 22:16 23:3 | 22:13 23:15 | terrorist 15:17,22 | twentieth 8:13 |
| scrutiny 19:3 | 27:12 | 24:16 25:15 | 15:22 16:3 17:18 | two 10:7 12:21 |
| sea 22:7 | situation 21:18 | 26:11,14,16,21 | 18:22 19:5 20:17 | 17:2 18:6 22:6 |
| seconds 5:8 | 29:8 | 27:2,5,17 28:14 | 20:21 21:21 22:2 | type 16:12,15 |
| Secretary 9:19,21 | six-month 10:8,9 | 29:3,6,14 33:4 | 22:4 26:13 | 18:18 24:7 |
| section 14:9 16:10 | slightly 22:3 | 34:4 | terrorists 18:2 | types 24:7 25:21 |
| 23:13 | small 9:8 16:20 | Sudanese 16:5 | 20:7,10 22:11 | typewriting 32:7 |
| sections 15:5 | soon 9:15 | 17:15,19,22 18:7 | 27:14 28:12 | |
| secular 25:10 | sorry 17:11 | 18:10,17 23:21 | testified 6:15 | U |
| secure 21:11 | sort 20:16 23:20 | 24:5 25:2,17 | testimony 13:20 | Ugandan 16:5 |
| Security 10:10 | 24:12 | 26:1 | 19:14 31:8,10 | 17:16 |
| see 27:6 | source 29:17 | Sudan's 18:14 | 32:4,5,8 | unable 6:7 |
| seen 25:19 27:1 | south 24:5,10 | 21:14 | text 23:10 | unclassified 16:18 |
| selected 8:8 9:9 | Soviet 10:5 | suggest 25:2 29:9 | Thank 21:8 29:20 | uncovered 16:9 |
| selecting 8:16 | Soviets 11:7 | suggests 29:12 | thing 24:12 | undersecretary |
| Senate 10:13,21 | space 11:7 | Suite 2:12 33:13 | things 19:1 26:5 | 10:19 |
| 11:17 | speak 14:22 | 34:2 | think 8:17 19:4 | understand 26:11 |
| sent 5:18 | specifically 15:10 | summer 10:6 | 22:15 23:18 | understanding |
| serve 10:19 11:22 | 23:2 | 11:18 12:5,9 | 25:13 26:7,9 | 25:20 |
| served 10:17,21 | spent 12:18 | 13:6 23:11 | thirty 33:11 | undertaken 24:13 |
| 12:1 20:6 | Staff 10:10 | summer/early | thought 20:19 | undertaking 11:9 |
| service 8:14 16:21 | Stanford 7:10,15 | 11:20 | three 10:14,21 | Union 10:5 |
| services 5:9,11 | 7:17 | Sunni 25:8,15 | 11:3 13:3 | United 1:1 8:9 |
| 10:13 25:10 26:3 | Stanton 5:17,18 | support 15:17 | tight 6:7 | 15:6 16:9 19:17 |
| 34:1 | 6:1 | 18:19 24:8,18,18 | time 5:7 6:4 8:20 | 19:20 |
| set 5:20 | start 15:20 | 27:13 28:10,15 | 11:4 12:17,17 | University 7:10,11 |
| settled 24:3 | starting 7:5 | 29:3,12 | 24:3,20 25:18 | 7:12 |
| Shea 10:15,22 | starts 23:2 | swear 6:10 | 26:10,21 27:9,11 | unrefuted 25:1 |
| 11:2,20 12:6 | state 4:9 5:13 6:19 | sworn 6:14 32:5 | 29:9,22 | 28:22 |
| sheet 31:11 33:9 | 15:6 19:17 21:19 | system 7:19 | today 12:11 22:18 | use 17:22 33:9 |
| 34:3 | 24:21 28:20 30:5 | | today's 5:6 30:2 | USS 13:13 |
| sheets 33:10,13 | States 1:1 8:9 15:6 | T | top 7:20,21 | usually 9:9 |
| Shiite 25:8 | 16:9 19:17,20 | T 4:1,1 | trafficking 24:8 | |
| shipments 23:20 | stenotype 32:6 | taken 5:3 20:4 | training 16:1,7,8 | V |
| short 22:14 | steps 20:5 | 32:3,6,11 | 26:5 27:14 28:11 | v 1:8 33:4 34:4 |
| show 19:7 20:17 | Stones 15:2 | talk 12:16 22:19 | 28:11 | various 13:8 21:4 |
| 22:16 | strategic 10:4 | talked 26:4 | transcript 33:8,12 | verbally 6:1 |
| sic 7:1 | Street 33:13 34:1 | talks 10:5 22:21 | 33:12 | version 16:18 |

R. James Woolsey

Page 40

versus 5:3
vice 7:2 12:11
video 5:7
videographer 3:11
5:1,9 6:9 29:22
videotaped 1:15
2:7 5:2
Vienna 10:3 11:14
view 24:16
Virginia 1:2 7:2

**W**

wait 6:3
want 15:9 18:11
27:8
wanted 27:10
war 24:2,3
Washington 1:16
2:13 5:6 33:13
34:2
way 5:16 19:14
29:19
weapons 11:2
Wednesday 1:17
week 5:18
weeks 11:10
went 9:16 12:3,9
we've 13:18 14:1
14:21 15:10 26:4
witness 4:2 6:10
6:13 30:9 32:4,6
32:9 34:5
witness's 19:13
Woolsey 1:3 2:7
4:4,6 5:3 6:1,20
6:21 14:16 30:4
31:7,15 33:4
34:5
Woolsey's 6:7
work 9:13,18 10:1
10:9 12:11,20,22
25:8
worked 9:19 10:6
13:3
working 9:21 13:8
20:19
world 21:22 25:21
27:19 28:18
wrap 27:7
writ 24:12
writing 9:9

**X**

x 1:4,13

**Y**

Yale 7:12 9:4,5,11
9:11
Yeah 26:16
year 8:9,18 11:11
20:1,2
years 9:1 10:7,14
10:21 11:3 12:5
12:18,21 13:2,3
17:1,2 20:15
Yemen 22:5,11
29:7,9,15
Yemeni 16:5
17:16
yesterday 6:2
York 17:20
younger 9:1

**Z**

Zeki 4:8 14:11,18
15:13

**1**

1 1:9 4:7 14:14,16
10:03 30:1
10:05 30:7
100 8:9
1020 33:13 34:1
12 20:3
125 23:3
14 4:7
1428 3:4 33:2
15 15:20,21 26:7
16 5:8
168-34 34:6
168034 1:22
17 13:12
19 12:9
19th 33:13 34:1
1903 8:12
1904 8:12
1959 7:9
1963 7:10
1965 7:11
1968 7:12
1969 10:1
1970 10:6,12
1973 10:15

1976 10:17
1979 10:22
1980s 11:3
1989 11:3,12,16
1991 11:20
1993 11:21
1998 16:6 17:14
17:22

**2**

2 4:9 19:10 30:4
2:04CV428 1:7
20 15:21 17:6
2000 4:9 13:13
19:8 20:9,9
21:18 24:21 26:3
30:5
20006 2:13
2001 4:9 21:19
23:9 26:11 30:6
2002 12:5,9 13:2,6
23:9,11
20036 33:13 34:2
2005 1:17 2:4 5:6
32:19
21 17:6
22 1:17 2:4 5:6
26 17:10,14
28 17:9

**3**

30 4:9 8:17
305)374-5030 3:6
31 32:19
32 8:17
33 131-9133 3:5
33:3
34 1:9
35 19:16

**4**

40.1 14:9
41 11:13

**5**

5 7:22
500 2:12

**6**

6 4:3
6/22/05 34:5
620 33:13 34:2

**8**

800 2:11 5:5
8283 7:1
83 11:4,11
86 11:4,11

**9**

9:34 2:5 5:7
90s 13:5 20:16
24:17
91 11:18
93 12:2
95 12:3,4 13:5
96 18:5 27:2

# Lorenzo Vidino, Ph.D./J.D.

## PROFESSIONAL EXPERIENCE

**Center for Security Studies**
**Swiss Federal Polytechnic/ETH** (Zurich, Switzerland)
*Senior Fellow*

June 2011

**RAND Corporation** (Arlington, VA)
*Visiting Fellow*

October 2010-June 2011

**Harvard University**
**Belfer Center, Kennedy School of Government** (Cambridge, MA)
*Fellow in International Security/Religion in International Affairs*

August 2009-June 2010

**United States Institute of Peace** (Washington, DC)
*Peace Scholar*

August 2009-June 2010

**Fletcher School of Law and Diplomacy** (Medford, MA)
*Fellow in International Security Studies*

August 2007- June 2009

**Jebsen Center for Counterterrorism Studies**
**Fletcher School of Law and Diplomacy** (Medford, MA)
*Research Programs Manager*

May 2006-May 2007

**The Investigative Project on Terrorism** (Washington, DC)
*Terrorism Analyst/Deputy Director/Consultant*

June 2002-August 2007

## TEACHING EXPERIENCE

**Universität Zürich** (Zurich, Switzerland)
*"Issues in Contemporary Terrorism and Radicalization"*

Fall Semester 2011

**National Defense University** (Washington, DC)
*"Political Islam"*

Spring Semester 2011

**University of Maryland/START** (College Park, MD)
*"Political Islam in the West"*

Winter Semester 2011

**Tufts University** (Medford, MA)
*"Al Qaeda and modern terrorism"*

Spring Semester 2009



EXHIBIT

P

1

## EDUCATION

**Fletcher School of Law and Diplomacy** (Medford, MA)                    March 2010
Ph.D., International Relations.

**Fletcher School of Law and Diplomacy** (Medford, MA)                    April 2007
Masters of Arts in Law and Diplomacy, International Security Studies
and Islamic Civilization.

**Università degli Studi di Milano Law School** (Milan, Italy)            June 2002
Dottore in Giurisprudenza (Juris Doctor). Focus on international law.

## TEACHING AND RESEARCH INTERESTS

- Terrorism and counter-terrorism, radicalization and counter-radicalization.
- Political Islam, particularly its developments in Europe and North America.
- Security studies (insurgency and counterinsurgency, armed non-state actors), European and American foreign policy, transatlantic relations, international organized crime, immigration, social movement theory.

## ACTIVITIES

- Regularly briefs/consults for agencies and ministries in the United States (Office of the Vice-President, FBI, CIA, NCTC, NSA, Department of Defense, Department of Justice, Department of Homeland Security....) and several European countries on issues of terrorism and political Islam.
- Testified three times before the U.S. Congress.
- Regularly interviewed as a terrorism expert on several American and international media outlets, including *The New York Times, The Wall Street Journal, Times of London, El Pais, Der Spiegel, Corriere della Sera...*
- Regularly appears on American (NBC, PBS, CBS, CNN, FOX News, CNBC, MSNBC...), Middle Eastern (Al Jazeera, Al Jazeera International, Al Hayat LBC...), and European (BBC, France 24, SRF, DR, RAI...) TV programs. Regularly interviewed by international and local radio stations, including NPR, Voice of America, BBC Radio...
- Frequent reviewer for International Security, Terrorism and Political Violence, Columbia University Press, Smith Richardson Foundation, Hurst...
- Testified as an expert witness in court cases in the United States and France.
- Consults on a regular basis with private businesses, law firms, and think tanks on issues of terrorism and political Islam.
- Traveled to more than 30 countries in 4 continents (many of them several times) for research. Spent at least 10 weeks every year traveling for research purposes over the last ten years.

2

## GRANTS

- **Public Safety Canada—Kanishka Project**: grant to study the use of the internet by convicted militants (project leader, conducted together with experts from Canada and the United States). March 2013.
- **Spanish Ministry for Science and Defense (Ministerio de Ciencia e Innovación)**: grant to study the organizational structure of international terrorism and its impact on European security (together with a group of Spanish academics). June 2011.
- **U.S. Department of Defense**: grant to study counter-radicalization programs in four European countries (project leader, together with James Brandon). June 2011.
- **Fritz Thyssen Stiftung**: individual grant to conduct two-year study of counter-radicalization efforts in Europe and North America.
- **U.S. Institute of Peace**: Peace Scholar Dissertation Fellowship (Jennings Randolph Fellowship), 2009/10.
- **Smith Richardson Foundation**: individual grant to conduct a two-year study of Muslim community engagement efforts by Western governments, 2008/09.
- **Ph.D. Fellowship**, Fletcher School of Law and Diplomacy, 2008.
- **Earhart Fellowship**, Fletcher School of Law and Diplomacy, 2007.
- **Jebsen Center**, Fletcher School of Law and Diplomacy, summer research grant, 2006.

## NON RESIDENT AFFILIATIONS

- International Centre for the Study of Radicalisation, King's College London
- Foreign Policy Research Institute, Philadelphia
- European Foundation for Democracy, Brussels
- Italian Institute of Strategic Studies Niccolò Machiavelli, Rome

## LANGUAGE PROFICIENCY

- Italian and English (native/near native)
- Spanish (conversational)
- German and French (basic knowledge)

3

## PUBLICATIONS

### Books

- *Western Governments and Political Islam after 2011,* Al Mesbar Studies and Research Center (Dubai, December 2012). Editor. In Arabic.
  - Translated and published in English as an EBook by the Foreign Policy Research Institute, February 2013 (titled *The West And The Muslim Brotherhood After The Arab Spring*).
- *The New Muslim Brotherhood in the West,* Columbia University Press, August 2010 (336 pages).
  - Translated and published in Arabic by Al Mesbar Studies and Research Center, Dubai (2011).
- *Al Qaeda in Europe: The New Battleground of International Jihad,* Prometheus, 2005 (403 pages).
  - Translated and published in Danish by Gyldendal (2006).

### Book chapters

- "From KSM's Genius to Sheer Amateurism: The Post-9/11 Evolution of the Terrorist Threat in the United States," in Bruce Hoffman and Fernando Reinares, eds., *Leader-Led Jihad, Rethinking the Global Terrorism Threat* (Columbia University Press, 2013), [forthcoming]
- "The European organization of the Muslim Brotherhood: Myth or Reality?" in Edwin Bakker and Roel Meijer, eds., *The Muslim Brotherhood in Europe* (Hurst/Columbia University Press, 2012).
- "Counter-radicalisation in the United States," in Rik Coolsaet, ed., *Jihadi Terrorism and the Radicalisation Challenge. European and American Experiences* (Ashgate, 2011).
- "The Role of Non-Violent Islamists in Radicalization and Counter-Radicalization: The European Debate," in Laurie Fenstermacher and Todd Leventhal, eds., *Countering Violent Extremism: Scientific Methods and Strategies* (U.S. Department of Defense, September 2011)
- Two entries ("John Walker Lindh" and "Jose Padilla") in Gus Martin, ed., *The Encyclopedia of Terrorism,* 2nd Edition (Sage, 2011).
- "Homegrown jihadist terrorism in the United States: A new and occasional phenomenon?" in John Horgan and Kurt Braddock, eds., *Terrorism Studies: A Reader* (Routledge, 2011).
- "Islamist Terrorism: Assessing Threats to Democracy," in Christopher K. Penny, ed., *The Administration of Justice and National Security in Democracies* (Irwin Law and the Federal Court of Canada, Ottawa, 2011)
- "Counter-radicalization and Europe's New Security Dilemma," in Eric Patterson and John Gallagher, eds., *Debating the War of Ideas* (Palgrave McMillan, 2010).
- "The Muslim Brotherhood in Europe," in Barry Rubin, ed., *Muslim Brotherhoods: The Organization and Policies of a Global Islamist Movement* (Palgrave McMillan, 2010).

4

- "The rising tide of Islamic radicalism," in Marvin Perry and Howard E. Negrin, eds., *The theory and practice of Islamic terrorism: an anthology* (Palgrave McMillan, 2008).
- "Origins and characteristics of homegrown jihadist networks in Europe" in Franz Eder and Martin Senn, eds., *Europe and Transnational Terrorism: Assessing Threats and Countermeasures* (Baden-Baden: Nomos, 2008).
- "Den Nye Terrorisme" ("New Terrorism") in Jakob Aahauge and Pelle Schierup, eds., *Terrorensanatomi* (Rosenkilde, 2007, in Danish).

## Journal articles

- "The Italian Radical Left's Ambivalent Fascination with Terrorism," *Dynamics Asymmetric Conflict: Pathways Towards Terrorism and Genocide*, DOI:10.1080/17467586.2012.745195, 2012.
- "Europe's Experience in Countering Radicalisation: Approaches and Challenges," *Journal of Policing, Intelligence and Counter Terrorism*, 7:2 (2012), 163-179 (with James Brandon)
- "Jihadism in Europe," *German Journal for Politics, Economics and Culture of the Middle East (Zeitschrift ORIENT)*, IV, 2011.
- "The Buccinasco *pentiti*: a unique case study of radicalization," *Terrorism and Political Violence*, 23: 3, 398 — 418, 2011.
- "Bringing Global Jihad to the Horn of Africa: al Shabaab, Western Fighters and the Sacralization of the Somali Conflict," *African Security*, 3:216–238, 2010 (with Evan Kohlmann and Raffaello Pantucci).
- "London's frantic quest for the Muslim holy grail: the post-9/11 evolution of the relationship between Whitehall and the British Muslim community," *Religion Compass*, Volume 5, Issue 4, April 2011.
- "Europe's New Security Dilemma," *Washington Quarterly* 32, no. 4 (October 2009): 61-75.
- "Islamism and the West: Europe as a Battlefield," *Islamism, Totalitarian Movements and Political Religions* (Routledge/ Taylor & Francis), 10:1 (2009).
- "Homegrown Jihadist Terrorism in the United States: A New and Occasional Phenomenon?" *Studies in Conflict & Terrorism*, Volume 32, Issue 1, (January 2009).
- "Islam, political Islam and Jihadism in Italy," *Current Trends in Islamist Ideology*, August 2008.
- "The Hofstad Group: The New Face of Terrorist Networks in Europe," *Studies in Conflict and Terrorism*, Volume 30, Issue 7, (July 2007).
- "After the Danish Cartoon Controversy," *Middle East Quarterly*, Winter 2007 (with Pernille Ammitzbøll).
- "The Arrival of Islamic Fundamentalism in Sudan," *Al Nakhla*, Fall 2006.
- "Aims and Methods of Europe's Muslim Brotherhood," *Current Trends in Islamist Ideology*, November 2006.
- "Arab Foreign Fighters and the Sacralization of the Chechen Conflict," *Al Nakhla*, Spring 2006.

5

- "Jihad from Europe," *Journal of International Security Affairs*, Fall 2005.
- "How Chechnya Became a Breeding Ground for Terror," *Middle East Quarterly*, Summer 2005.
- "The Muslim Brotherhood's Conquest of Europe," *Middle East Quarterly*, Winter 2005.

## Other publications

- The Sentinel (West Point Combating Terrorism Center), *The evolution of jihadism in Italy: Rise in homegrown radicals*, November 2012.
- Longitude (official monthly of the Italian Ministry of Foreign Affairs), *O Brotherhood: Where Art Thou?* August 2013. Cover story.
- Aus Politik und Zeitgeschichte (official journal of the German Federal Agency for Civic Education), *Deradikalisierung durch gezielte Interventionen*, 29-31, July 2013.
- Vice Magazine, *A Long Way from Home*, May 2013 issue.
- Longitude (official monthly of the Italian Ministry of Foreign Affairs), *Al-Qaeda Inc.*, March 2013. Cover story.
- The Sentinel (West Point Combating Terrorism Center), *European Experiences in Counterradicalization*, June 2012. With James Brandon.
- ISN Insight (ETH Zurich), *Assessing the Toulouse Killings*, March 29, 2012.
- ISN Insight (ETH Zurich), *Facing the New Islamist Challenge*, May 31, 2011.
- The Sentinel (West Point Combating Terrorism Center), *The Role of Non-Violent Islamists in Europe*, December 2010.
- Panorama (leading Italian weekly), *Cosi' Finanziano la Striscia*, Issue 6, January 30, 2009.
- Panorama (leading Italian weekly), *Jihadisti Pentiti a Scuola di Non Violenza*, Issue 48, November 21, 2008.
- The Sentinel (West Point Combating TerrorismCenter), *A Preliminary Assessment of Counter-Radicalization in the Netherlands*, August 2008.
- Journal of Counterterrorism and Homeland Security International, *The Multi-layered Threat of Islamism to Europe*, Summer Issue, Volume 14, 2008.
- In Focus Quarterly, *The Tripartite Threat of Radical Islam to Europe*, Winter 2007.
- Jamestown Foundation Terrorism Monitor, *Current Trends in Jihadi Networks in Europe*, October 2007.
- Jamestown Foundation Terrorism Monitor, *Italy's Left-Wing Terrorists Flirt with Radical Islamists*, September 2007 (with Andrea Morigi).
- Jamestown Foundation Terrorism Monitor, *The Danger of Homegrown Terrorism to Scandinavia*, October 2006.
- Jamestown Foundation Terrorism Monitor, *Is Italy Next in Line After London?* September 2005.
- Armed Forces Journal, *The Enemy Within*, January 2005.

## Op-eds

- *Hisba in Europe? Assessing a Murky Phenomenon*, European Foundation for Democracy, June 2013.
- *The Muslim Brotherhood after the Arab Spring: Tactics, Challenges and Future Scenarios*, Center for European Studies, May 2013.
- *European Strategies against Jihadist Radicalisation,* CSS Analysis, Center for Security Studies, ETH Zurich, Issue 128, February 2013.
- *Countering Radicalization in Europe,* International Centre for the Study of Radicalization, King's College London, December 2012.
- *Lessons Learnt: Post-Mubarak developments within the Egyptian Muslim Brotherhood,* U.K. Arts and Humanities Research Council, Swindon, December 2011.
- *The Muslim Brotherhood in Egypt: Hurdles on the Way to Power*, Strategic Trends Analysis, Center for Security Studies, ETH Zurich, N. 101, October 2011.
- *Radicalization, Linkage and Diversity: Current Trends in Terrorism in Europe*, Occasional Paper, RAND Corporation, July 2011.
- *The Impact of the Arab Awakening on Muslim Radicalization in Europe: A Preliminary Assessment*, special report for the Real Instituto Elcano, Madrid, Spain, ARI 120/2011, July 14, 2001.
- *Political Islam in Europe*, report for the Centre for European Studies, Brussels, June 2011.
- *The Muslim Brotherhood in the West: Evolution and Western policies*, special report for the International Centre for the Study of Radicalisation and Political Violence, King's College London, March 2011.
- *The Global Muslim Brotherhood: Myth or Reality?*, report for the Homeland Security Policy Institute, George Washington University, Issue Brief 10, March 2, 2011.
- *Egyptian Crosscurrents: The Muslim Brotherhood and Democracy on the Nile*, report for the Homeland Security Policy Institute, George Washington University, Issue Brief 9, March 2, 2011.
- *Countering Radicalization in America: Lessons from Europe*, special report for the U.S. Institute of Peace, November 2010.
- *The Homegrown Terrorist Threat to the U.S. Homeland*, special report for the Real Instituto Elcano, Madrid, Spain, ARI 171/2009, December 18, 2009.

## <u>PUBLIC PRESENTATIONS</u>

- Bundesverfassungsschutz (German domestic intelligence agency), conference on de-radicalization, *Targeted interventions: the experience of three European countries*, Berlin, November 27, 2013.
- Foro Elcano on Global Terrorism, *La amenaza del terrorismo yihadista en Italia* (The threat of jihadist terrorism in Italy), Casa Arabe, Madrid, November 14, 2013. In Spanish.

8

- European Foundation for Democracy, *Media Reporting on From Radicalisation to foreign fighters: How can the US and the EU learn from each other?* moderator, European Parliament, Brussels, September 25, 2013.
- Mossos d'Esquadra academy, launch of the report *Hisba in Europe: Assessing a Murky Phenomenon*, Mollet del Valles (Catalan police headquarters), July 18, 2013. In Spanish and Catalan.
- United States Consulate, Barcelona, launch of the report *Hisba in Europe: Assessing a Murky Phenomenon*, Barcelona, July 15, 2013. In English and Catalan.
- Virginia Tech and Applied Research Corporation, conference on countering violent extremism, *Counter-radicalization in Europe*, July 12, 2013. Via videoconference.
- Universidad Pablo de Olavide (Sevilla), summer course for Spanish military and intelligence community, *Hisba in Western Europe*, Carmona (Sevilla, Spain), July 9, 2013. In Spanish.
- European Parliament, launch of the report *Hisba in Europe: Assessing a Murky Phenomenon*, Brussels, June 25, 2013.
- ISPI, panel on New Terrorism: Beyond al Qaeda, *The Jihadist Threat in Europe*, Milan, June 18, 2013. In Italian.
- Center for European Studies, launch of the report *The Muslim Brotherhood after the Arab Spring: Tactics, Challenges and Future Scenarios*, Brussels, May 29, 2013.
- European Foundation for Democracy, *Radicalisation and the Internet,* moderator, European Parliament, Brussels, May 28, 2013.
- ISN, *Public Policy and (Myths About) Terrorism*, discussant, Zurich, May 22, 2013.
- Turkish National Police Academy, *Countering Radicalization in Europe*, Ankara, May 7, 2013.
- Indonesian Embassy and FORAS, panel *Political Islam - from North Africa to South East Asia*, Zurich, April 25, 2013.
- Royal Danish Defence College, Security Policy Course on the Middle East, North and East Africa 2013, *The Muslim Brotherhood and Islamism after the Arab spring*, Copenhagen, April 11, 2013.
- Roskilde University, panel discussion, *Islamism and Secularism after the Arab Uprisings*, Roskilde (Denmark), April 11, 2013.
- Foreign Policy Research Institute, book launch, *The Muslim Brotherhood and the West*, Washington, DC, March 20, 2013.
- George C. Marshall European Center for Security Studies, Program on Terrorism and Security Studies, *Disengagement and de-Radicalization*, Garmisch-Partenkirchen, March 13, 2012.
- United Nations Interregional Crime and Justice Research Institute (UNICRI) and University of Turin, Masters of Law in International Crime and Justice, two-day lecture on radicalization and counter-radicalization, Turin, March 7 and 8, 2013

- European Foundation for Democracy, *Media Reporting on Radicalisation: Striking the Right Balance,* moderator, European Parliament, Brussels, January 23, 2013.
- Fundación Ortega-Marañón and Real Instituto Elcano, Madrid, 10th Permanent Seminar on Terrorism: *Contrarrestando la radicalización yihadista en Europa* (Countering Jihadist Radicalization in Europe), November 14, 2013.
- European Foundation for Democracy, *Radicalisation in Schools and Universities: Heeding the Warning Signs,* moderator, European Parliament, Brussels, November 13, 2012.
- European Foundation for Democracy, *Junge Muslime in Gefahr? Salafismus in Deutschland (Young Muslims in Danger? Salafism in Germany),* introductory speech, Bonn, November 3, 2012.
- Mossos d'Esquadra academy, conference on "Intelligence Facing Radicalization," *The Importance of Prevention Policies,* Mollet del Valles (Catalan police headquarters), October 30, 2012.
- George C. Marshall European Center for Security Studies, Senior Executive Seminar, *Pathways out of Violent Extremism,* Garmisch-Partenkirchen, September 11, 2012.
- Italian Ministry of Foreign Affairs, *The Spring of Religions? The different faces of the Muslim Brotherhood,* Rome, June 26, 2012.
- Center for Near Abroad Strategic Studies, *The Future of the Muslim Brotherhood after the Egyptian Presidential Elections,* Rome, June 25, 2012.
- George C. Marshall European Center for Security Studies, Program on Terrorism and Security Studies, *Counter-Radicalization in Europe,* Garmisch-Partenkirchen, June 19, 2012.
- Link Campus University/Centro Studi Germani, Seminar on Fundamentalisms in the World, *The Muslim Brotherhood between Fundamentalism and Pragmatism,* Rome, May 15, 2012.
- Global Counter Terrorism Conference, Counter Terror Expo 2012, *Islamism and Political Violence: The Effects on Europe's Security,* London, April 25, 2012.
- Brussels Forum (German Marshall Fund of the United States' annual conference), *The Rise of Political Islam,* Brussels, March 24, 2012
- Centre for European Studies and the German Marshall Fund of the United States, conference titled The West and The New Middle East, *The rise of Islamism: Implications for the West,* Brussels, March 22, 2012
- Canadian Security Intelligence Service's headquarters, luncheon lecture, *The Muslim Brotherhood in the West,* Ottawa, March 20, 2012.
- King's College London, *Countering radicalization in Europe,* March 14, 2012
- George C. Marshall European Center for Security Studies, *Islamism and Jihadism in Italy,* Italian Parliament, Rome, March 6, 2012.
- ETH Zurich, *The Muslim Brotherhood in Egypt: Lessons Learned from Indonesia, conversation between Amien Rais and Lorenzo Vidino,* Zurich, February 29, 2012.
- Fundación Ortega-Marañón and Real Instituto Elcano, Madrid, 10th Permanent Seminar on Terrorism: *Terrorist Radicalization and Delegitimation of Jihadist Terrorism in the United States and Western Europe,* November 14, 2011.

- Belgian Royal Institute for International Relations (Egmont), Terrorism, Radicalisation & De-Radicalisation: European and American Experiences Conference, Brussels: *Counter-Radicalisation in the U.S.*, October 10, 2011.
- International Institute for Counter Terrorism, Herzliya, Israel, *The Radicalization Process in the West* and *Countering Violent Extremism and Radicalization* (moderator), September 13, 2011.
- International Centre for Counterterrorism, The Hague, *De-Radicalization Programs in Europe*, The Hague, August 23, 2011.
- Global Futures Forum, joint conference organized by the governments of Spain (Centro Nacional de Inteligencia) and the United States (Office of the Director of National Intelligence, National Intelligence Council, Department of Homeland Security, and Department of State), *The Impact of Identity Politics on Violent Extremism*, Madrid, Spain, June 22, 2011.
- International Security Forum 2011, Zurich, Switzerland, *Radicalization and Deradicalization: How Terrorism Begins and Ends*, May 31, 2011.

- United Nations Interregional Crime and Justice Research Institute (UNICRI), Lucca, Italy, *Upstream prevention and downstream disengagement, rehabilitation and reintegration*, (moderator of the Asia panel), May 25, 2011.
- Foreign Policy Research Institute, Philadelphia, PA, *The Muslim Brotherhood in the USA: Social Service or Taqiyya?* Annual Templeton Lecture on Religion and World Affairs, May 19, 2011.
- RAND Corporation, Arlington VA, *Political Islam in Europe*, May 13, 2011.
- National Press Club, Washington DC, *The Global Muslim Brotherhood: Myth or Reality?* April 27, 2011.
- American Jewish Committee, Washington DC, *The Global Muslim Brotherhood*. April 27, 2011.
- Council of Foreign Relations, New York, roundtable with Ed Husain, *Global Prospects for the Muslim Brotherhood*, April 25, 2011.
- House Permanent Select Committee on Intelligence, Subcommittee on Terrorism, HUMINT, Analysis and Counterintelligence: *The Muslim Brotherhood in the West: Characteristics, Aims and Policy Considerations*. April 13, 2011.
- Foundation for Defense of Democracies, Washington DC, *The Muslim Brotherhood*, March 21, 2011.
- Woodrow Wilson International Center for Scholars, Washington DC, *Book Discussion: The New Muslim Brotherhood in the West*, March 17, 2011.
- U.S. Congress, House of Representatives, Anti-Terrorism Caucus, Washington DC: *Radicalization and Homegrown Terrorism 101*, March 4, 2011.
- United States Institute of Peace, Washington DC: *Countering Radicalization in America*, December 15, 2010.
- RAND Corporation, Arlington, VA: *The Muslim Brotherhood in the West*, December 14, 2010.
- RAND Corporation, Arlington, VA: *The De-Radicalization of Islamist Extremist*, November 30, 2010.
- Foreign Policy Research Institute, Washington, DC: *The Foreign Fighter Problem: Recent Trends and Case Studies*, September 27, 2010.

- International Centre for the Study of Radicalisation (King's College), annual conference, New York: *Radicalisation in the West*, July 1, 2010.
- Belfer Center, Kennedy School of Government, Harvard University: *Firefighters or Arsonists? Debating the Role of Non-violent Islamists in Counter-radicalization Programs*, May 6, 2010.
- Italian Ministry of Defense (Istituto Alti Studi per la Difesa, IASD) and George C. Marshall European Center for Security Studies, Rome: *The Ideological Dimension of Counterterrorism*, April 15, 2010.
- Counter-Terror Expo 2010, London: *Radicalisation - A New Security Dilemma for Europe?* April 14, 2010.
- Harvard Institute for Learning in Retirement, Harvard University, Cambridge, MA: *De-radicalizing Homegrown Terrorists: Lessons from the Middle East and Europe*, April 2, 2010.
- Program in Criminal Justice Policy and Management, Harvard University, Kennedy School of Government Cambridge, MA: *Islamic Radicalization in the U.S. Homeland: A Myth or Reality?*, March 31, 2010.
- Islam in the West Workshop, Center for Middle Eastern Studies, Harvard University, Cambridge, MA: *The Muslim Brotherhood in Europe*, March 23, 2010.
- Politische Akademie der ÖVP/Centre for European Studies, Vienna (Austria): *Understanding Political Islam*, March 22, 2010.
- Link Campus University, Department of Strategic Intelligence and Security, Rome (Italy), three-hour course: *Europe's New Security Dilemma*, December 19, 2009.
- Netherlands Institute of International Relations "Clingendael" and General Intelligence and Security Service of the Dutch Ministry of Interior and Kingdom Relations (AIVD), seminar on the Muslim Brotherhood in Europe, The Hague, *The European Organization of the Muslim Brotherhood: Myth or Reality?* December 4, 2009.
- George C. Marshall European Center for Security Studies, Skopje (Macedonia): *Countering the Ideological Support for Terrorism*, November 23, 2009.
- Fundación José Ortega y Gasset, Madrid (Spain), *Terrorist Threats on Both Sides of the Atlantic: Differences and Similarities*, November 16, 2009.
- Legatum Institute, London: *Terrorism in the United States*, November 6, 2009.
- British Association of Chief Police Officers, UK Office of Security and Counter Terrorism, Home Office, Wilton Park (UK), *Islamism and Shared Values*, November 4-6, 2009.
- U.S. Consulate, Barcelona (Spain), roundtable: *Counter-Radicalization Efforts in Europe and Europe's New Security Dilemma*, October 23, 2009.
- Universidad de Granada (Spain), conference on European security: *Counter-radicalization efforts in Europe*, October 22, 2009.
- Universidad Carlos III, Madrid (Spain): *Europe's New Security Dilemma*, October 20, 2009.
- Real Instituto Elcano, Madrid (Spain): lecture entitled *Countering violent Islamist radicalization: a preliminary assessment of the European experience*, October 20, 2009.

- International Security Studies Section of ISA/International Security and Arms Control Section of APSA Annual Conference, *Monterey Institute of International Studies and Naval Postgraduate School, Monterey, CA: The Hofstadgroep as a New Model of Terrorism in the West*, October 16, 2009.
- Peace Scholars conference, U.S. Institute of Peace, Washington D.C., *Soft Approaches to Counterterrorism: Counter-radicalization in Great Britain and the Netherlands, October 5, 2006.*
- Boston ROTC Consortium, Boston, MA: *Current Trends in Terrorism*, March 25, 2009.
- U.S. Immigration and Customs Enforcement, National Anti-Terrorism Conference, Boston, MA: *The Muslim Brotherhood: History, Methods, Aims and Security Implications*, March 20, 2009.
- King's College, London, International Centre for the Study of Radicalisation and Political Violence: *The Muslim Brotherhood in Europe*, December 9, 2008.
- Fletcher School of Law and Diplomacy, 2008 Fletcher Doctoral Conference: *Armed Groups: A Major 21st Century Security Challenge*, October 17, 2008.
- U.S. National Counterterrorism Center (NCTC) and University of Texas, Austin, TX: *The Current Terrorist Enemies of the United States: Prospects for a New U.S. Administration*, September 17/18, 2008.
- Organization for the Security and Cooperation in Europe (OSCE), Istanbul, Turkey: *Links Between Crime and Terrorism*, June 28, 2008.
- Joint Special Operations University (SOCOM), Shirlington, VA: *Terrorist Networks and Beyond al-Qaeda*, June 17, 2008.
- 16-hour course at the Tufts University's Osher Lifelong Learning Institute: *Terrorism, Political Islam and U.S. Policies*, March to May 2008.
- Newton Public Schools Lifelong Learning, Newton, MA: *The "War on Terror": Reasons and Goals*, October 24, 2007.
- International Institute for Counter Terrorism, Herzliya, Israel: *Homegrown Terrorism in Europe and the US*, September 11, 2007.
- NEFA Foundation, Florence, Italy: *The Muslim Brotherhood in the West*, June 13, 2007.
- Canadian Centre of Intelligence and Security Studies (in association with the Canadian Supreme Court), Ottawa, Canada: *International Terrorism: Assessing Threats to Democracy and Law*, June 11, 2007.
- Global Investigative Journalist Conference, Toronto, Canada: *Investigating Terrorist Organizations*, May 25, 2007.
- Osher Lifelong Learning Institute, Medford, MA: *The "War on Terror": Reasons and Goals*, April 23, 2007.
- Woodrow Wilson Center for International Scholars, Washington DC: *Jihad in Europe*, April 16, 2007.
- Jebsen Center for Counterterrorism Studies, Fletcher School of Law and Diplomacy, Tufts University: *Al Qaeda in the West*, March 7, 2007.
- Harvard University, Kennedy School of Government, Belfer Center: *Terrorism, a European Perspective*, March 2, 2007.

- CENTRA (organized by the U.S. Central Intelligence Agencies), Arlington VA: *The Muslim Brotherhood in the West*, November 6, 2006.
- Italian Senate, Rome, *The withdrawal of Italian troops from Iraq: and then?* (in Italian), June 28, 2006.
- CENTRA (organized by U.S. State Department), London: *Muslim Radicalization in Europe*, July 26, 2006.
- INTERPOL, Lyon, Complex Asian Crime Symposium: *The Links Between Organized Crime and Terrorism*, June 27, 2006.
- Danish Institute for International Studies, Copenhagen: *Jihad in Europe*, June 9, 2006.
- Johns Hopkins University, SAIS, Forum with Francis Fukuyama and Daniel Benjamin: *Islamic Fundamentalism in Europe: Transatlantic Perspectives*, May 18, 2006.
- Osher Lifelong Learning Institute, Medford, MA: *Al Qaeda*, April 28, 2006.
- Simmons College, Boston, MA, lecture on terrorism in Europe, March 6, 2006.
- Fletcher School of Law and Diplomacy, Tufts University, EPIIC Symposium: *Identity Crisis: Europe, Immigration and "the Other"*, February 25, 2006.
- University of Malta, Rome: *Islamic Radicalism in Europe*, January 10, 2006. In Italian.

14