

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

AVINESH KUMAR, et al.,

    Plaintiff,

v.

REPUBLIC OF SUDAN,

    Defendant.

CIVIL NOS. 2:10cv171, 2:13cv618,
2:13cv619, 2:13cv620, 2:13cv621,
2:13cv622, 2:13cv623, 2:13cv624,
2:13cv625, 2:13cv626, 2:13cv627,
2:13cv628, 2:13cv629, 2:13cv630,
2:13cv631, 2:13cv632, 2:13cv633,
2:13cv634

## MEMORANDUM OPINION

In a written opinion dated April 29, 2014, this Court found that the Republic of Sudan

("Sudan") was liable to Plaintiffs Avinesh Kumar, et al. ("Plaintiffs") under the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. ECF No. 98. However, the Court took

under advisement the issue of damages as to each plaintiff. After reviewing the deposition

testimony of each plaintiff and having an evidentiary hearing to hear testimony from two of the

plaintiffs, the Court awards damages as explained herein.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

In 2004, fifty nine family members of the victims killed in the bombing of the *U.S.S.*

*Cole* on October 12, 2000 filed suit against Sudan in in Rux v. The Republic of Sudan,

495 F. Supp. 2d 541 (E.D. Va. 2007). The families brought suit under the FSIA, alleging that

Sudan was liable for damages from the attack because it provided material support and assistance

to, Al Qaeda, the terrorist organization that planned and carried out the attack. Under the FSIA as

it was first enacted in 1996, it was unclear whether the statute itself provided an independent

federal cause of action or whether it simply conferred jurisdiction to federal courts to hear

1

terrorism cases grounded in federal, state, or international law claims. By 2004, when Plaintiffs filed suit in Rux, however, courts had determined that the FSIA only conferred jurisdiction but did not create a separate federal cause of action. See Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1027 (D.C. Cir. 2004). Thus, the FSIA waived foreign sovereign immunity but required plaintiffs in terrorism cases to find another source of law on which to base their claims. In the Rux case, this Court found that source of law in the Death on the High Seas Act ("DOHSA"). In 2007, this Court held that Sudan was liable under the DOHSA and ordered it to pay economic damages, amounting to $7,956,344 plus post-judgment interest. Rux, 495 F. Supp. 2d at 569. Under the DOHSA, which the Court held was the exclusive remedy, Plaintiffs could not recover non-economic damages. Id. at 564, 566–67.

In 2008, Congress amended the FSIA to provide a separate federal cause of action. Under this federal cause of action, plaintiffs may recover "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Subsequent to the enactment of the new FSIA, the plaintiffs in Rux, along with four new plaintiffs, filed the instant suit against Sudan in April of 2010.[1] ECF No. 1. This time they seek the non-economic damages that they were unable to recover under the DOHSA.

In an opinion issued on May 29, 2014, the Court found that Sudan's provision of material support and resources to Al Qaeda led to the murders of seventeen American servicemen and women serving on the *U.S.S. Cole*, and entered judgment against Sudan under the FSIA. ECF No. 198. The Court took under advisement the issue of damages as to each plaintiff. The issue presently before the Court is the award of those damages.

---

[1] Plaintiffs Jack Earl Swenson and Ollesha Smith Jean filed suit on October 7, 2010 in 2:10cv498. On May 4, 2011, the Court consolidated 2:10cv498 with the present action, 2:10cv171. ECF No. 28. Additionally, on February 25, 2015, Plaintiffs filed a Notice of Voluntary Dismissal, dismissing now-deceased plaintiff Reed Triplett. ECF No. 118. Consequently, there are now sixty-three plaintiffs total.

## II.    ANALYSIS

The FSIA-created cause of action for damages does not specify the elements needed to prove a claim. Thus, courts apply "general principles of tort law," looking to such sources as "state decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be well-established standards of state common law, a method which mirrors—but is distinct from—the 'federal common law' approach." Heiser v. Islamic Republic of Iran ("Heiser II"), 659 F. Supp. 2d 20, 24 (D.D.C. 2009).

Each plaintiff has brought claims for loss of solatium, pain and suffering, and punitive damages. Plaintiffs' claims for pain and suffering mirror their claims for solatium and are thus considered as part of their solatium claims.[2] The Court first addresses Plaintiffs' claims for solatium, and then addresses their claims for punitive damages.

### A.    SOLATIUM

"A claim for solatium refers to the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 196 (D.D.C. 2003). In FSIA cases, courts have analyzed solatium claims using an intentional infliction of emotional distress framework. See Surette v. Islamic Republic of Iran, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002).

Consequently, to recover on a claim for solatium, Plaintiffs must prove the following: (1) extreme and outrageous conduct, (2) directed at persons other than Plaintiffs, (3) which

---

[2] In FSIA cases, claims for solatium damages and pain and suffering damages are distinct. Pain and suffering damages are based on the suffering felt by the victim of the terrorist act; loss of solatium claims are based on the grief felt by the victim's family members. See generally Harrison v. Republic of Sudan, 882 F. Supp. 2d 23 (D.D.C. Mar. 30, 2012); Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78 (D.D.C. 2002); Surette v. Islamic Republic of Iran, 231 F. Supp. 2d 260 (D.D.C. 2002). Here, Plaintiffs' claims labeled "pain and suffering" are really claims for solatium because they describe the "extreme emotional damages" suffered by the family members of the victims. Consequently, the Court will consider the allegations labeled "pain and suffering" as part of Plaintiffs' loss of solatium claims.

3

intentionally or recklessly caused severe emotional distress, (4) to such persons' immediate family members who were present at the time the conduct occurred. <u>Valore v. Islamic Republic of Iran</u>, 700 F. Supp. 2d 52, 78 (D.D.C. 2001) (citing RESTATEMENT (SECOND) OF TORTS § 46(1)-(2)(a)). However, in FSIA cases, courts have liberally interpreted the last requirement to require only that the plaintiff be an immediate family member but not that he was physically present. <u>See</u> <u>Murphy v. Islamic Republic of Iran</u>, 740 F. Supp. 2d 51, 76 (D.D.C. 2010) ("One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result.").[3]

In this case, Plaintiffs have proven the first three elements. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." <u>Belkin v. Islamic Republic of Iran</u>, 667 F. Supp. 2d 8 (D.D.C. 2009). Additionally, the conduct was directed at the servicemen, not Plaintiffs. Finally, most of Plaintiffs have satisfied the final requirement. To recover, Plaintiffs must be members of the deceased's "immediate family." Courts have interpreted the "immediate family" requirement to permit recovery only for spouses, children, parents, and siblings. <u>Murphy</u>, 740 F. Supp. 2d at 76. Two of the plaintiffs in this case do not satisfy this requirement. Regrettably, Novella Wiggins, described as the "permanent living companion" and fiancé of deceased serviceman James Rodrick McDaniels, and Sean Walsh, half-brother of deceased serviceman Patrick Howard Roy, may not recover. The

---

[3] The rationale behind this liberal interpretation is that the Restatement has a caveat, which leaves open the possibility of liability in "other circumstances," which suggests that "[i]f the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability." <u>Estate of Heiser v. Islamic Republic of Iran</u>, 659 F. Supp. 2d 20, 26–27 (2009) (quoting Dan B. Dobbs, <u>The Law of Torts</u> § 307, at 834 (2000)). The Court notes that the Restatement Third specifically addresses courts' dismissal of the presence requirement in these cases and expresses skepticism. Comment m to the Restatement ultimately concludes,

> No appellate review of these cases has taken place because the losing party . . . has not appeared in any of them; as well, these cases have been decided outside the ordinary adversarial process because of defendant's default. While this development is worthy of note, it falls well short of the development of [an] exception to the presence requirement that the Institute would endorse.

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 46 (2012).

Court does not deny that these individuals have suffered extreme grief, but precedent has clearly defined the "immediate family" requirement to bar their recovery.

The remaining plaintiffs seek solatium damages as follows: (1) each spouse requests $10 million, (2) each child requests $5 million, (3) each parent requests $5 million, and (4) each sibling requests $2.5 million. Compl., ECF No. 1, at 61–64. There is little justification for how Plaintiffs came upon these figures. The Court assumes that Plaintiffs looked to various FSIA terrorism cases in the District Court for the District of Columbia ("D.D.C.") in which spouses have been awarded between $8 and $12 million, parents have been awarded approximately $5 million, and siblings have been awarded approximately $2.5 million. See Estate of Heiser v. Islamic Republic of Iran ("Heiser I"), 466 F. Supp. 2d 229, 269 (D.D.C. 2006).

Before explaining how the Court calculated the amount of damages appropriate for each eligible plaintiff in this case, the Court notes the unusual nature of these FSIA terrorism cases in general. These cases have been filed almost exclusively in the D.D.C. Because the foreign-nation defendants almost never appear to defend the cases, courts usually enter default judgments. As a result, there is no adversarial party to appeal the cases. Consequently, almost all of the case law has come from a single *district* court. There is not an authoritative body of precedent that governs. Moreover, the Court believes that these claims should not be resolved through the judicial system, but rather are more conducive to resolution through an administrative body. The essence of the court system is its adversarial nature. Nonetheless, since the case is presently before the Court and since the Court acknowledges that Plaintiffs deserve just compensation, the Court will award damages.

In determining the amount of solatium damages to award family members of a victim, courts consider the nature of the relationship between the family member and the victim and the

5

severity of the pain suffered by the family member. Heiser I, 466 F. Supp. 2d at 269. Solatium "began as a remedy for the loss of a spouse or a parent" but "expanded to include the loss of a child." Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 30 (D.D.C. 1998). "Where the claim is based on the loss of a sibling, the claimant must prove a close emotional relationship with the decedent." Id. Since Flatow, the D.D.C. has liberally permitted all spouses, children, parents, and siblings of victims to recover. Although the solatium damages requested by Plaintiffs are within the range of damages awarded by the D.D.C. in prior cases, Plaintiffs have filed in the Eastern District of Virginia; this Court is not bound by D.D.C. precedent. This Court will not follow the amount of damages awarded by the D.D.C. However, it follow the framework adopted by the D.D.C. in assigning a set amount of damages to each category of plaintiff and then adjusting that award based on the specific nature of the plaintiff's relationship with the victim. The Court has determined that the following solatium damages are appropriate for most of these families: (1) $1 million for a spouse, (2) $600,000 for a child, (3) $300,000 for a parent, and (4) $50,000 for a sibling. The Court has reviewed the deposition transcripts of each plaintiff and sees no reason to depart from this framework for the vast majority of Plaintiffs.

Plaintiff Hugh Palmer merits further discussion. The Court finds that Mr. Palmer's relationship with decedent Lakiba Palmer, his daughter, was tenuous. Mr. Palmer's deposition was taken on February 13, 2014. Pl. Ex. 112. Mr. Palmer testified that he has suffered emotionally as a result of her death, struggled with depression, and even tried to "inflict pain" on himself. Id. at 11:18–14:21. However, the Court has reservations about Mr. Palmer's testimony. To begin with, in all of these cases, Plaintiffs were examined only by their own counsel. They were not cross-examined, as Defendant Sudan did not participate. For Mr. Palmer, the fact that he was not cross-examined left many questions unanswered. For instance, Mr. Palmer was not

6

specifically asked about his role in Lakiba's upbringing. Instead, he spoke generally about an "average father and daughter relationship" and going to her track meets, walking the mall, visiting her friends, and going to parks. Id. at 9:3-7. Similarly, in his deposition, Mr. Palmer does not mention that he was never married to Teresa Snell (formerly Teresa Smith), Lakiba's mother, or that he broke up with Ms. Snell when Lakiba was very young.

The Court began to question the veracity of Mr. Palmer's testimony after reviewing the deposition testimony of Teresa Snell. Ms. Snell's deposition was taken on the same day as Mr. Palmer's, February 13, 2014. Pl. Ex. 111 at 1. When asked if Ms. Snell was married to Mr. Palmer, she stated "No . . . . when they [Lakiba and her brother, Kenyon,] were little, he got on drugs, and I just let him go." Id. at 9:19-22. Ms. Snell further explained that the only people who helped her raise her children were her mother and stepfather. Id. at 10:5-6. "That's how Lakiba ended up going into the Service because my stepfather did 20 years, and Lakiba would always talk about it." Id. at 10:6-8.

The Court held an evidentiary hearing on August 25, 2014 to address these discrepancies. At the hearing, Mr. Palmer admitted that he was never married to Ms. Snell. Tr. of Evidentiary Hr'g at 29:14-15, ECF No. 25. He testified that he maintained a relationship with Ms. Snell only for about five to six years after Lakiba was born. Id. at 29:18-21. Mr. Palmer also admitted that during the majority of their relationship, he was not living with Ms. Snell or Lakiba. Id. at 29:22–30:4; id. at 36:24–37:11. Mr. Palmer claims to have provided for Lakiba but did not quantify how much support he provided. Id. at 30:8-11. ("Every week, you know, I would take her to the things that she needed, give Terry the money that she needed for the baby and whatnot."). He admitted that he was never required to pay child support and that he never had custody of Lakiba. Id. at 39:18-23.

Mr. Palmer's testimony at the hearing about the birth of Lakiba's daughter, his alleged granddaughter, further reveals the distance in their relationship. It appears that he did not know that Lakiba was pregnant until he found out from Ms. Snell that Lakiba had had a baby girl. Id. at 32:5-13. Mr. Palmer did not speak to Lakiba until three or four months after she had the baby. Id. at 32:14-18. He also stated that he never traveled to Virginia to see his daughter or his granddaughter because he is afraid of flying.[4] Id. at 32:23–33:5.

Considering all of the facts before it, the Court finds that Mr. Palmer did not have a close relationship with Lakiba Palmer. Consequently, the Court reduces Mr. Palmer's award of solatium damages to $10,000. The Court awards the other plaintiffs the standard amounts explained above and set out in the separate orders to follow this opinion.

## B.    PUNITIVE DAMAGES

Plaintiffs have also requested punitive damages. "Punitive damages, made available under the revised FSIA terrorism exception, serve to punish and deter the actions for which they awarded." Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 55–56 (D.D.C. 2012). "Punitive damages are not meant to compensate the victim, but instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." Id. To determine the proper award for punitive damages, courts consider the following: (1) the character of the defendant's act, (2) the nature and extent of harm to the plaintiff that the defendant caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendant. Flatow, 999 F. Supp. at 32. In FSIA cases, courts have developed a framework for calculating the proper amount of punitive damages. In a related case arising out of the same U.S.S. Cole bombing, the D.D.C. explained:

> Synthesizing these factors, courts in similar cases have generated two numbers

---

[4] The Court notes that Mr. Palmer flew from California to Virginia for this hearing.

> that together, determine the punitive damages award: (1) the multiplicand and (2) the multiplier (the factor by which the multiplicand should be multiplied to yield the desired deterrent effect). Depending on the evidence available, the multiplicand is either the magnitude of defendant's annual expenditures on terrorist activities or the amount of compensatory damages already awarded.

Harrison v. Republic of Sudan, 882 F. Supp. 2d 23, 50 (D.D.C. 2012) (internal citations omitted).

Consequently, the Court must to determine the multiplicand and the multiplier in this case. Because Plaintiffs have not presented any evidence as to Sudan's expenditures on terrorist activities, the Court will use the amount of compensatory damages as the multiplicand. In the Rux litigation, this Court awarded $7,956,344 in economic damages. In this case, the Court awards an additional $20,700,000 in non-economic damages. Thus, the multiplicand is $28,656,344.

Next, the Court must determine the proper multiplier. The D.D.C. has generally used a multiplier of around 3. See Harrison, 882 F. Supp. 2d at 50 ("The multiplier has ranged between three and, in exceptional cases, five."); Estate of Bland v. Islamic Republic of Iran, 831 F. Supp. 2d 150 (D.D.C. 2011) (explaining that 3.44 is the multiplier for all FSIA cases arising out of the Beirut bombing). But see Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163 (D.D.C. 2010) (using a multiplier of 1.03). However, each case is unique and this Court has determined that the proper multiplier in this matter is 0.5. Using 0.5 as the multiplier still results in a punitive damages award in excess of $14 million.

Sudan has already been punished for the underlying conduct. The Court in Harrison, the related case arising out of the bombing of the *U.S.S. Cole*, held Sudan liable for over $230 million in punitive damages alone. Summing the total compensatory and punitive damages awarded by the D.D.C. in Harrison and the total compensatory and punitive damages awarded by this Court in Rux and in the instant opinion, Sudan will be held liable for more than $350 million

in damages for all of the seventeen deaths. This Court in no way condones the actions of Sudan in providing support to terrorists but must recognize that Sudan was not directly involved in the attacks. The Court does not minimize the harm suffered by Plaintiffs but finds that more than $14 million in additional punitive damages is sufficient to deter and punish Sudan. The Court believes that any punitive damages award in excess of this amount would amount to *rewarding* Plaintiffs for the death of a loved one, as opposed to *awarding* them just compensation based on their very real grief.

Therefore, the Court awards Plaintiffs 0.5 times the total compensatory damages, including the economic damages previously awarded in Rux, in punitive damages, to be distributed in proportion to each plaintiff's share of the compensatory award. The orders to follow this opinion will set out these numbers with respect to each plaintiff.

III.    **CONCLUSION**

For the reasons set forth herein, the Court has determined the appropriate amount of damages to be awarded to each plaintiff. On November 15, 2013, this Court ordered that this matter be separated into seventeen distinct cases, so that each decedent was assigned a separate case number. ECF No. 55. This opinion serves to explain the Court's determination as to all seventeen cases. The Court will specify the amount of damages to be awarded in each of the cases in separate orders.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

UNITED STATES DISTRICT JUDGE

Norfolk, VA
March _13_, 2015

10